# Exhibit 1

**STATE OF NORTH CAROLINA**

FILED

2018 MAY 29 P 2:49

MECKLENBURG CO., C.S.C

BY_____

_____ MECKLENBURG _____ County

File No. _10723_ 18-CVS-

In The General Court Of Justice
☐ District ☒ Superior Court Division

| Name Of Plaintiff | |
|---|---|
| Willie Summers | **APPLICATION AND ORDER** |
| **VERSUS** | **EXTENDING TIME TO** |
| Name Of Defendant | **FILE COMPLAINT** |
| City of Charlotte | G.S. 1A-1, Rule 3 |

## APPLICATION

The undersigned requests permission to file a complaint in this action within twenty (20) days of any order granting this Application, as provided in Rule 3 of the Rules of Civil Procedure. The nature and purpose of the action are:

*Name And Purpose Of The Action*

Violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. 2000e et seq., 42 U.S. Code § 1981, and 42 U.S.C. Section 1983.

| Date | Signature | |
|---|---|---|
| 05-29-2018 | *WMBMaloney* | ☐ Applicant ☒ Attorney For Applicant |

## ORDER

The Court states that the nature and purpose of this action are as set forth above.

Therefore, it is ORDERED that permission is granted to the applicant to file a complaint in this action up to and including the date shown below.

| File Complaint On Or Before | Date Of Order |
|---|---|
| 06-18-2018 | 5.29.18 |
| *(Date must be within 20 days of date of Order.)* | Signature |
| | ☒ Assistant Clerk Of Superior Court   ☐ Clerk Of Superior Court |

**NOTE:** *Under Rule 3 of the Rules of Civil Procedure, upon entry of this Order, a summons shall be issued and the summons and a copy of this Order must be served in accordance with the provisions of Rule 4. A complaint must be filed in this action within the period provided above and that complaint must be served in accordance with the provisions of Rule 4 or by registered mail if the plaintiff so elects. If a complaint is not filed within the above period, the action shall abate.*

AOC-CV-101, Rev. 7/11
© 2011 Administrative Office of the Courts

(Over)

MECKLENBURG COUNTY CLERK OF COURT

V4864850          05/31/18  15:37:03

PAYOR: SUMNER,WILLIE
PAYEE: CITY OF CHARLOTTE
CASE#: 18CV8010723 VCAP-Y
CITA#:

| | |
|---|---|
| 21120 SC-CIVIL FEES | 179.05 |
| 21124 SC-CV L&A FEES | .95 |
| 24681 JUD TECH & FAC | 4.00 |
| 22120 CO FAC FEE S CV | 16.00 |
| | |
| TOTAL PAID | 200.00 |
| CO TENDERED | 200.00 |
| CHANGE | .00 |

7918    ID C59KLF

# STATE OF NORTH CAROLINA

MECKLENBURG County

File No. 10723

18-CVS-

Film No.

Name Of Plaintiff

Willie Summers

**VERSUS**

Name Of Defendant(s)

City of Charlotte

## CIVIL SUMMONS
## TO BE SERVED WITH
## ORDER EXTENDING
## TIME TO FILE COMPLAINT

G.S. 1A-1, Rule 4

TO:

Name And Address Of Defendant 1

City of Charlotte
Attn: Marcus Jones, City Manager
600 East 4th Street
Charlotte, NC 28202

TO:

Name And Address Of Defendant 2

## A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or the plaintiff's attorney within thirty (30) days after you have been served with the complaint as authorized in the attached order. You may serve your answer by delivering a copy to the plaintiff or the plaintiff's attorney or by mailing a copy to one of them at his/her last known address.

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)

Margaret B. Maloney
Maloney Law & Associates, PLLC
1824 East Seventh Street
Charlotte, NC 28204

Date 5.29.18    Time 2.49 ☐ AM ☒ PM

Signature

☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court

I certify that this Summons and a copy of the Order were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of this Summons and Order.

☐ By leaving a copy of this Summons and Order at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of this Summons and Order to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Service Accepted By Defendant

| Date Accepted | Time Served ☐ AM ☐ PM | Signature |
|---|---|---|

☐ Other Manner Of Service (specify)

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of this Summons and Order.

☐ By leaving a copy of this Summons and Order at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of this Summons and Order to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Service Accepted By Defendant

| Date Accepted | Time Served ☐ AM ☐ PM | Signature |
|---|---|---|

☐ Other Manner Of Service (specify)

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Date Received | Name Of Sheriff |
|---|---|---|
| Paid By | Date Of Return | County |
| | | Deputy Sheriff Making Return |

AOC-CV-102, Side Two, Rev. 1/10
© 2010 Administrative Office of the Courts

STATE OF NORTH CAROLINA FILED

COUNTY OF MECKLENBURG

WILL SUMMERS, JR., a/k/a WILLIE
SUMMERS,

Plaintiff,

v.

CITY OF CHARLOTTE,

Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18-CVS-10723

**COMPLAINT**
**(Jury Trial Demanded)**

COMES NOW Plaintiff Will Summers, Jr. a/k/a Willie Summers, complaining of Defendant City of Charlotte and alleges as follows:

## PARTIES

1. Plaintiff Will Summers, Jr. a/k/a Willie Summers ("Plaintiff" or "Summers") is an adult citizen and resident of Huntersville, Mecklenburg County, North Carolina.

2. Upon information and belief, Defendant City of Charlotte (the "City" or "Defendant") is organized by City Charter under §160A of the North Carolina General Statutes with its principal office and place of business in Charlotte, Mecklenburg County, North Carolina.

3. Defendant maintains and administers a fire department known as the Charlotte Fire Department (the "CFD" or "Fire Department").

4. To the extent it is applicable, Defendant has adopted a plan of insurance pursuant to N.C. Gen. Stat. § 160-A-485 and has waived its immunity from civil liability.

## JURISDICTION AND VENUE

5. The unlawful practices alleged in this complaint were committed in Mecklenburg County, North Carolina.

1

6. Jurisdiction and venue are proper in this court pursuant to N.C. Gen. Stat. §§ 1-75.4 and 1-79 and 29 U.S.C. § 2617(a)(2).

## ADMINISTRATIVE PROCEDURES

7. Summers timely submitted a charge of discrimination ("Charge") against Defendant with the Equal Employment Opportunity Commission ("EEOC") on or about January 10, 2017.

8. On or about February 27, 2018, Summers received a Notice of Right to Sue from the EEOC entitling him to commence a Title VII action within 90 days of receipt of that notice.

9. Summers timely filed an Application and Order Extending Time to File Complaint on May 29, 2018. N.C. Gen. Stat. § 1A-1, Rule 4.

10. Summers has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

## INTRODUCTION AND NATURE OF ACTION

11. Plaintiff brings this action against Defendant for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), 42 U.S.C. 2000e et seq., 42 U.S. Code § 1981, and 42 U.S.C. Section 1983.

## CITY/CFD HISTORY

12. Initially, Charlotte's fire brigade consisted of segregated volunteer companies.

13. When the City organizing a paid department in the late 19th Century, it excluded Black/African Americans from serving as firefighters, and the City's last black volunteer company disbanded in 1907.

14. There were no Black/African American firefighters from 1907 until 1967.

2

15.     While the CFD first allowed Black/African Americans to serve as firefighters in 1948, the CFD did not actually hire any Black/African Americans as firefighters until 1967. CFD did not promote a Black/African American to Captain until 1977 and did not promote a Black/African American to Battalion Chief until 1984.

16.     Fire Chief Luther Fincher was Fire Chief from 1987 to 2007 ("Chief Fincher," white male"). During the first seventeen (17) years as Fire Chief, Chief Fincher selected a white male for promotion to Deputy Chief every time an opening came up.

17.     Throughout his tenure as Fire Chief, Fincher has periodically changed the selection process for Deputy Chief, at times favoring a formal process and at other times simply handpicking an individual for promotion. It was well known that Chief Fincher did not relate well with people of all races and had even used derogatory racial epithets in the past.

18.     In 1999, during the period when Chief Fincher had an informal promotional process, Fincher selected then-Battalion Chief Jon Hannan ("Hannan" or "Chief Hannan," white male) for promotion to Deputy Chief, even though Hannan only had three (3) years of experience as a Battalion Chief. Under the previous formal process, only Battalion Chiefs with at least four years of experience were considered eligible.

19.     The process was reverted back to a formal promotional process in 2001 when Plaintiff complained about the informal and innately biased process.

## HISTORY OF DISCRIMINATION AFTER CHIEF HANNAN

20.     In 1999, Hannan became the Administrative Deputy Chief under Chief Fincher, assuming responsibility for the CFD promotional process when Division Chief David Taylor retired. The last promotional list under Division Chief Taylor expired in July 2000.

3

21.     Between 2000 and 2007, the overall percentage of Black/African Americans dropped from 15% when Hannan assumed Division Chief Taylor's duties, to 11% immediately prior to Hannan becoming the Fire Chief.  All Black/African American percentages dropped during this time period, except for Captain.

22.     Upon information and belief, since Hannan had been selected for promotion by Chief Fincher informally as part of the good-old-boy cronyism instituted by Chief Fincher, that's how he intended to continue the recruiting, assignment, and promotional process.

23.     Upon information and belief, under Chief Fincher, the CFD was approximately 85% white and approximately 15% Black/African American.

24.     In addition, CFD had the following percentage of black firefighters in leadership:

    a.  Captain: 12%

    b.  Battalion Chief: 22%

    c.  Deputy Chief: 0%

    d.  Fire Chief: 0%

25.     Chief Hannan became Fire Chief in 2007.  Upon information and belief, under Chief Hannan, diversity in leadership with Black/African American employees decreased dramatically and got further away from reflected the racial demographics of Charlotte rather than getting closer.

26.     CFD does not have a good record of hiring, retaining, training, developing, or promoting Black/African American employees.

27.     For example, the CFD has summarily dismissed qualified, dedicated Black/African American firefighter recruits just days or a few weeks before graduation from the CFD Fire

4

Academy without an adequate basis. Indeed, it appears as if the CFD is actively looking for reasons to deny opportunities Black/African American recruit candidates.

28.     Upon information and belief, by 2017, under Chief Hannan, the CFD had the following percentages of Black/African American firefighters and officers:

  e. Total: 10.8%

  f. Captain: 7.7 %

  g. Battalion Chief: 10%

  h. Division Chief: 20%

  i. Deputy Chief: 33.33%

  j. Fire Chief: 0%

29.     Chief Hannan did not take the opportunity to fill the vacancy in the Deputy ranks when Deputy Chief Kinniburgh retired in 2016 as Deputy Chief over Fire Prevention, Fire Investigation, Fire Education, IT, and Communications. After Deputy Chief Kinniburgh's retirement, there were three (3) Deputy Chiefs instead of four (4). This move by Chief Hannan again limited Plaintiff's opportunity for promotion.

30.     Indeed, CFD did not promote a Black/African American to Deputy Fire Chief until December 2004, after three Black/African American Battalion Chiefs sued for failure to promote.

31.     During Chief Hannan's tenure, no Black/African Americans were promoted to Deputy Chief.

32.     The CFD has not promoted a Black/African American above the rank of Battalion Chief since.

33.     Although the CFD provides fundamental civil services to the City, and despite the City's knowledge of dishonesty and retaliation by Chief Hannan, the City failed to properly

investigate, monitor, manage, and correct issues of discrimination and disparate impact within the CFD.

34.     Indeed, unlike the police department, which requires department leaders to take cultural competency/implicit bias/diversity training, the CFD did not require its leadership to take the class and none of them had taken the class voluntarily as of May 2017 when the Eschert case went to trial, a case where the CFD tried unsuccessfully to use race to divide and cover unlawful retaliation by Chief Hannan and his faithful subordinates.

35.     While he worked for the City, Chief Hannan was managed by and responsible to the City Manager, with support from the Office of the City Attorney ("Legal Department") and the Human Resources Department.

36.     Chief Hannan also lobbied for support from City Council members who intervened on his behalf with former City Manager Ron Carlee and City Attorney Hagemann.

37.     Both the City Manager and the City Attorney are hired by and report to the City Council.

38.     Upon information and belief, City Council is prohibited from getting involved in personnel matters, including personnel issues with the Fire Chief.

39.     Upon information and belief, historically, Chief Hannan influenced and lobbied City Council members, directly and indirectly, by leading them to believe that he could influence their voters and opportunities for reelection.

40.     Upon information and belief, as a result, some of the City Council members were willing to lobby on behalf of Chief Hannan with the City Manager and City Attorney.

41.     In Charlotte, both the City Manager and City Attorney are appointed by and report to City Council.  Accordingly, if the City Manager and City Attorney care more about carrying

6

favor with and pleasing City Council members to protect their jobs, they bend to the will of City Council rather than standing up to do the right thing.

42.     The City Attorney and HR Director supported and defended Chief Hannan and deferred to him and his management, even allowing them to investigate themselves when accused of discrimination, harassment, and retaliation.

43.     The City Attorney and HR Director prefer to defer to department heads like Chief Hannan, even when it is not in the best interest of the City or its employees to do so, and at great expense to the taxpayers.

44.     Upon information and belief, City management has a history of deferring to Chief Hannan and not requiring him to follow city policies and procedures, including on the following types of matters: Personnel; Training; Promotions; Discipline; and Terminations.

45.     Upon information and belief, City management and its Legal Department took the position that Chief Hannan does not have to be right in his employment decisions in order for the City to support and defend him against complaints by employees and former employees.

46.     Indeed, under Chief Hannan, the Fire Department engaged in the following preferential treatment of white male fire fighters, including:

    a.  Approval of reimbursement of inappropriate personal expenses for favored senior employees;

    b.  Approval of reimbursement of excessive expenses for favored senior employees;

    c.  Approval of rehiring retirees or paying them as independent contractors; and,

    d.  Approval of paying significant, unnecessary overtime to one individual for work performed rather than delegating the work to multiple individuals.

**PLAINTIFF'S BACKGROUND**

7

47.    Summers is a Black/African American male.

48.    Summers was hired by the City of Charlotte to work in the CFD on or around April 30, 1986. To date, he has enjoyed a 32-year career with the CFD.

49.    Summers was an outstanding employee who was promoted multiple times during his career with the CFD: he was promoted to Fire Fighter II in 1988, promoted to Relief Fire Captain in 1992, and to Battalion Chief in 1999.

50.    Plaintiff pushed himself to obtain all of the degrees he might need in order to be successful in the promotional process. He was conscious of Chief Fincher's decision to institute a four-year degree requirement in December 2003, which effectively eliminated many otherwise well qualified, highly trained, experienced and long-tenured Black/African American candidates.

51.    Plaintiff's educational background includes:

   a. Bachelor of Science:  Physical Education and Health, Wayne State College (1980);
   b. Bachelor of Science: Fire Safety Engineering Technology, UNC-Charlotte (2009) Cum Laude;
   c. Master of Science: Leadership and Emergency Preparedness, Grand Canyon University (2012).

52.    Additionally, Plaintiff acquired the following training and certifications:

   a. Executive Fire Officer Certification;
   b. Haz-Mat Operations;
   c. ICS 200, 300, and 400;
   d. IS 100, 200, 700 and 800;
   e. Operations Section Chief;
   f. Logistics Section Chief;
   g. NC 101 Fire Chief;
   h. Level II Fire Instructor; Fire Officer I and II;
   i. Incident Safety Officer;
   j. EMT certification (EMT-8);
   k. Chair Succession Planning Committee;
   l. Instructor Notional Safety Council;
   m. North Carolina Fire Chief (Executive Development Program);
   n. City of Charlotte Executive Development Program; and,
   o. City of Charlotte Trailblazer Program.

8

53. While working for the CFD, Plaintiff has been a member of the following associations:

    a. North Carolina Association of Fire Chiefs; and
    b. North Carolina State Fireman's Association.

54. In addition to his service for the CFD, Plaintiff participated in the following community service activities:

    a. Directed the City of Charlotte's United Way Campaign (6500 employees from 18 City departments, exceeding goal by 10%);
    b. United Way of Carolinas Advisory Board (2007-09);
    c. Coordinated CFD's Arts & Science Council Fundraiser (exceeding goal by 10%);
    d. Firefighter's Burn Children Fund, Treasurer;
    e. CFD's Accident Review Board (2010-13) (part of the Health Safety Officer's responsibility);
    f. CFD's interview committee for new hires as firefighters (2001-09);
    g. Recruitment of future firefighters;
    h. Coordinated design of CFD Battalion Chief command vehicles;
    i. Mentor to future leaders of the CFD;
    j. Mentor with Big Brother/Big Sisters;
    k. North Star Reading Program (Title I School); and
    l. Loaves & Fishes volunteer.

55. Throughout his tenure with the Fire Department, Plaintiff has dedicated himself to the City, its citizens, and employees of the CFD.

56. Throughout his tenure, Plaintiff has advocated to increase the diversity within the CFD to more closely parallel the citizens it serves; he has taken a particular interest in training and mentoring Black/African American firefighters.

57. In order to improve the diversity in the workplace, equal opportunity for Black African American firefighters, Plaintiff did the following, often during off-duty time:

9

a. Regularly represented CFD Recruitment Division at the CIAA Basketball Tournament, which is a highly attended tournament for historically black colleges hosted yearly in Charlotte;

b. Regularly represented CFD Recruitment Division at Johnson C. Smith University Recruitment Fair. Johnson C. Smith is a local historically black college;

c. Requested educational leave to attend a Public Safety Equity & Diversity conference in 2014, but was denied leave time; and,

d. Mentored young black firefighters.

58. Plaintiff is highly respected by the entire fire department. He has supervised or managed a majority of the chief officers within CFD. He has held management positions over then-Captains Paula McDaniel, David Moore, Shane Nantz, Tim Ramsey, and Justin Field, all of whom have been promoted to chief officers. Plaintiff is an exceptional mentor and leader to black and white firefighters alike.

59. Plaintiff has received a performance review of "exceeds expectations" every year for the past 15 years.

60. In Summers' 2015 review, his supervisor, Deputy Chief Pete Key, wrote:

> During the current year of employee assessment Battalion Chief Willie Summers has exhibited a broad and positive display of the various categories of employee performance. Chief Summers has successfully led his assigned Battalion in the completion of their mandated objectives such as customer service, training, employee development, and community service.
>
> Operationally, Chief Summers has supported the Charlotte Fire Department's vision and mission statement. He responded to a variety of significant incidents, working fires, MVA [motor vehicle accidents] with persons pinned in, and water related incidents. Battalion Chief Summers also responded to other incidents where he served in the various command positions. During all of the incidents Chief Summers exhibited effective leadership and unwavering command presence in successfully bringing the

incidents to closure.

Chief Summers is considered by his peers and by members of Battalion 2(A) as being highly approachable. During the past year he has provided understanding and keen insight to several of his firefighters experiencing distressing situations. He has also provided coaching and career development to some of the rising stars within his battalion.
...
Battalion Chief Willie Summers is a fully committed, loyal, and dedicated Chief Officer.

61. While Plaintiff continued to exceed expectations on his yearly performance reviews, his objectives and goals have remained the same, to continue to advance and be promoted with the CFD.

## PROMOTIONS AND SPECIAL ASSIGNMENTS

62. Plaintiff has reached a glass ceiling and has not been able to rise above it as a Black/African American firefighter who has actively and consistently advocated for equal opportunity and equal terms and conditions of employment for Black/African American firefighters, meaningful training on diversity, race and color, and accountability for recruiting, retaining, and promoting Black/African American employees within the CFD.

### Deputy Chief

63. Plaintiff competed for the position of Deputy Chief in 2015 after the retirement of Deputy Chief Jeff Dulin. Kevin Gordon ("Gordon," white male) was promoted by Chief Hannan for the position.

64. Gordon had very similar training, education, and work experience to Plaintiff, although Plaintiff had been a Battalion Chief six (6) years longer than Gordon at the time of the Deputy Chief promotional process. The one thing that Gordon had over Plaintiff was the many special assignments he was given, including Training Officer, Haz-Mat Captain, and Chief of Training.

65. It is common knowledge that Chief Hannan, as well as Chief Fincher before him, handpicked who they wanted to promote and offered them special assignments, which were then cited as qualifications and experience that set them apart. Special assignments groomed them for later promotion.

66. Plaintiff would have applied for the special assignment of Recruitment Chief in 2009, but the position was not posted. Upon information and belief, the position was not posted because Chief Hannan had already decided who he would give the assignment, and a formal interview process would have been a waste of time.

67. In January 2018, the City supplied the EEOC with a list of special assignments for the past two years, which showed that out of two-hundred seventy (270) special assignments, only seventeen (17) of those were given to non-officer-level Black/African American employees and none of the five (5) officer-level special assignments were assigned to Black/African Americans. Indeed, none of the Black/African American Battalion Chiefs were selected to a special assignment during Chief Hannan's tenure.

68. Special assignments receive a five percent (5%) pay differential, making such a special assignment a promotion. In addition to missing out on the pay differential for the special assignment, Black/African American employees miss out on important opportunities to distinguish themselves from their peers and gain critical knowledge and experience that is worthy of promotion to the highest ranks of the CFD.

69. Plaintiff was denied any feedback on the Deputy Chief promotional process, although at least one other white male candidate received feedback.

12

<u>Division Chief</u>

70. In 2015, the CFD decided to add a layer of management between the Deputy Chiefs and Battalion Chiefs called Division Chief. This level of management was eliminated previously due to budget cuts in 1992.

71. The CFD created five (5) new Division Chief positions for which thirteen (13) people applied.

72. Plaintiff applied for the position of Division Chief in August 2015. Despite his education, training, interest, experience, qualifications, leadership within the CFD, the City, and the Community, and Executive Fire Officer Certification ("EFO Certification"), he was not selected.

73. The individuals promoted include three white males, one Black/African American male, and one white female. Those selected had been promoted to Battalion Chief in the years 2005, 2008, 2009, 2010, and 2011, while Plaintiff had been promoted to Battalion Chief in 1999.

74. Those who were promoted not did not have a history of advocacy for diversity, equal hiring practices, and commitment to mentoring and training Black/African American fire fighters to succeed in the CFD.

75. Additionally, none of the candidates promoted had the experience or training that Plaintiff had: only one of the candidates had a Masters Degree and EFO Certification from the National Fire Academy, which Plaintiff has; upon information and belief, none of these candidates have the City of Charlotte Dimensions in Leadership Certification, upon information and belief, none have completed the National Fire Academy management series, and upon information and belief, none have earned the City of Charlotte Trailblazers Certification, which is a certification given to those trained to identify up and coming minorities employed by the City of Charlotte.

13

76. Upon information and belief, Deputy Chief Gordon told executive members of the Charlotte Fire Fighters Association that the candidates for Division Chief had been chosen before the promotional process even began.

77. Plaintiff did not appeal the promotion denial because, at the time, he was under consideration for a position outside Charlotte and did not want to incite Chief Hannan to retaliate.

78. Indeed, as described in the April 27, 2015 Van Laningham Report issued by the Turning Point Litigation firm (commissioned by the City to investigation the wrongful termination of fire investigator Crystal Eschert), retaliation by Chief Hannan was long standing and well known within the CFD and the City:

   a. That their "independent" investigation "encountered...a distrust of the command staff, specifically Chief Hannan and Deputy Chief Granger."

   b. "There is an environment of distrust in the Fire Department (or at least certain parts of it) that is so significant that it causes many to believe that any infraction of departure from the desires of certain members of the command staff will result in unfair punishment, targeting, and retaliation."

   c. And that members of the CFD "gave voice to a fear that appears widespread that any action deemed undesirable by certain members of the command staff will result in targeting and discipline."

79. Plaintiff's fear of retaliation was common among his peers and a reasonable reaction to the actions he saw taken by his command staff when others complained, voiced opinions different from those of Chief Hannan or Deputy Chief Rich Granger ("Deputy Chief Granger," white male), voiced their concerns, or disagreed with or appealed decisions made their ranking officers.

14

80.    Indeed, Chief Hannan and Deputy Chief Granger had a well-known, deeply ingrained bias against Black/African Americans, in particular, any who were highly respected and had a following within the CFD.

81.    Upon information and belief, there has been no Black/African American in CFD leadership who is more respected than Plaintiff.

82.    Upon information and belief, there has been no Black/African American in CFD leadership who is more sought out for advice and counsel than Plaintiff.

83.    Upon information and belief, there has been no Black/African American in CFD leadership who is more respected by both black and white firefighters than Plaintiff.

84.    Plaintiff has expressed his interest to HR and senior leadership within the CFD in continuing to rise through the ranks of the CFD.

85.    Plaintiff has advocated inside and outside the CFD to improve learning and understanding within the CFD among persons of difference races and colors, including Black and White.

86.    Plaintiff has advocated for a CFD that reflects the population it serves and, in particular, includes the Blacks/African American community.

87.    Plaintiff was promoted to his current position with the CFD during Chief Fincher's tenure as Fire Chief. Upon information and belief, since his promotion to Deputy Chief of Administration, which includes the promotional process, and later as Fire Chief, Chief Hannan and his right-hand operator, Deputy Chief Granger, have blocked Plaintiff's progress and interfered with Plaintiff's career through their ability to:

    a.   Manipulate what positions were posted;

    b.   Manipulate the promotional process and system; and,

    c.  Manipulate and control special assignments.

88.    Upon information and belief, the CFD and the City conceal and facilitate the manipulation of hiring and promotional processes, by among other things:

    a.  Not following/evading the public records laws;

    b.  Allowing/instructing management how to not follow/evade the public records laws;

    c.  Not performing adverse impact analysis;

    d.  Not following their own processes and procedures;

    e.  Continuing processes and procedures they know are unfair and subject to manipulation;

    f.  Allowing conflicts of interest;

    g.  Not maintaining records;

Special Assignment

89.    In May 2016, Plaintiff applied for the special assignment of Health and Safety Officer. Despite his education, interest, experience, qualifications, reputation, and standing, he was not selected.

90.    There were only two people who applied for the position: Plaintiff and a white female. CFD hired the white female for the special assignment although she is not as tenured as Plaintiff; Plaintiff had been a Battalion Chief since 1999, while the white female candidate had only been a Battalion Chief since 2005. And before that, Plaintiff was promoted to Captain in 1992, while the white female candidate was promoted to Captain in 2000.

91.    The May 13, 2016 Competitive Process Memo giving instructions to potential candidates and explaining the assessment process for hiring states that:

16

The successful candidate will be selected through a competitive process based on merit principles. It will consist of the following components:

    a. Submission of an application packet by the established deadline;

    b. Credentials review;

    c. A Deputy Chief interview.

92. While Plaintiff adhered to the process, the white female was given additional information on the position from Deputy Chief Gordon prior to the Deputy Chief's interview.

93. This was deeply upsetting to Plaintiff because he had previously been denied any feedback from the Deputy Chiefs regarding past promotional processes, despite repeated requests.

94. Eventually, Plaintiff quit requesting information and feedback on the promotional process because his experience was that such were futile. Accordingly, upon information and belief, it has been exceptionally frustrating for him to learn that white employees seeking advancement have been treated differently.

95. As noted above, the CFD has a pattern and practice of denying special assignments to Black/African American candidates, and this assessment process falls in line with that pattern and practice.

96. Plaintiff was particularly qualified for this assignment because he has 25 years' experience in a leadership position with the CFD, a Bachelor of Science Physical Education and Health with a minor in Safety, a Bachelor of Science in Fire Safety engineering Technology, a Master of Science in Leadership and Emergency Preparedness, strong yearly performance reviews in which he is consistently rated "exceeds expectations," and he served as Chairman to the CFD's

17

Accident Review Board, which is part of the responsibility of the Health and Safety Officer position for he sought.

97.    During his interview for the special assignment, Chief Kinniburgh asked Plaintiff a question related to Plaintiff's ability to communicate with a diverse group of people outside of the department, but when Plaintiff started to answer the question, Chief Kinniburgh said that it was a rhetorical question. Plaintiff was not given the opportunity to answer the questions because, presumably, the Deputy Chiefs had already determined before the interviews who they would select for the position.

98.    The interviews were simply a formality. Deputy Chief Howard "Pete" Key told Plaintiff later that Plaintiff gave a better interview than the selected candidate. Upon information and belief, although the Deputy Chiefs were supposed to make the decision as to who got the special assignment, the decision on the assignment was actually left to the Fire Chief, who has ultimate authority in hiring, despite the procedures and protocols in place by the City, and upon information and belief, who made the decision ahead of the interviews.

99.    While the City argues that the special assignment that Plaintiff applied for was not a promotion (he would retain the rank of Battalion Chief), the special assignment included a pay differential of 5% and provided valuable experience that Plaintiff would gain in order to be promoted to Division Chief or Deputy Chief later on.

## PLAINTIFF'S GRIEVANCE

100.   On July 26, 2016, Plaintiff filed a grievance with the City based on the CFD's failure to promote based on the candidate's merits and for discrimination and retaliation based on race and color.

18

101.     Plaintiff told the City HR Consultant that he was concerned that the CFD would not be able to fairly review his grievance since the person deciding the grievance had previously unfairly denied him promotions and the special assignment—Chief Hannan.

102.     However, consistent with past precedent, the City continued to allow the CFD to investigate itself and allow Chief Hannan to make decisions even when he had a clear conflict of interest.

103.     Upon information and belief, Chief Hannan has never reversed an internal grievance based on failure to promote.

104.     Upon information and belief, that is because Chief Hannan had knowledge of and involvement in each promotion and assignment—especially in the promotion at the level of Division/Deputy Chief promotion—before the fact and already approved of the promotional decisions being grieved.

105.     Upon information and belief, the City has never reversed Chief Hannan's denial of a grievance filed regarding a promotional decision on appeal to the City Manager's Office.

106.     Upon information and belief, the manipulation of the promotional process under Chief Hannan continues today since he continues to influence the process from outside of the CFD through Deputy Chief Granger and other hand-chosen placements high in the ranks.

107.     Additionally, the City cannot say that the hiring of a new Chief upon Chief Hannan's retirement in 2017 has corrected the problems caused by Chief Hannan's discrimination, failure to promote, and retaliation.

108.     As the City has been so apt to point out in its EEOC position statement, there are only so many positions above Battalion Chief for which Plaintiff could fill and those positions do not come open very often.  The promotions to Deputy Chief, Division Chief, and the special

19

assignment of Health Safety Officer were very big opportunities that will likely not come up again during the duration of Plaintiff's tenure with the CFD.

109.    Upon information and belief, the constant manipulation of the CFD's promotion process created a disincentive for Blacks/African Americans and others to apply for certain promotions.

110.    Upon information and belief, the consistent deferral by the City Manager's Office, City HR and City Legal to Chief Hannan created a disincentive for CFD employees to appeal a decision of the CFD.

111.    Upon information and belief, employees were also afraid to challenge or appeal decisions due to fear of retaliation by senior officers, in particular, Chief Hannan and Deputy Chief Granger.

112.    Upon information and belief, another disincentive to Black/African Americans firefighters' aspiration for promotion and participation in the process was to see the CFD's unfair and discriminatory denial of promotions to Plaintiff, who they considered to be most respected Black/African American chief officer within the CFD.

113.    Ultimately, Plaintiff's July 2016 grievance was reviewed by Chief Hannan, who was named in Plaintiff's grievance. Plaintiff's grievance specifically states that Chief Hannan "has had promotional processes manipulated for his benefit on multiple occasions. Further, the Fire Chief has used the promotional processes of the Charlotte Fire Department to engage in favoritism as well as retaliation against those who speak out against unfair practices. I have been passed over for multiple promotions and appointments (most recently the Health and Safety Officer Position) by the Fire Chief for candidates with lesser qualifications and tenure (resume upon request)." Plaintiff's grievance also states that he believes that he is "being discriminated against based on

race ... [and] being retaliated against for speaking out against unfairness in [the] Charlotte Fire Department."

114. Chief Hannan's September 6, 2016 response to Plaintiff's grievance justifies his hearing of the grievance by stating, "[the decision not to hire Plaintiff for Health and Safety Officer] was made by the deputy chiefs." However, It is widely known that Chief Hannan had ultimate authority and say in who was hired for each and every position, even those who did not report directly to him.

115. Not surprisingly, Chief Hannan concluding that there was "no evidence of favoritism or retaliation. Interestingly, Chief Hannan's response to Plaintiff's grievance says nothing about discrimination, although discrimination based on race and color and retaliation were the basis of Plaintiff's grievance.

## PLAINTIFF'S APPEAL

116. Plaintiff then appealed the decision to the City Manager on September 23, 2016 because of the innate conflict of interest that plagued the CFD's review of Plaintiff's grievance. Plaintiff also complained that Chief Hannan, in his review of the grievance, did not bother to interview Plaintiff and gather all of the relevant facts before making his decision. Upon information and belief, Chief Hannan did not interview any witnesses related to Plaintiff's grievance before making a determination, because his mind was made up before he reviewed it.

117. Plaintiff's appeal was heard by Assistant City Manager Debra Campbell ("ACM Campbell"). Nor surprisingly, Plaintiff was notified via letter dated December 1, 2106, that ACM Campbell was upholding Chief Hannan's decision. That same letter notified Plaintiff that the City Manager's decision was final and that he was not entitled to any further appeals.

21

118. ACM Campbell did indicate, however, that "investigation of your concern did reveal and affirm that there is opportunity for improvement in the Fire Department's promotion and selection process. Specifically, I am strongly recommending that the Fire Department incorporate a formal feedback process at the conclusion of any promotion or selection process."

119. ACM Campbell also stated that "the [fire] department needs to do a better job communicating that the opportunity exists for all interested applicants to seek additional or clarifying information about job opportunities."

120. Upon information and belief, despite these findings, the CFD did not revise its processes in a timely or adequate manner to address the concerns raised or the findings of ACM Campbell.

121. Upon information and belief, despite the City's knowledge of the problems within the CFD's promotional process, the promotional processes continue to have an adverse impact on Black/African American firefighters and officers.

## CONFLICTS OF INTEREST IN THE GRIEVANCE/APPEAL PROCESS

122. Plaintiff's 2016 grievance about race discrimination and retaliation by Chief Hannan was reviewed by Chief Hannan—the very Fire Chief about whom he was complaining. When Plaintiff appealed this bogus decision to the City Manager's office per City grievance and appeal procedures, the City concluded that Chief Hannan upheld the City policies in his review of Plaintiff's grievance.

123. Again, the City was allowed to ignore conflicts of interest and investigate itself and conclude that the policies and procedures in place were being upheld because the policies and procedures regarding the grievance and appeal process did not address conflicts of interest.

124. Upon information and belief, the City has not considered changing its grievance and appeal process to make it less biased and remove the conflict of interest that exists when an entity investigates itself; the CFD grievance policy mirror's the City's grievance policy.

125. So while the City/CFD failed to follow its own policies and procedures when it favored white employees for management positions and discriminated against Black/African Americans, it nevertheless failed to address and correct those policy violations when it allowed the conflicts of interest to exist in the grievance and appeal processes.

## COUNT I
### (Title VII, 42 U.S.C. § 2000e *et seq.* – Race Discrimination, Failure to Promote, and Retaliation against the City)

126. The allegations of the previous paragraphs are realleged and incorporated herein by reference.

127. The City regularly employed more than fifteen (15) employees at all relevant times.

128. Summers is a Black/African American male and is thus a member of a protected class based on his race and color.

129. The City, through its agents, employees, and supervisors, engaged in unlawful discrimination against Summers based on his race and color.

130. As noted above, the CFD has a long history and pattern and practice of denying special assignments and promotions to Black/African American candidates. Chief Hannan and Deputy Chief Granger had a well-known, deeply ingrained bias against Black/African Americans.

131. The City violated Title VII by treating Plaintiff differently than his similarly situated or less qualified peers outside of his protected class in the terms and conditions of his employment.

23

132. Specifically, Plaintiff applied for the special assignment of Health and Safety Officer, which is which is a promotion because of the increased pay differential and it is a stepping stone to future promotions. Despite his education, interest, experience, qualifications, Plaintiff was not selected. Instead, the CFD hired a white female candidate who was less tenured and less qualified than Summers and gave her additional information on the position prior to the Deputy Chief's interview. Plaintiff was also treated differently than his similarly situated or less qualified peers in other ways to be proven at trial.

133. As a result of this race/color-selective and targeted discrimination, Summers was passed over and denied multiple promotions and special assignments because of his race and color.

134. Upon information and belief, as set forth above, there is a widespread belief among members of the CFD that any action deemed undesirable by certain members of the command staff will result in targeting and retaliation.

135. CFD management also targeted Summers for retaliation because he was known for advocating for equal opportunity and equal terms and conditions of employment for Black/African American firefighters, meaningful training on diversity, race/color, and accountability for recruiting, retaining, and promoting Black/African American employees within the CFD.

136. Chief Hannan has manipulated and used the promotional process to engage in favoritism as well as retaliation against those who speak out against unfair practices, including Plaintiff.

137. The City had knowledge of and ratified the acts of unlawful race discrimination and continuing retaliation and failed to take corrective action to remedy the discrimination and continuing retaliation inflicted upon Plaintiff.

138. The City and CFD retaliated against Plaintiff shortly after he engaged in

24

protected activities by repeatedly denying him promotions and special assignments and by failing to afford Plaintiff fair and impartial Grievance and Appeal processes. Chief Hannan failed to properly investigate Plaintiff's Grievance, failed to interview him, and upon information and belief, failed to interview any witness related to Plaintiff's Grievance before making a determination since his mind was made up before he reviewed it. In addition, the City retaliated by upholding Chief Hannan's decision when Plaintiff appealed Chief Hannan's decision of his Grievance, and by failing to revise its promotional and Grievance processes, which have had an adverse impact on Plaintiff and Black/African American firefighters within the CFD.

139.    A causal connection exists between Plaintiff's protected activities and the adverse actions taken against him.

140.    As a result of Plaintiff's protected activities, Plaintiff was passed over and denied multiple promotions and special assignments, including the Health and Safety Officer Position.

141.    To the extent the City purports to have had legitimate, non-discriminatory reasons for taking adverse actions against Plaintiff, such reasons are pretexts for the true reasons, which are his race, color, and legally protected activities as described herein.

142.    The City's conduct, as described above, was without justification or excuse, is reprehensible, and occurred despite Plaintiff's efforts to prevent, halt, and reverse the discrimination, retaliation, and hostile work environment. As a direct and proximate result of the City's unlawful conduct, Plaintiff is now and will continue to be unlawfully deprived of income in the form of wages, compensation, and other monetary and non-monetary benefits due to him, in amounts to be proven at trial.

143.    The City's conduct, as described above, was outrageous and aggravated, and included actual malice, oppression, insult, rudeness, indignity and a reckless and wanton disregard

for his rights and interests under Title VII. As a result, Plaintiff is entitled to an award for punitive damages.

144.    As a result, Plaintiff is entitled to have and recover all damages resulting from the CFD's misconduct in an amount to be proven at trial, including compensatory and consequential damages; reinstatement; injunctive relief to deter similar misconduct in the future; prejudgment interest; reasonable attorney's fees; and the costs of this action.

## COUNT II
### (42 U.S.C. §1981 – Race Discrimination, Failure to Promote, and Retaliation against the City)

145.    The allegations of the previous paragraphs are realleged and incorporated herein by reference.

146.    Summers is a Black/African American male and is thus a member of a protected class based on his race and color.

147.    The City, through its agents, employees, and supervisors, engaged in unlawful and intentional discrimination against Summers based on his race and color.

148.    As noted above, the CFD has a long history and pattern and practice of denying special assignments and promotions to Black/African American candidates. Chief Hannan and Deputy Chief Granger had a well-known, deeply ingrained bias against Black/African Americans.

149.    The City violated Section 1981 by treating Summers differently than his similarly situated or less qualified peers outside of his protected class in the terms and conditions of his employment.

150.    Specifically, Summers applied for the special assignment of Health and Safety Officer, which is which is a promotion because of the increased pay differential and it is a stepping stone to future promotions. Despite his education, interest, experience, qualifications, Summers

was not selected. Instead, the CFD hired a white female candidate who was less tenured and less qualified than Summers and gave her additional information on the position prior to the Deputy Chief's interview.

151. Summers also applied for a Deputy Chief position in 2015 after the retirement of Chief Jeff Dulin, but was denied this promotion and a white male with less tenure than Summers was selected as set forth above. Summers was not given the same opportunities for special assignments as the white male employee who was selected because of his race and color as set forth above.

152. Summers also applied for a Division Chief position in 2015, but was denied Promotion, and four white employees who were less tenured and less qualified than Summers were instead selected as set forth above.

153. Summers was also treated differently than his similarly situated or less qualified peers in other ways to be proven at trial.

154. As a result of this race/color-selective and targeted discrimination, Summers was deprived of the rights afforded to other similarly situated employees outside of his protected class and was passed over and denied multiple promotions and special assignments because of his race and color.

155. Upon information and belief, as set forth above, there is a widespread belief among members of the Fire Department that any action deemed undesirable by certain members of the command staff will result in targeting and retaliation.

156. Fire Department management also targeted Plaintiff for retaliation because he was known for advocating for equal opportunity and equal terms and conditions of employment for Black/African American firefighters, meaningful training on diversity, race/color, and

27

accountability for recruiting, retaining, and promoting Black/African American employees within the CFD.

157.    Chief Hannan has manipulated and used the promotional process to engage in favoritism as well as retaliation against those who speak out against unfair practices, including Summers.

158.    The City had knowledge of and ratified the acts of unlawful race discrimination and continuing retaliation and failed to take corrective action to remedy the discrimination and continuing retaliation inflicted upon Plaintiff.

159.    The City and CFD retaliated against Summers shortly after he engaged in protected activities by repeatedly denying him promotions and special assignments and by failing to afford Summers fair and impartial Grievance and Appeal processes.  Chief Hannan failed to properly investigate Summers' Grievance, failed to interview him, and upon information and belief, failed to interview any witness related to Summers' Grievance before making a determination since his mind was made up before he reviewed it.  In addition, the City retaliated by upholding Chief Hannan's decision when Summers appealed Hannan's decision of his Grievance, and by failing to revise its promotional and Grievance processes, which have had an adverse impact on Plaintiff and Black/African American firefighters within the CFD.

160.    A causal connection exists between Summers' protected activities and the adverse actions taken against him.

161.    As a result of Summers' protected activities, Plaintiff was passed over and denied multiple promotions and special assignments, including but not limited to the Health and Safety Officer Position, the 2015 Deputy Chief position, and the 2015 Division Chief position.

162.    The Fire Department's conduct, as described above, was without justification or

excuse, is reprehensible, and occurred despite Summers efforts to prevent, halt, and reverse the discrimination and retaliation.

163. To the extent the City purports to have had legitimate, non-discriminatory reasons for taking adverse actions against Plaintiff, such reasons are pretexts for the true reasons, which are his race, color, and legally protected activities as described herein.

164. The City's conduct, as described above, was without justification or excuse, is reprehensible, and occurred despite Plaintiff's efforts to prevent, halt, and reverse the discrimination, retaliation, and hostile work environment. As a direct and proximate result of the City's unlawful conduct, Plaintiff is now and will continue to be unlawfully deprived of income in the form of wages, compensation, and other monetary and non-monetary benefits due to him, in amounts to be proven at trial.

165. The City's conduct, as described above, was outrageous and aggravated, and included actual malice, oppression, insult, rudeness, indignity and a reckless and wanton disregard for his rights and interests under §1981. As a result, Plaintiff is entitled to an award for punitive damages.

166. As a result, Summers is entitled to have and recover all damages resulting from the Fire Department's misconduct in an amount to be proven at trial, including compensatory and consequential damages; reinstatement; injunctive relief to deter similar misconduct in the future; prejudgment interest; reasonable attorney's fees; and the costs of this action.

## COUNT III
**(Due Process, Equal Protection, and First Amendment Retaliation - 42 U.S.C. §1983)**

167. The allegations of the previous paragraphs are realleged and incorporated herein by reference.

29

168.  The City acted under color of state law and with reckless or deliberate indifference to Summers' constitutional rights and with malice.

169.  The City deprived Summers of his constitutional rights to equal protection and due process under the Fourteenth Amendment, and retaliated against Summers in violation of his First Amendment

170.  Summer also engaged in protected activity under the First Amendment by speaking out on matters of public concern.

171.  The City's actions toward Plaintiff constitute retaliation.

172.  The City's actions in retaliation for free speech, failure to afford due process, and equal protection deprived Summers of rights, privileges, and immunities secured by the Constitution and violates 42 U.S.C. §1983.

173.  The constitutional rights to free speech, equal protection, and due process were established at the time of the City's actions.

174.  The City knew, or in the exercise of duties should have known, about Summers' constitutional rights.

175.  As a result of this race/color-selective and targeted discrimination Summers was deprived of the rights afforded to other similarly situated employees outside of his protected class and was passed over and denied multiple promotions and special assignments because of his race and color.

176.  As a result of Summers' protected activities, Plaintiff was passed over and denied multiple promotions and special assignments, including but not limited to the Health and Safety Officer Position, the 2015 Deputy Chief position, and the 2015 Division Chief position.

177.  The Fire Department's conduct, as described above, was without justification or excuse, is reprehensible, and occurred despite Summers efforts to prevent, halt, and reverse the discrimination and retaliation.

178.    To the extent the City purports to have had legitimate, non-discriminatory reasons for taking adverse actions against Plaintiff, such reasons are pretexts for the true reasons, which are his race, color, and legally protected activities as described herein.

179.    The City's conduct, as described above, was without justification or excuse, is reprehensible, and occurred despite Plaintiff's efforts to prevent, halt, and reverse the discrimination, retaliation, and hostile work environment. As a direct and proximate result of the City's unlawful conduct, Plaintiff is now and will continue to be unlawfully deprived of income in the form of wages, compensation, and other monetary and non-monetary benefits due to him, in amounts to be proven at trial.

180.    The City's conduct, as described above, was outrageous and aggravated, and included actual malice, oppression, insult, rudeness, indignity and a reckless and wanton disregard for his rights and interests under §1983. As a result, Plaintiff is entitled to an award for punitive damages.

181.    As a result, Summers is entitled to have and recover all damages resulting from the Fire Department's misconduct in an amount to be proven at trial, including compensatory and consequential damages; reinstatement; injunctive relief to deter similar misconduct in the future; prejudgment interest; reasonable attorney's fees; and the costs of this action.

182.    As a result, Summers is entitled to have and recover all damages resulting from the Fire Department's misconduct in an amount to be proven at trial, including compensatory and consequential damages; reinstatement; injunctive relief to deter similar misconduct in the future; prejudgment interest; reasonable attorney's fees; and the costs of this action.

31

## COUNT IV
### (Article I, Section 1, Constitution of the State of North Carolina)

183.    The allegations contained in the foregoing paragraphs are realleged and incorporated by reference.

184.    Article I, Section 1 of the North Carolina State Constitution provides:

Section 1. The equality and rights of persons.

We hold it to be self-evident that all persons are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness.

185.    No North Carolina state law provides a private right of action for a public employee to bring based on the failure to promote, leaving Plaintiff no other recourse to obtain relief for his injury under state law.

186.    CFD has a legitimate governmental interest in selecting qualified candidates to fill the Health Safety Officer position.  On its face, the Competitive Process Memo would identify successful candidates through a competitive process based on merit principles including: submission of an application packet by the established deadline; credentials review; and a Deputy Chief interview.

187.    Upon information and belief, CFD had a policy and practice implemented by Chief Hannan to preselect their preferred candidate based upon their own personal preferences and not the objective qualifications in the memo.

188.    Plaintiff was not selected based upon the personal, arbitrary preferences of Chief Hannan and implemented by Deputy Chief Granger in violation of the stated qualifications in the Competitive Process Memo.

189.    The arbitrary selection of the white female for the position was not based upon the actual qualifications of the candidate as Plaintiff had been a Battalion Chief since 1999, while the

white female candidate had only been a Battalion Chief since 2005. And before that, Plaintiff was promoted to Captain in 1992, while the white female candidate was promoted to Captain in 2000.

190. The review by ACM Campbell only served to provide additional evidence of the arbitrary nature of the selection process by the statement that there were problems with CFD's promotion and selection process.

191. There are only so many positions above Battalion Chief for which Plaintiff could fill and those positions do not come open very often. The promotions to Deputy Chief, Division Chief, and the special assignment of Health Safety Officer were very big opportunities that will likely not come up again during the duration of Plaintiff's tenure with the CFD.

192. By denying Plaintiff's promotion due to the arbitrary and irrational qualities preferred by Chief Hannan, Plaintiff was denied the enjoyment of the fruits of his own labor, in violation of the North Carolina Constitution.

193. As a result of Defendant's actions, Plaintiff is entitled to have and recover all damages including direct consequential, general, compensatory, special, and emotional distress damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays the Court as follows:

1. Pursuant to Count I (First Amendment Violation – The Complaints of Risks to Health and Safety and of Financial Mismanagement), that Plaintiff have and recover all damages including reinstatement, compensatory, back pay, front pay, benefits, costs of this action and attorney's fees, pursuant to 42 U.S.C. § 1988;

33

2.      Pursuant to Count II (First Amendment Violation – The Facebook Postings), that Plaintiff have and recover all damages including reinstatement, compensatory, back pay, front pay, benefits, costs of this action and attorney's fees, pursuant to 42 U.S.C. § 1988;

3.      Pursuant to Count III (Union Activity and Association), that Plaintiff have and recover all damages resulting from the Fire Department's misconduct in an amount to be proven at trial, including compensatory and consequential damages; reinstatement; injunctive relief to deter similar misconduct in the future; prejudgment interest; reasonable attorney's fees; and the costs of this action;

4.      Pursuant to Count IV (Article I, Section 1, Constitution of the State of North Carolina) to have and recover all damages including direct consequential, general, compensatory, special, and emotional distress damages

5.      That this matter be tried by a jury; and

6.      That the Court grant such other and further relief as this Court may deem just, proper, and equitable.

Respectfully submitted, this the 18th day of June, 2018.

MALONEY LAW & ASSOCIATES, PLLC

Margaret Behringer Maloney, N.C. Bar 13253
Jennifer Diane Spyker, N.C. Bar 46048
1824 E. Seventh Street
Charlotte, NC 28201
mmaloney@maloneylegal.com
Telephone: 704-632-1622
Facsimile: 704-632-1623
*Attorney for Plaintiff*

34

# STATE OF NORTH CAROLINA

_____Mecklenburg_____ County

File No.
18-CVS-

Film No.
10723

In The General Court Of Justice
☐ District   ☒ Superior Court Division

*Name Of Plaintiff*

Will Summers, Jr., a/k/a Willie Summers

**VERSUS**

**DELAYED SERVICE OF COMPLAINT**

*Name Of Defendant*

City of Charlotte

G.S. 1A-1, Rules 3 & 4

| TO: | TO: |
|---|---|
| *Name And Address Of Defendant 1* <br> City of Charlotte <br> Attn: Marcus Jones, City Manager <br> 600 East 4th Street <br> Charlotte, NC 28202 | *Name And Address Of Defendant 2* |

You are being served with a copy of the complaint in this action, the delayed filing of which was ordered when the summons was issued. You must:

1. Serve a copy of your written answer to the complaint upon the plaintiff or the plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or the plaintiff's attorney or by mailing a copy to one of them at his/her last known address.

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)* <br> Margaret B. Maloney <br> Maloney Law & Associates, PLLC <br> 1824 East Seventh Street <br> Charlotte, NC 28204 | Date 6/8/18 | Time 4:47 ☐ AM ☒ PM |
|---|---|---|
| | Signature *Kim Verg* | |
| | ☒ *Deputy CSC*   ☐ *Assistant CSC*   ☐ *Clerk Of Superior Court* | |

CITY ATTORNEY'S OFFICE

OCT 1 7 2018

AOC-CV-103, Rev. 1/10
© 2010 Administrative Office of the Courts

Original File   Copy-Each Defendant   Copy-Attorney/Plaintiff
(Over)

## RETURN OF SERVICE

I certify that this Document and a copy of the Complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of this Document and Complaint.

☐ By leaving a copy of this Document and Complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of this Document and Complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Service Accepted By Defendant

| Date Accepted | Time Served ☐ AM ☐ PM | Signature |
|---|---|---|

☐ Other Manner Of Service (specify)

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of this Document and Complaint.

☐ By leaving a copy of this Document and Complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of this Document and Complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Service Accepted By Defendant

| Date Accepted | Time Served ☐ AM ☐ PM | Signature |
|---|---|---|

☐ Other Manner Of Service (specify)

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Date Received | Name Of Sheriff |
|---|---|---|
| Paid By | Date Of Return | County |
| | | Deputy Sheriff Making Return |

AOC-CV-103, Side Two, Rev. 1/10
© 2010 Administrative Office of the Courts

# STATE OF NORTH CAROLINA

▶ File No.
18CVS10723

<u>MECKLENBURG</u> County

In The General Court Of Justice
☐ District ☒ Superior Court Division

| | |
|---|---|
| *Name Of Plaintiff*<br>Will Summers, Jr., a/k/a Willie Summers<br>*Address*<br>c/o Maloney Law and Assocaites, PLLC, 1824 East Seventh Street<br>*City, State, Zip*<br>Charlotte, NC 28204 | **CIVIL SUMMONS**<br>☒ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**<br><br>G.S. 1A-1, Rules 3, 4 |
| **VERSUS** | *Date Original Summons Issued*<br>05-29-2018 |
| *Name Of Defendant(s)*<br>City of Charlotte | *Date(s) Subsequent Summons(es) Issued* |

## To Each Of The Defendant(s) Named Below:

| *Name And Address Of Defendant 1* | *Name And Address Of Defendant 2* |
|---|---|
| City of Charlotte<br>Attn: Marcus Jones, City Manager<br>600 East 4th Street<br>Charlotte, NC 28202 | CITY ATTORNEY'S OFFICE |

OCT 1 7 2018

### A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)*<br>Margaret B. Maloney<br>Maloney Law & Associates, PLLC<br>1824 East Seventh Street<br>Charlotte, NC 28204 | *Date Issued*<br>8. 8/18 | *Time*<br>3:15 | ☐ AM<br>☒ PM |
|---|---|---|---|
| | *Signature* | | |
| | ☒ Deputy CSC | ☐ Assistant CSC | ☐ Clerk Of Superior Court |

| ☐ ENDORSEMENT (ASSESS FEE)<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement* | *Time* | ☐ AM<br>☐ PM |
|---|---|---|---|
| | *Signature* | | |
| | ☐ Deputy CSC | ☐ Assistant CSC | ☐ Clerk Of Superior Court |

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100, Rev. 6/11
© 2011 Administrative Office of the Courts

(Over)

| | RETURN OF SERVICE | |
|---|---|---|

I certify that this Summons and a copy of the complaint were received and served as follows:

## DEFENDANT 1

| *Date Served* | *Time Served* ☐ AM ☐ PM | *Name Of Defendant* |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

## DEFENDANT 2

| *Date Served* | *Time Served* ☐ AM ☐ PM | *Name Of Defendant* |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason.

| *Service Fee Paid* $ | *Signature Of Deputy Sheriff Making Return* |
|---|---|
| *Date Received* | *Name Of Sheriff (Type Or Print)* |
| *Date Of Return* | *County Of Sheriff* |

# STATE OF NORTH CAROLINA

MECKLENBURG County

In The General Court Of Justice
☐ District  ☒ Superior Court Division

**Name Of Plaintiff**
Will Summers, Jr., a/k/a Willie Summers

**Address**
c/o Maloney Law and Assocaites, PLLC, 1824 East Seventh Street

**City, State, Zip**
Charlotte, NC 28204

## VERSUS

**Name Of Defendant(s)**
City of Charlotte

## CIVIL SUMMONS
☒ ALIAS AND PLURIES SUMMONS (ASSESS FEE)

G.S. 1A-1, Rules 3, 4

**Date Original Summons Issued**
05-29-2018

**Date(s) Subsequent Summons(es) Issued**
08/08/2018

---

### To Each Of The Defendant(s) Named Below:

**Name And Address Of Defendant 1**
City of Charlotte
Attn: Marcus Jones, City Manager
600 East 4th Street
Charlotte, NC 28202

**Name And Address Of Defendant 2**

CITY ATTORNEY'S OFFICE

OCT 1 7 2018

---

### A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

**Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)**
Margaret B. Maloney
Maloney Law & Associates, PLLC
1824 East Seventh Street
Charlotte, NC 28204

**Date Issued** 10/9/18     **Time** 3:14  ☐ AM ☒ PM

**Signature** Rosa Vasq

☒ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court

---

☐ ENDORSEMENT (ASSESS FEE)
This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.

**Date Of Endorsement**     **Time**  ☐ AM ☐ PM

**Signature**

☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court

---

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100, Rev. 6/11
© 2011 Administrative Office of the Courts

(Over)

| | RETURN OF SERVICE | |
|---|---|---|

I certify that this Summons and a copy of the complaint were received and served as follows:

## DEFENDANT 1

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

## DEFENDANT 2

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason.

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (Type Or Print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 6/11
© 2011 Administrative Office of the Courts

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

WILL SUMMERS, JR., a/k/a WILLIE
SUMMERS,

Plaintiff,

v.

CITY OF CHARLOTTE,

Defendant.

FILED

2018 OCT -9 PM 3: 14

MECKLENBURG CO., C.S.C

BY___

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18-CVS-10723

**AMENDED**
**COMPLAINT**
**(Jury Trial Demanded)**

COMES NOW Plaintiff Will Summers, Jr. a/k/a Willie Summers, complaining of Defendant City of Charlotte and alleges as follows:

## PARTIES

1.      Plaintiff Will Summers, Jr. a/k/a Willie Summers ("Plaintiff" or "Summers") is an adult citizen and resident of Huntersville, Mecklenburg County, North Carolina.

2.      Upon information and belief, Defendant City of Charlotte (the "City" or "Defendant") is organized by City Charter under §160A of the North Carolina General Statutes with its principal office and place of business in Charlotte, Mecklenburg County, North Carolina.

3.      Defendant maintains and administers a fire department known as the Charlotte Fire Department (the "CFD" or "Fire Department").

4.      To the extent it is applicable, Defendant has adopted a plan of insurance pursuant to N.C. Gen. Stat. § 160-A-485 and has waived its immunity from civil liability.

## JURISDICTION AND VENUE

5.      The unlawful practices alleged in this complaint were committed in Mecklenburg County, North Carolina.

6. Jurisdiction and venue are proper in this court pursuant to N.C. Gen. Stat. §§ 1-75.4 and 1-79 and 29 U.S.C. § 2617(a)(2).

## ADMINISTRATIVE PROCEDURES

7. Plaintiff timely submitted a charge of discrimination ("Charge") against Defendant with the Equal Employment Opportunity Commission ("EEOC") on or about January 10, 2017.

8. On or about February 27, 2018, Plaintiff received a Notice of Right to Sue from the EEOC entitling him to commence a Title VII action within ninety (90) days of receipt of that notice.

9. Plaintiff timely filed an Application and Order Extending Time to File Complaint on May 29, 2018. N.C. Gen. Stat. § 1A-1, Rule 4.

10. Plaintiff timely filed a Complaint on June 18, 2018.

11. Plaintiff now timely files this Amended Complaint as of right.

12. Plaintiff has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

## INTRODUCTION AND NATURE OF ACTION

13. Plaintiff brings this action against Defendant for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), 42 U.S.C. § 1981, 42 U.S.C. § 1983, and Article I Sections 1, 14, and 19 of the North Carolina Constitution.

## CITY/CFD HISTORY

14. In its nascent years, the City's fire brigade consisted of segregated volunteer companies.

2

15.    When the City organized a paid department in the late 19th Century, it excluded Black/African Americans from serving as firefighters, and the City's last black volunteer company disbanded in 1907.

16.    The City did not hire any Black/African American firefighters from 1907 until 1967.

17.    The Civil Service Act passed in 1939 allowed "all persons possessing the rights of suffrage" to apply for employment with the CFD. Act of Mar. 28, 1939 ch. 366, § 49(2), 1936 N.C. Law 394 (codifying certain statutes comprising the City Charter including the Civil Service Act). However, this limited Black/African American candidates, many of whom did not have suffrage rights as a result of the literacy test requirement passed by the North Carolina Legislature in 1899, which aimed to disenfranchise and exclude black voters. Act of Feb. 21, 1899, ch. 218, 1899 N.C. Law 341 (amending the North Carolina State Constitution to add literacy test to disenfranchise black voters). However, illiterate white men were grandfathered in and allowed to keep their voting rights. Id. Accordingly, Black/African American candidates were not fully allowed to apply for employment on the same footing as their white counterparts until 1947, when the language was changed to allow all persons "between the ages of twenty-one and thirty [to apply for employment]." Act of Apr. 5, 1947, ch. 1033, § 1(i), 1947 N.C. Law 1513 (amending the language of Civil Service Act). So although the law changed so that the CFD could legally hire Black/African American firefighters in 1947, the CFD did not actually hire any Black/African Americans until 1967—a fully twenty years later.

18.    CFD did not promote a single Black/African American to Captain until 1977 and did not promote a single Black/African American to Battalion Chief until 1984. The first Black/African American female firefighter (Linda Lockhart) was not hired until 1981. The CFD

did not promote a Black/African American to Deputy Fire Chief until December 2004, after three Black/African American Battalion Chiefs sued for failure to promote. Even then, the City only promoted the plaintiff who dropped out of the lawsuit.

19.    Fire Chief Luther Fincher was Fire Chief from 1987 to 2007 ("Chief Fincher," white male). During the first seventeen (17) years as Fire Chief, Chief Fincher selected a white male for promotion to Deputy Chief every time an opening came up.

20.    Throughout his tenure as Fire Chief, Fincher periodically changed the selection process for Deputy Chief, at times favoring a formal process, and at other times simply handpicking individuals for promotion.

21.    In 1999, when Chief Fincher had an informal promotional process in place, Fincher selected then-Battalion Chief Jon Hannan ("Hannan" or "Chief Hannan," white male) for promotion to Deputy Chief, even though Hannan only had three (3) years of experience as a Battalion Chief. Under the previous formal process, only Battalion Chiefs with at least four (4) years of experience were considered eligible.

22.    The process reverted back to a formal promotional process in 2001 when Plaintiff complained about the informal and innately biased process.

23.    While Plaintiff did not file a lawsuit at the time, he did complain to the Fire Chief that the promotional process in place was inherently biased and discriminated against qualified and experienced Black/African Americans with seniority. He took issue that the process was not merit based and pointed out his concerns for the betterment of the CFD as a whole. Plaintiff firmly believed that the CFD would benefit from fair promotional processes that advanced firefighters based on merit, regardless of race.

# HISTORY OF DISCRIMINATION UNDER CHIEF HANNAN

24.     In 1999, Hannan became the Administrative Deputy Chief under Chief Fincher, assuming responsibility for the CFD promotional process when Division Chief David Taylor retired. The last promotional list under Division Chief Taylor expired in July 2000.

25.     Upon information and belief, during the relevant time, Deputy Chief promotions were treated more as an appointment or special assignment since they were not approved by the Civil Service Board.

26.     With Hannan as the Administrative Deputy Chief, the overall percentage of Black/African Americans in the CFD dropped from 15% in 2000 to 11% in 2007. All Black/African American percentages dropped during this time period, except for Captain.

27.     Upon information and belief, since Hannan had been informally selected for promotion by Chief Fincher as part of the good-old-boy cronyism instituted by Chief Fincher, which Hannan continued through recruiting, assignment, and promotional processes, even if it meant not following the written promotion and transfer policies.

28.     Upon information and belief, under Chief Fincher, the CFD was approximately 85% white and approximately 15% Black/African American.

29.     Upon information and belief, in 2000, the area served by the CFD was 27.9% Black/African American.

30.     In addition, CFD had the following percentages of black firefighters in leadership:

   a.  Captain: 12%

   b.  Battalion Chief: 22%

   c.  Deputy Chief: 0%

   d.  Fire Chief: 0%

31.    Chief Hannan became Fire Chief in 2007.  Upon information and belief, under Chief Hannan, diversity in leadership with Black/African American employees decreased dramatically and got further away from reflecting the racial demographics of Charlotte rather than getting closer.

32.    CFD does not have a good record of hiring, retaining, training, developing, or promoting Black/African American employees.

33.    For example, upon information and belief, the CFD has summarily dismissed qualified, dedicated Black/African American firefighter recruits just days or a few weeks before graduation from the CFD Fire Academy without an adequate basis.  Indeed, it appears as if the CFD is actively looking for reasons to deny opportunities to Black/African American recruit candidates.

34.    Upon information and belief, by 2017, under Chief Hannan, the CFD had the following percentages of Black/African American firefighters and officers:

   a.  Total: 10.8%

   b.  Captain: 7.7 %

   c.  Battalion Chief: 10%

   d.  Division Chief: 20%

   e.  Deputy Chief: 33.33%

   f.  Fire Chief: 0%

35.    Upon information and belief, in 2017, the area served by the CFD was 32.8% Black/African American.

36.    Chief Hannan did not take the opportunity to fill the vacancy in the Deputy ranks when Deputy Chief Kinniburgh retired in 2016 as Deputy Chief over Fire Prevention, Fire

Investigation, Fire Education, IT, and Communications. After Deputy Chief Kinniburgh's retirement, there were three (3) Deputy Chiefs instead of four (4). This move by Chief Hannan again limited Plaintiff's opportunity for promotion.

37. Upon information and belief, Deputy Chief Kinniburgh's position was not filled to deprive Plaintiff and others not in Chief Hannan's inner circle from applying, especially since Plaintiff, upon information and belief, was widely regarded as the most qualified of the potential internal candidates.

38. Under Chief Hannan, the Fire Department engaged in the following preferential treatment of white male fire fighters, including:

      a. Approval of reimbursement of inappropriate personal expenses for favored senior employees;

      b. Approval of reimbursement of excessive expenses for favored senior employees;

      c. Approval of rehiring retirees or paying them as independent contractors;

      d. Approval of paying significant, unnecessary overtime to one individual for work performed rather than delegating the work to multiple individuals;

      e. Manipulation of hiring and promotional processes; and,

      f. Manipulation of opportunities and special assignments within the CFD.

39. Unlike the police department, which requires its department leaders to take cultural competency/implicit bias/diversity training, the CFD does not require its leadership to take the class. None of them had taken the class voluntarily as of May 2017, when the Eschert case went to trial, a case where the CFD unsuccessfully tried to use race as a weapon to divide and to cover

up unlawful retaliation by Chief Hannan and the faithful subordinates he used to implement his retaliation.

40. Upon information and belief, the classes have not been mandated within the CFD since then, either by the CFD or the City, and the classes have not been encouraged or required by City Council.

41. Despite the City's knowledge of dishonesty and retaliation by Chief Hannan, head of the CFD, a department that provides fundamental services to the City, the City failed to properly investigate, monitor, manage, and correct issues of race and color discrimination, disparate impact, and retaliation, First Amendment violations, and violations of other constitutional rights, and also failed to provide substantive and procedural due process to firefighters and other CFD employees in promotions, transfers, special assignments, grievances, and appeals within the CFD under Chief Hannan.

42. Under Chief Hannan, the City and the Fire Department engaged in the following violations of substantive and procedural due process to allow or ratify retaliatory, arbitrary, discriminatory, irrational, and/or improperly motivated abuses of power in violation of Plaintiff's state and federal legal rights, including, upon information and belief:

   a. Not following written policies and procedures related to promotions, transfers, and special assignments;

   b. Adopting written policies and procedures related to promotions, transfers, or special assignments that are arbitrary or capricious or otherwise fail to provide fundamental fairness to employees;

c. Failing to adopt written policies and procedures related to promotions, transfers, or special assignments that are not arbitrary or capricious or otherwise subject to improper manipulation;

d. Allowing unwritten *ad hoc* policies and procedures related to promotions, transfers, and special assignments, which are implemented in an arbitrary, capricious, or unfair manner to make selections based on bias, nepotism, or favoritism;

e. Allowing individuals with conflicts of interest or personal agendas to design, implement or manipulate policies and procedures related to promotions, transfers, and special assignments;

f. Allowing promotions, transfers, and special assignments to be awarded to employees who do not meet the minimum requirements for the position at issue;

g. Not correcting known violations of substantive and procedural due process related to promotions, transfers, or special assignments;

h. Not following written policies and procedures related to appeals and grievances;

i. Adopting written policies and procedures for grievances and appeals that are arbitrary or capricious or otherwise fail to provide fundamental fairness to employees;

j. Failing to adopt written policies and procedures for grievances and appeals that are not arbitrary, capricious, discriminatory, unfair, or in violation of

procedural and substantive due process and constitutional rights of employees;

k. Allowing the CFD to investigate itself;

l. Allowing individuals with conflicts of interest or personal agendas to serve as decision makers or otherwise be involved in decisions related to promotions, transfers, special assignments, grievances or appeals; and

m. Not keeping records, altering records, or creating fraudulent records to cover up and conceal violations of procedural and substantive due process and constitutional and legal rights.

43.     Although the City is on notice, including upon information and belief, the current Fire Chief, Director of HR, City Manager, and City Attorney, it has failed to act to correct and prevent the many wrongful acts described and alleged in this lawsuit. The failure to act is part of a longstanding pattern and practice of behavior by those with a duty to act including the City Manager's office, the HR Director, and the Legal Department.

44.     While he worked for the City, Chief Hannan was managed by and reported to the City Manager, with support from the Office of the City Attorney ("Legal Department") and the Human Resources Department.

45.     Chief Hannan also repeatedly lobbied for support from City Council members who intervened on his behalf with former City Manager Ron Carlee and City Attorney Robert Hagemann.

46.     Upon information and belief, City Council is prohibited from getting involved in personnel matters, including personnel issues with the Fire Chief.

47.     Upon information and belief, historically, Chief Hannan influenced and lobbied City Council members, directly and indirectly, and led them to believe that he could influence their voters and opportunities for reelection.

48.     Upon information and belief, as a result, City Council lobbied on his behalf with the City Manager and the City Attorney, although City Council, the City Manager, and the City Attorney knew, or had reason to know, about Chief Hannan's longstanding pattern of dishonesty, retaliation, and manipulation, including violations of state and federal laws.

49.     In Charlotte, both the City Manager and City Attorney are appointed by and report to City Council. Accordingly, if the City Manager and City Attorney care more about carrying favor with and pleasing City Council members to protect their jobs, they bend to the will of City Council members rather than standing up to do the right thing.

50.     The City Attorney and HR Director supported and defended Chief Hannan and deferred to him and his management, even allowing him and those acting in concert with him to investigate themselves when accused of discrimination, harassment, and retaliation, and allowing them to evade and violate the public records laws.

51.     The City Manager, City Attorney, and HR Director supported, defended, deferred to, and ratified the actions and inactions of Chief Hannan and CFD Management even when such actions are in violation of procedural and substantive due process rights applicable to all City employees regardless of race or color, and applicable, in particular, to CFD firefighters.

52.     The City Attorney and HR Director prefer to defer to department heads like Chief Hannan, even when it is not in the best interest of the City or its employees to do so, and at great expense to the taxpayers.

53.     Upon information and belief, City management, including the City Manager, City Attorney, and HR Director, had a history of deferring to Chief Hannan and not requiring him to follow city policies and procedures, including but not limited to on the following types of matters: Personnel; Training; Promotions; Discipline; Terminations; Grievances; and Appeals.

54.     Upon information and belief, City management and its Legal Department consistently have taken the position that Chief Hannan does not have to be right in his employment decisions in order for the City to support and defend him against complaints by employees and former employees.

55.     Upon information and belief, they have adopted this same "hands off" approach to those put in place by Chief Hannan to continue his pattern and practice of manipulation, bias, discrimination and retaliation, placing bias(es), nepotism, favoritism, and revenge over merit.

56.     City Management and its Legal Department with the support of City Council have used the City's personnel and financial resources to support and defend the past and continuing wrongful acts of the CFD and its management, at exorbitant expense, and continue to support and defend the continuation of that pattern and practice since Chief Hannan's departure.

57.     The policies, procedures, and practices of CFD and the City discourage employees from bringing forward complaints or issues of discrimination, harassment, retaliation, and violations of procedural and substantive due process rights.

## PLAINTIFF'S BACKGROUND

58.     Plaintiff is a Black/African American male.

59.     Plaintiff was hired by the City of Charlotte to work in the CFD on or around April 30, 1986. He enjoyed a 32-year career with the CFD.

60.     Plaintiff was an outstanding employee who was promoted multiple times during his career with the CFD: he was promoted to Fire Fighter II in 1988, promoted to Relief Fire Captain in 1992, and to Battalion Chief in 1999.

61.     Plaintiff pushed himself to obtain all of the degrees he might need in order to be successful in the promotional process. He was conscious of Chief Fincher's decision to institute a four-year degree requirement in December 2003, which effectively eliminated many otherwise well qualified, highly trained, experienced, and long-tenured Black/African American candidates.

62.     Plaintiff's educational background includes:

    a.  Bachelor of Science: Physical Education and Health, Wayne State College (1980);
    b.  Associate of Arts: Fire Protection Technology, CPCC (1999);
    c.  Bachelor of Science: Fire Safety Engineering Technology, UNC-Charlotte, *cum laude* (2009); and,
    d.  Master of Science: Leadership and Emergency Preparedness, Grand Canyon University (2012).

63.     Additionally, Plaintiff currently has the following training and certifications:

    a.  Executive Fire Officer Certification;
    b.  Haz-Mat Operations;
    c.  ICS 200, 300, and 400;
    d.  IS 100, 200, 700 and 800;
    e.  Operations Section Chief;
    f.  Logistics Section Chief;
    g.  NC 101 Fire Chief;
    h.  Level II Fire Instructor; Fire Officer I and II;
    i.  Incident Safety Officer;
    j.  EMT certification;
    k.  Chair Succession Planning Committee;
    l.  Instructor National Safety Council;
    m.  North Carolina Fire Chief (Executive Development Program);
    n.  City of Charlotte Executive Development Program;
    o.  Chief Fire Officer Designation (CSPE); and,
    p.  City of Charlotte Trailblazer Program.

64.     While working for the CFD, Plaintiff has been a member of the following associations:

a. North Carolina Association of Fire Chiefs; and
b. North Carolina State Fireman's Association.

65. In addition to his service for the CFD, Plaintiff participated in the following community service activities:

a. Directed the City of Charlotte's United Way Campaign (6500 employees from 18 City departments, exceeding goal by 10%);
b. United Way of Carolinas Advisory Board (2007-2009);
c. Chaired the CFD United Way Campaign;
d. Coordinated CFD's Arts & Science Council Fundraiser (exceeding goal by approximately 10%);
e. Firefighter's Burn Children Fund, Treasurer;
f. Chairperson for CFD's Accident Review Board (part of the Health Safety Officer's responsibility) (2010-2013);
g. Chaired CFD's United Way Campaign;
h. CFD's interview committee for new hires as firefighters (2001-2009);
i. Recruitment of future firefighters;
j. Coordinated design of CFD Battalion Chief command vehicles;
k. Mentor to future leaders of the CFD;
l. Mentor with Big Brother/Big Sisters;
m. North Star Reading Program (Title I School); and
n. Loaves & Fishes Volunteer.

66. Throughout his tenure with the Fire Department, Plaintiff has dedicated himself to the City, its citizens, and the employees of the CFD.

67. Plaintiff is conscious of how past institutional race discrimination still affects the CFD. As a result, Plaintiff has advocated to increase the diversity within the CFD to more closely parallel the citizens it serves. He has taken a particular interest in training and mentoring Black/African American firefighters while remaining committed to all firefighters.

68. In order to improve the diversity in the workplace, and support equal opportunities for Black/African American firefighters, Plaintiff did the following, often during off-duty time:

a. Regularly represented the CFD Recruitment Division at the CIAA Basketball Tournament, which is a highly attended tournament for historically black colleges hosted annually in Charlotte;

b. Regularly represented the CFD Recruitment Division at Johnson C. Smith University Recruitment Fair. Johnson C. Smith is a local historically black college;

c. Requested educational leave to attend a Fire Equity & Diversity conference in 2015, but was denied leave time; and,

d. Mentored young black firefighters.

69. Plaintiff also conducted research on Minority Leadership in the Fire Service and the Next Generation, which was published at the National Fire Academy.

70. Plaintiff has earned and received performance reviews of "exceeds expectations" every year for the past 15 years.

71. In Plaintiff's 2015 review, his supervisor, Deputy Chief Pete Key, wrote:

During the current year of employee assessment Battalion Chief Willie Summers has exhibited a broad and positive display of the various categories of employee performance. Chief Summers has successfully led his assigned Battalion in the completion of their mandated objectives such as customer service, training, employee development, and community service.

Operationally, Chief Summers has supported the Charlotte Fire Department's vision and mission statement. He responded to a variety of significant incidents, working fires, MVA [motor vehicle accidents] with persons pinned in, and water related incidents. Battalion Chief Summers also responded to other incidents where he served in the various command positions. During all of the incidents Chief Summers exhibited effective leadership and unwavering command presence in successfully bringing the incidents to closure.

Chief Summers is considered by his peers and by members of Battalion 2(A) as being highly approachable. During the past year he has provided understanding and keen insight to several of his firefighters experiencing distressing situations. He has also provided coaching and career development to some of the rising stars within his battalion.

...

Battalion Chief Willie Summers is a fully committed, loyal, and dedicated Chief Officer.

72. Plaintiff is highly respected by the entire fire department. He has supervised or managed a majority of the chief officers within CFD. He has held management positions over then-Captains Paula McDaniel, David Moore, Shane Nantz, Tim Ramsey, and Justin Field, all of whom are white and have been promoted to chief officer positions. Plaintiff is an exceptional mentor and leader to black and white firefighters alike.

73. Indeed, CFD employees have specifically wanted to work for Plaintiff because of his honesty and integrity.

74. While there is no formal recognition given to Chiefs whose subordinates rise through the ranks, firefighters notice who successfully mentors their subordinates on how to improve their skills and background and succeed within the CFD and excel in the promotional process.

75. Upon information and belief, in 2015, just prior to announcing the promotion of one firefighter who worked in Plaintiff's battalion, the firefighter was transferred to another battalion.

76. Upon information and belief, there was no reason to do this other than to say that the firefighter worked for someone other than Plaintiff when the firefighter was promoted.

77. Upon information and belief, Deputy Chief Granger and CFD senior leadership are threatened by Plaintiff's natural ability to lead and mentor, and his commitment to diversity and fairness to employees based on merit, and wanted to refuse him the honor of having those underneath him promoted.

78. Indeed, having strong relationships with coworkers is extremely important to Plaintiff. He has worked hard to develop solid working relationships with coworkers based on

genuine interest, mutual respect, and integrity, regardless of age, race, color, ethnicity, gender, religion, national origin, and sexual orientation.

79.    In 2015, during the Battalion Chief Assessment process, one of Plaintiff's direct reports was told by Deputy Chief Rich Granger ("Deputy Chief Granger," white male), "We like you. We'd like to see you work for someone that we like," making a negative reference to Plaintiff. Upon information and belief, Plaintiff's direct report inferred that Deputy Chief Granger and senior leadership were attempting to undermine Plaintiff and his standing and reputation within the CFD.

80.    Upon information and belief, Deputy Chief Granger and those acting in concert with him retaliate and discriminate against Plaintiff for standing up against them to protect firefighters from unfair treatment and unfair or baseless discipline. Plaintiff stands up to protect the substantive and procedural due process rights of firefighters, and their rights to protection from discrimination, harassment, retaliation, and other violations of state and federal laws.

81.    Plaintiff advocates for hiring and promotional processes that are consistent for all participants, regardless of age, race, color, gender, religion, national origin, gender and sexual orientation.

82.    Plaintiff has also advocated for promotional processes based on merit, education, training, performance, and seniority in order to eliminate opportunities for personal manipulation of the process, which results in bias, nepotism, and favoritism.

83.    Plaintiff wants all firefighters and officers within the CFD to have a fair chance to move through the ranks based on merit, with equal opportunity for stretch and special assignments.

84.     Plaintiff wants a fair and open process that firefighters and officers want to participate in rather than opt out of because they view the process as biased and preordained since upper management knows who will be selected before the process begins.

85.     Upon information and belief, Chief Hannan, Chief Granger, and others acting in concert with them, are threatened by Plaintiff who expects and demands substantive and procedural due process in procedures, promotions, transfers, special assignments, grievances, and appeals so that all firefighters are treated fairly and are not discriminated or retaliated against in violation of state and federal law, including the North Carolina and United States Constitutions.

## PROMOTIONS AND SPECIAL ASSIGNMENTS

86.     Plaintiff has reached a glass ceiling and has not been able to rise above it as a Black/African American who has actively and consistently advocated for equal opportunity and equal terms and conditions of employment for Black/African American firefighters, meaningful training on diversity, race, and color, and accountability for recruiting, mentoring, retaining, and promoting Black/African American employees within the CFD, and is an outspoken advocate for procedural and substantive due process and protection of the legal and constitutional rights of all CFD firefighters regardless of race and color.

### Deputy Chief

87.     Plaintiff competed for the position of Deputy Chief in 2015 after the retirement of Deputy Chief Jeff Dulin.  The promotional process was actually held twice because, upon information and belief, it was leaked that Chief Hannan had chosen a candidate before the process was completed.

88.     On May 26, 2018, Chief Hannan sent an email to all of the Deputy Chief candidates stating, "Because of the environment we are in, I believe I also have to be more deliberate in how

the next deputy chief is selected. Although you went through the selection process once, we are going to redo it with more eyes and more rigor, and that means it will take a little longer."

89.     The process was redone and this time, in addition to the panel interview, there was a job-related exercise added and the panels included Charlotte business leaders, other City department heads, and the CFD Deputy Chiefs. Despite this addition, the promotional process memo still states in bold, "The Fire Chief has the authority to promote any of the candidates based on performance in the interview, the profile characteristics listed above in paragraph III and relevant factors as stated in G.O. 206.01." Essentially, the Fire Chief still has the last word.

90.     After the second process, Chief Hannan promoted Kevin Gordon ("Gordon," white male) for the position and announced it to the Fire Department on June 24, 2015, who, upon information and belief, was the same candidate selected in the first process.

91.     Plaintiff never received a letter from Chief Hannan indicating whether he had passed or failed the assessment. He merely received a phone call from Chief Hannan indicating they had chosen someone else for the Deputy Chief position.

92.     Gordon had very similar training, education, and work experience as Plaintiff, but Plaintiff had been a Battalion Chief six (6) years longer than Gordon at the time of the Deputy Chief promotional process. The one thing that Gordon had over Plaintiff was the many special assignments he had been given by the Fire Chief, including Training Officer, Haz-Mat Captain, and Chief of Training.

93.     It is common knowledge that Chief Hannan handpicked who he wanted to promote and offered them special assignments, which were then cited as qualifications and experience that set those candidates apart from others in the promotional process. Special assignments groomed candidates for later promotion.

94.     Plaintiff would have applied for the special assignment of Recruitment Chief in 2009, but the position was not posted, and he did not have any opportunity to apply. Upon information and belief, the position was not posted because Chief Hannan had already decided who he wanted for the assignment, and a formal interview process would have been meaningless. The failure to post the position is just another example of manipulation of the processes for promotion, transfer, and special assignments.

95.     In January 2018, the City supplied the EEOC with a list of special assignments for the past two (2) years, which showed that out of two-hundred seventy (270) special assignments, only seventeen (17) special assignments were given to non-officer-level Black/African American employees and none of the five (5) officer-level special assignments were assigned to Black/African Americans. Indeed, none of the Black/African American Battalion Chiefs were ever selected to a special assignment during Chief Hannan's tenure.

96.     Special assignments receive a five percent (5%) pay differential. In addition to missing out on the pay differential for the special assignment, Black/African American employees miss out on important opportunities to distinguish themselves from their peers and gain critical knowledge and experience that is worthy of promotion to the highest ranks of the CFD.

97.     In addition, some special assignments include other perks like set daily hours (as opposed to shift work), use of an assistant, and use of an assigned CFD vehicle, a benefit worth thousands of dollars per year.

98.     Plaintiff requested feedback on his performance in the Deputy Chief promotional process so that he was better prepared for the Division Chief promotional process. Plaintiff was denied feedback by Deputy Chief Granger, who told him that the command staff had discussed

not giving feedback until the process was completed. However, Chief Hannan told Plaintiff that one other white male candidate received feedback.

99.     Further, Deputy Chief Kinniburgh told Plaintiff that the CFD did not have the assessors' notes from the first Deputy Chief process.

100.     Improper policies, procedures, practices, and staffing tainted the promotional process when Gordon was selected as Deputy Chief and continue to taint the promotional process within the CFD to this day.

101.     Upon information and belief, the interview panels for promotional processes have been staffed by individuals with special ties to Chief Hannan and Chief Granger, who already know whom they want to promote. The interview panels have been stacked with individuals to whom Chief Hannan has shown bias, nepotism, favoritism, or exchange of *quid pro quo* treatment.

102.     In addition, in or around January 2012, once Chief Hannan and Chief Granger were allowed to choose their own HR Director, Kristi Kjeldsen, the promotional processes became much less transparent. The selection requirements against which candidates were evaluated were not provided to those candidates, and the written assessments of each assessor were no longer provided to them either. Upon information and belief, neither the assessments nor the stacked rankings were provided to the participants, even on request.

103.     Upon information and belief, the documentation of the CFD selection processes for Division Chief and Deputy Chief, including the written assessments and assessors' notes have been altered or destroyed with the knowledge and approval of City senior management, including the City Manager, City HR, and the City Attorney.

104.     For example, upon information and belief, in the process for Deputy Chief in which Chief Gordon was selected, as well as the current Deputy Chief process, CFD employees are being

allowed to serve as assessors although they failed to comply with applicable General Orders on training and certification requirements.

105.    For example, upon information and belief, Granger did not have the ICS 300 and ICS 400 when he was promoted to Deputy Chief, although it was an eligibility requirement to participate in the promotional process when he became Deputy Chief.

106.    In addition, candidates are not being disqualified from participation in the promotional, transfer, or special assignment processes when the CFD or City are aware that they are not in compliance with the requirements for training and certification required by the General Orders.

107.    Upon information and belief, the assessors overseeing the promotional, transfer, or special assignment processes review requirements inconsistently and only choose to enforce certain requirements when it assists them in dismissing a candidate they do not want to hire or justifying their selection of another chosen candidate.

108.    CFD management, including Chief Hannan, and those acting in concert with them, protected, covered up for, and refused to discipline CFD managers who failed and refused to comply with CFD mandatory training requirements, even allowing them to participate in promotions, transfers, and special assignments.

Division Chief

109.    In 2015, the CFD decided to bring back a layer of management between the Deputy Chiefs and Battalion Chiefs, called Division Chief.  The Division Chief positions had been eliminated previously, purportedly due to budget cuts in 1992.

110.    The CFD created five (5) new Division Chief positions for which thirteen (13) people applied.

111.    Plaintiff applied for the position of Division Chief in August 2015. Despite his education, training, interest, experience, qualifications, seniority, leadership within the CFD, the City, and the Community, respect and followership from the firefighters, Executive Fire Officer Certification ("EFO Certification"), and compliance with the General Orders, Plaintiff was not selected.

112.    Plaintiff never received a letter from Chief Hannan indicating whether he had passed or failed the assessment. He merely received a phone call from Chief Hannan indicating they had chosen other candidates for the Division Chief positions.

113.    The individuals promoted include three (3) white males, one (1) Black/African American male, and one (1) white female. Upon information and belief, the CFD was forced to hire minority candidates in this hiring wave because of the volume of positions filled; had they been filled one at a time, upon information and belief, more white male candidates would have been selected.

114.    Of the candidates promoted, one had been a permanent Battalion Chief for only four (4) months, and one had been a permanent Battalion Chief for only six (6) months, although the July 24, 2015 Promotional Process Memo specifically says that completion of four (4) years of service in the Department as a Battalion Chief is required for promotion to Division Chief. Upon information and belief, the CFD counted time served as a relief Battalion Chief as time served as Battalion Chief, although the two are not the same.

115.    The Promotional Process Memo or "Promotional Announcement" is referred to in General Order 206.01, which states, "The *Promotional Announcements* shall provide detailed instructions for participating in the promotional process, including the eligibility dates for meeting

the requirements for each rank" and "[a]ll promotional requirements shall be met by the date indicated in the *Promotional Announcement*." (emphasis in original).

116. Those serving as relief Battalion Chiefs do not have the same management experience and responsibilities, such as completing yearly performance reviews, working to resolve personnel problems, and issuing final decisions on disciplinary matters, for example, as assigned Battalion Chiefs.

117. Additionally, upon information and belief, at least three (3) of the candidates promoted did not meet the minimum requirements of the July 24, 2015 Promotional Process Memo when they applied and were selected.

118. The July 24, 2015 Promotional Process Memo states that one of the three components of the process is a "credentials review."

119. Upon information and belief, the Deputy Chiefs overseeing this competitive process either knew or should have known that some candidates chosen did not meet the minimum requirements of the position including the completed credentials review per the July 24, 2014 Promotional Process Memo.

120. Those who were promoted did not have the same history as Plaintiff of advocacy for diversity and equal hiring practices, commitment to mentoring and training Black/African American firefighters to succeed in the CFD, and advocacy for fairness for the benefit of all firefighters regardless of race or color.

121. Those who were promoted did not have the same history as Plaintiff of advocacy for procedural and substantive due process and protection of the legal and constitutional rights of firefighters regardless of race and color, or refusal to follow improper instructions from Chief Hannan or Chief Granger.

122. On September 23, 2014, Plaintiff sought leave to attend the Fire Equity & Diversity Conference in Roanoke, Virginia, but his request was denied. Plaintiff also discussed this denial directly with Chief Hannan on October 22, 2015.

123. Plaintiff's 2015 Performance Review, dated July 4, 2015, states that he represented the CFD Recruitment Division at the CIAA Basketball Tournament, which is a highly attended tournament for historically black colleges hosted annually in Charlotte and represented the CFD Recruitment Division at Johnson C. Smith University Recruitment Fair. Johnson C. Smith is a local historically black college.

124. The CFD was clearly aware of Plaintiff's engagement in these activities since they are listed in his 2015 Performance Review.

125. Plaintiff's minority recruitment and mentoring activities were well known to CFD management and documented in his performance review.

126. Additionally, none of the candidates promoted had the experience or training that Plaintiff had: only one of the candidates had a Masters Degree and EFO Certification from the National Fire Academy; upon information and belief, none of these candidates had the City of Charlotte Dimensions in Leadership Certification; upon information and belief, none had completed the National Fire Academy management series; and, upon information and belief, none had earned the City of Charlotte Trailblazers Certification, which is a certification to identify up and coming minorities employed by the City of Charlotte.

127. Upon information and belief, Deputy Chief Gordon told executive members of the Charlotte Fire Fighters Association that the candidates for Division Chief had been chosen before the promotional process even began.

128. Plaintiff did not appeal the promotion denial because, at the time, he was under consideration for a position outside Charlotte and did not want to incite Chief Hannan to retaliate against him, and he also reasonably believed an appeal would be futile.

129. Furthermore, the appeal to the Civil Service Board would be futile since the Civil Service Board is influenced by the City and the CFD and does not give full and fair consideration to CFD promotional cases.

130. Indeed, as described in the April 27, 2015 Van Laningham Report issued by the Turning Point Litigation firm (commissioned by the City to investigate the unlawful, retaliatory termination of fire investigator Crystal Eschert), retaliation by Chief Hannan and Chief Granger was long standing and well known within the CFD and the City. The Van Laningham Report said:

a. That their "independent" investigation "encountered…a distrust of the command staff, specifically Chief Hannan and Deputy Chief Granger[;]"

b. "There is an environment of distrust in the Fire Department (or at least certain parts of it) that is so significant that it causes many to believe that any infraction of departure from the desires of certain members of the command staff will result in unfair punishment, targeting, and retaliation[;]" and,

c. That members of the CFD "gave voice to a fear that appears widespread that any action deemed undesirable by certain members of the command staff will result in targeting and discipline."

131. Plaintiff's fear of retaliation was common among his peers and a reasonable reaction to the actions he saw taken by his command staff when others complained, voiced opinions different from those of Chief Hannan or Deputy Chief Granger, voiced their concerns, or

disagreed with or appealed decisions made by Chief Hannan, Deputy Chief Granger, or anyone acting in concert with them.

132. Indeed, Chief Hannan and Deputy Chief Granger had a well-known, deeply ingrained bias against Black/African Americans, in particular, any who were highly respected and had a following within the CFD. They also had a bias and retaliated against anyone who challenged the procedural and substantive due process or fairness of their decisions, policies, practices, or procedures.

133. Upon information and belief, there has been no Black/African American in CFD leadership who is more respected than Plaintiff.

134. Throughout his career, Plaintiff has demonstrated his commitment to building relationships throughout the CFD regardless of race, color, and sex.

135. Upon information and belief, there has been no Black/African American in CFD leadership who is more sought out for advice and counsel than Plaintiff.

136. Upon information and belief, there has been no Black/African American in CFD leadership who is more respected by both black and white firefighters than Plaintiff.

137. Plaintiff has expressed his interest to HR and senior leadership within the CFD in continuing to rise through the ranks of the CFD.

138. Plaintiff has advocated inside and outside the CFD to improve learning and understanding within the CFD among persons of different races and colors, including Black and White.

139. Plaintiff has advocated for the CFD as a department that reflects the population it serves, in particular, the Black/African American community.

140.    Plaintiff was promoted to his Battalion Chief position with the CFD during Chief Fincher's tenure as Fire Chief. Upon information and belief, Chief Hannan, with his right-hand operator, Deputy Chief Granger, since Hannan's promotion to Deputy Chief of Administration, and later as Fire Chief, has blocked Plaintiff's progress and interfered with Plaintiff's career through his ability to:

     a.  Manipulate what positions were posted;

     b.  Manipulate the promotional process and system;

     c.  Manipulate and control special assignments; and,

     d.  Manipulate who was involved in the process and their decision.

141.    Upon information and belief, the CFD and the City conceal and facilitate the manipulation of hiring and promotional processes within the CFD, by, among other things:

     a.  Not following/evading the public records laws;

     b.  Allowing/instructing management how to not follow/evade the public records laws;

     c.  Not performing adverse impact analyses;

     d.  Not following their own policies, processes, and procedures;

     e.  Not adopting policies and procedures that are fair and objective and which do not violate substantive or procedural due process or constitutional rights of firefighter employees;

     f.  Continuing processes and procedures they know are unfair, continuing processes and procedures they know are unwritten and selectively applied, continuing processes and procedures they know are subjective or otherwise subject to manipulation;

g. Allowing conflicts of interest;

h. Not maintaining records, destroying records, altering records, creating fraudulent records;

i. Not providing fair and adequate grievance and appeal processes for employment decisions; and,

j. Not complying with applicable laws.

142. Article III, Sec. 4.61(u) of the City Charter states that, "The chief of the police department and the chief of the fire department shall have authority to make all promotions of officers of their respective departments, subject to majority approval of the Civil Service Board." (Charlotte, N.C., Ordinances, ch. 4, art. III, § 4.61(u)). The Fire Chief, and in Plaintiff's case, Chief Hannan, had the ultimate authority to control whether Plaintiff could rise through the ranks of the CFD beyond Battalion Chief.

143. Upon information and belief, Chief Hannan lobbied City Council members to appoint people who would act favorably toward his choices for management and defer to him on personnel issues, including the members of the Civil Service Board.

Special Assignment

144. In May 2016, Plaintiff applied for the special assignment of Health and Safety Officer. Despite his education, interest, experience, qualifications, reputation, seniority, and standing, he was not selected.

145. There were only two (2) people who applied for the position: Plaintiff and a white female. Both candidates were experienced and dedicated Charlotte firefighters. However, upon information and belief, only Plaintiff met all of the qualifications for the job. In addition, Plaintiff was more senior. Plaintiff had been a Battalion Chief since 1999, while the white female candidate

had only been a Battalion Chief since 2005. And before that, Plaintiff was promoted to Captain in 1992, while the white female candidate was promoted to Captain in 2000.

146.    Additionally, upon information and belief, the candidate chosen by the CFD for this special assignment did not meet the minimum requirements of the May 13, 2016 Assessment Process Memo, which lists the special assignment qualification requirements, she did not satisfy all minimum requirements when she applied or when she was selected.

147.    The May 13, 2016 Assessment Process Memo states that one of the three components of the process is a "credentials review."

148.    Upon information and belief, the Deputy Chief overseeing this competitive process either knew or should have known that this candidate did not have all of the required certifications at the time she applied and at the time they chose to hire her.

149.    In addition to setting the special assignment qualification requirements, the May 13, 2016 Assessment Process Memo gives instructions to potential candidates and explains the assessment process. It states:

> The successful candidate will be selected through a competitive process based on merit principles. It will consist of the following components:
>
>> a.  Submission of an application packet by the established deadline;
>>
>> b.  Credentials review; and,
>>
>> c.  A Deputy Chief interview.

150.    While Plaintiff followed the process detailed in the May 13, 2016 Assessment Process Memo, the white female candidate was given additional information about the position

outside of the May 13, 2016 Assessment Process Memo from Deputy Chief Gordon and prior to the Deputy Chief's interview.

151. This was deeply upsetting to Plaintiff because he had previously been denied any feedback from the Deputy Chiefs regarding past promotional processes, despite repeated requests. In addition, having more information about the position would have benefitted Plaintiff in the interview process.

152. Eventually, Plaintiff quit requesting information and feedback on the promotional process because after his repeated requests were denied, he reasonably believed that further requests were futile. Accordingly, upon information and belief, it has been exceptionally frustrating for Plaintiff to learn that white employees seeking advancement have been treated differently and more favorably than him.

153. As noted above, the CFD has a pattern and practice of denying special assignments to Black/African American candidates, and the assessment process for this special assignment falls in line with that pattern and practice.

154. Plaintiff was particularly qualified for this assignment because he has: 25 years' experience in a leadership position with the CFD; a Bachelor of Science in Physical Education and Health, with a minor in Safety; a Bachelor of Science in Fire Safety Engineering Technology; a Master of Science in Leadership and Emergency Preparedness; strong yearly performance reviews in which he is consistently rated "exceeds expectations;" and he served as Chairman to the CFD's Accident Review Board for three (3) years, which is part of the responsibility of the Health and Safety Officer position for he sought. Finally, he has published research on the health and safety of firefighters.

155. Additionally, upon information and belief, Plaintiff was the only candidate who met all of the requirements set forth in the May 13, 2016 Assessment Process Memo.

156. During Plaintiff's interview for this special assignment, Chief Kinniburgh asked Plaintiff a question related to Plaintiff's ability to communicate with a diverse group of people outside of the department, but when Plaintiff started to answer the question, Chief Kinniburgh said that it was a rhetorical question and would not allow Plaintiff to answer it. Plaintiff was not given the opportunity to answer the questions because, presumably, the Deputy Chiefs had already determined whom they would select for the position before the interviews took place.

157. On or about July 14, 2016, Plaintiff was notified by telephone call from Chief Gordon that the CFD chose the white female candidate for the special assignment.

158. Deputy Chief Howard "Pete" Key told Plaintiff later that Plaintiff gave a better interview than the selected candidate.

159. Upon information and belief, although the Deputy Chiefs were supposed to make the decision as to who got the special assignment, the decision on the assignment was actually left to the Fire Chief, who has ultimate authority in hiring and transfers, despite the processes and procedures in place by the City, and who, upon information and belief, made the decision ahead of the interviews.

160. While the City argues that the special assignment that Plaintiff applied for was not a promotion (he would retain the rank of Battalion Chief), the special assignment included a pay differential of 5% and provided valuable experience that Plaintiff could use in order to be promoted to Division Chief or Deputy Chief later on. In addition, the special assignment of Health and Safety Officer includes the use of a CFD take-home vehicle, a benefit worth thousands of dollars.

32

161.     Rather than being treated as a promotion by the City, special assignments are treated as transfers.

162.     The CFD's transfer policy (GO 206.02 Duty Assignments and Transfer Requests) specifically states, "When there is more than one request for an open position, the senior-in-grade member, who is qualified, will receive priority consideration." In other words, if there is more than one qualified candidate, the one with more experience should be chosen. Plaintiff was clearly the senior candidate and, upon information and belief, the only candidate meeting all qualification requirements and should have been selected for the special assignment as a result.

163.     As described in the June 8, 2015 Deputy Chief Assessment Process Memo and the July 24, 2015 Division Chief Assessment Process Memo, "the promotional process is a competitive process *based on merit principles*." (emphasis added). Similarly, the May 13, 2016 Health and Safety Officer Assessment Processs Memo states, "The successful candidate will be selected through a competitive process *based on merit principles*." (emphasis added). The statements in the Assessment Process Memos are consistent with Charlotte's City Council Resolution on the promotional processes for civil service employees such as police officers and fire fighters.

164.     The Charlotte City Council February 5, 1973 Resolution on such promotions provides:

> Under the general supervision of the Civil Service Board, the City Personnel Director Shall: . . . (e) develop and administer a plan for promotions which gives appropriate considerations to an applicant's qualifications, record of performance and abilities in relation to the work to be performed.

Resolution, Section 3(5)(e).

165.     The Resolution provides further:

> Selection techniques used in the examination process shall be impartial and related to those subjects which fairly measure the relative capacities of the persons examined to execute satisfactorily the duties and responsibilities of the positions open for appointment.

Resolution, Section 5.1(1).

166. The Resolution goes on to provide that:

> As determined by the [City] Personnel Director, examinations (sic) shall consists (sic) of selection techniques which will test fairly the qualifications of candidates . . .

Resolution, Section 5(3).

167. As described above, Plaintiff, and others participating in the CFD's promotional processes, have ongoing liberty and property interests in being judged based on performance and merit for purposes of promotion or transfer. Plaintiff, and others participating in the CFD's promotional processes, also have ongoing liberty and property interests in the promotional processes of the CFD and the underlying policies and processes in compliance with and implemented in accordance with applicable laws and City Council Resolutions.

168. The failure and refusal of the City and its officials to follow and comply with the duly enacted policies and resolutions of the City Council regarding promotional processes in the CFD, and the manipulation of the application of policies and resolutions by the CFD and the City's affirmation and participation in that manipulation constitutes arbitrary and capricious acts which violate the fundamental rights of Plaintiff as guaranteed by Article I, Sections 1, 14, and 19 of the North Carolina Constitution.

## PLAINTIFF'S GRIEVANCE

169. On July 16, 2016, Plaintiff submitted a grievance to his supervisor, Chief Key. Plaintiff's grievance details how he was passed over for the special assignment of Health and

Safety Officer, but also includes a history of failure to promote to show the clear pattern and practice as background.

170. Chief Key did not respond to Plaintiff's grievance. Accordingly, Plaintiff submitted his grievance to City HR, per the City's Human Resources Standards and Guidelines Rule V, General Order 208.04, and City HR Policy HR 11.

171. On July 27, 2016, Plaintiff filed a grievance with City HR based on the CFD's failure to award the special assignment based on the candidates' merits and seniority and for discrimination and retaliation based on race and color and based on unfair practices that deprive firefighters of procedural and substantive due process.[1]

172. Plaintiff's grievance specifically quoted the City Charter, "Appointments and promotions shall be made solely on the basis of merit and fitness, demonstrated by examination or other evidence of competence." (Charlotte, N.C., Ordinances, ch. 4, art. II, § 4.05)

173. Plaintiff told the City HR Consultant that he was concerned that the CFD would not fairly review his grievance since the person deciding the grievance, Chief Hannan, was the very person who had previously unfairly denied him promotions and the special assignment.

174. When the City HR representative told Plaintiff that she was going to "proceed with moving [your grievance] to the Fire Department [for review]" Plaintiff responded, "As you know, my complaint is against the Charlotte Fire Department. With that said, how would I receive a fair review from the organization in which I am filing a grievance against?" and "My grievance is based on retaliation. Does this change the process?" The City HR representative told Plaintiff "This does not change the process."

---

[1] Because the CFD treats special assignments as a transfer rather than a promotion, Plaintiff's complaint went through the City's grievance process rather than going to the Civil Service Board for review (GO 208.04 Grievances).

175. And so, consistent with past precedent, the City continued to allow the CFD to investigate itself and allow Chief Hannan to make decisions on grievances although he had a clear conflict of interest.

176. Plaintiff's grievance specifically states that Chief Hannan:

"has had promotional processes manipulated for his benefit on multiple occasions. Further, the Fire Chief has used the promotional processes of the Charlotte Fire Department to engage in favoritism as well as retaliation against those who speak out against unfair practices. I have been passed over for multiple promotions and appointments (most recently the Health and Safety Officer Position) by the Fire Chief for candidates with lesser qualifications and tenure (resume upon request)."

177. Plaintiff's grievance also states that he believes that he is "being discriminated against based on race ... [and] being retaliated against for speaking out against unfairness in [the] Charlotte Fire Department," *i.e.* Chief Hannan and those acting in concert with him are unfairly manipulating the process to prefer chosen white employees and unfairly denying substantive and procedural due process to all firefighters participating in the promotional process. "[U]nfair practices" includes discrimination based on race and color as well as substantive and procedural due process violations, and unlawful retaliation

178. Chief Hannan's September 6, 2016 response to Plaintiff's grievance attempts to justify Chief Hannan's decision to decide the grievance himself by stating, "[the decision not to hire Plaintiff for Health and Safety Officer] was made by the deputy chiefs." To the contrary, it is widely known that Chief Hannan had ultimate authority and say in who was hired for each and every position, even those who did not report directly to him.

179. The CFD Grievance and Conflict of Interest policies do not address what to do in the event that a conflict of interest arises in the grievance process (GO 208.04 and GO 208.05).

Similarly, the City's Nepotism and Conflict of Interest policies (HR 7 and HR 13) are too narrow to encompass the conflicts of interest that could arise in the grievance and appeal process.

180. The CFD's Grievance policy (GO 208.04) states that it mirrors the City's Grievance policy (HR 11). City HR 11 allows for a Step II grievance, which is heard by a hearing officer or "Key Business Executive" (in Plaintiff's case, Chief Hannan) and a Step III grievance, which is presented to the City Manager, should the grievant not be satisfied or find fault in the Step II decision. The Grievance policy does not guarantee a hearing.

181. While neither the City nor the CFD have specific policies and procedures regarding discrimination, the Harassment policies (City HR 5 and General Order 208.07) do reference discrimination based on race, sex, national origin, religion, or color, as a form of harassment which will not be tolerated.

182. City HR 5 states:

> Investigation of a complaint will normally include conferring with the parties involved and any named or apparent witnesses. A review of written documentation will be made. Employees are <u>guaranteed</u> an impartial and fair hearing. All employees will be protected from coercion, intimidation, retaliation, interference or discrimination for filing a complaint or assisting in an investigation.

(emphasis added).

183. City HR 5 specifically states employees are <u>guaranteed</u> an impartial and fair hearing. That clearly did not happen here.

184. Per the CFD and City policies, during the Step II grievance, the hearing officer can decide whether or not to conduct a hearing into the grievance and allow documents and witnesses to be introduced into evidence before making a determination.

185.     Plaintiff should have been guaranteed an impartial and fair hearing, but he was not even given a hearing.  Rather, the hearing officer who determined whether or not he would receive a hearing was the person who presided over the discrimination and retaliation against Plaintiff.

186.     Allowing a hearing officer to deny a hearing to those with grievances deprives them of due process, including the opportunity to present evidence and witnesses, make arguments, and cross examine Defendant's witnesses.

187.     Here, Chief Hannan, as hearing officer, denied Plaintiff the opportunity for a hearing to present witnesses and evidence and cross examine the City's witnesses and decisionmakers; denied Plaintiff the opportunity to present his case to impartial decisionmakers; and denied Plaintiff's grievance stating, "I have investigated the assessment process and found no evidence of favoritism or retaliation."

188.     Interestingly, Chief Hannan's dismissive, six-sentence response to Plaintiff's grievance says nothing about discrimination, although discrimination based on race and color and related retaliation were clearly included in Plaintiff's grievance.

189.     At no time did Chief Hannan interview Plaintiff regarding his grievance or, upon information and belief, ever investigate Plaintiff's grievance.

190.     Chief Hannan clearly had a conflict of interest in reviewing Plaintiff's Step II grievance.  However, City Policies HR 5 and HR 11 do not address how to handle conflicts of interest in grievance review and General Orders 208.04 and 208.07 are also silent on the matter. Thus, there was no procedure in place to ensure Plaintiff received an impartial and fair hearing pursuant to City HR 5.

191.    The City failed to protect Plaintiff from discrimination and retaliation, and failed to protect his other legal and constitutional rights by denying him substantive and procedural due process.

192.    Upon information and belief, the manipulation of the promotional process under Chief Hannan continues today since he continues to influence the process from outside of the CFD through Deputy Chief Granger and other hand-chosen placements high in the ranks of the CFD.

193.    Additionally, the City cannot say that the hiring of a new Chief upon Chief Hannan's retirement in 2017 has corrected the problems caused by Chief Hannan's discrimination, failure to promote, and retaliation.

194.    Upon information and belief, with encouragement of the City Manager, City HR, and City Legal, the current Fire Chief has decided not to take action to correct past discrimination, retaliation, constitutional violations, and lack of substantive and procedural due process in the policies, procedures, and processes for promotions, transfers, special assignments, grievances, and appeals.

195.    The current process is being allowed to go forward without the approval of the Fire Chief/Deputy Chief of Operations, with assessors who are biased and have conflicts of interest or should otherwise be disqualified, and participants who should be excluded due to their repeated and ongoing failure to take mandatory training.

196.    As the City has been so apt to point out in its EEOC position statement, there are only so many positions above Battalion Chief for which Plaintiff could fill and those positions do not come open very often.  The promotions to Deputy Chief, Division Chief, and the special assignment of Health Safety Officer were very significant and rare opportunities.

197.    Upon information and belief, the constant manipulation of the CFD's promotion process created a disincentive for Blacks/African Americans and others to apply for certain promotions and special assignments.

198.    Upon information and belief, the consistent deferral by the City Manager's Office, City HR, and City Legal to Chief Hannan created a disincentive for CFD employees to appeal a decision of the CFD.

199.    Upon information and belief, employees were also afraid to challenge or appeal decisions due to fear of retaliation by senior officers, in particular, Chief Hannan, Deputy Chief Granger, and those acting in concert with them. In addition, employees were disincentivized from challenging or appealing decisions regarding promotions, transfers, and special assignments because they reasonably believed such challenges and appeals were futile.

200.    Upon information and belief, another disincentive to Black/African Americans firefighters' aspirations for promotion and participation in the process was to see the CFD's unfair and discriminatory denial of promotions to Plaintiff, who is widely considered the most respected Black/African American chief officer within the CFD.

## PLAINTIFF'S APPEAL

201.    Plaintiff appealed Chief Hannan's grievance decision to the City Manager on September 23, 2016 because of Plaintiff's disagreement with Chief Hannan's conclusion and due to the innate conflict of interest that plagued the CFD's review of Plaintiff's grievance.

202.    Plaintiff also complained that Chief Hannan, in his review of the grievance, did not bother to interview Plaintiff and gather all of the relevant facts before making his decision. Upon information and belief, Chief Hannan did not interview any witnesses related to Plaintiff's grievance before making a determination because his mind was made up before he reviewed it.

203.     Plaintiff's appeal was heard by Assistant City Manager Debra Campbell ("ACM Campbell"). Not surprisingly, Plaintiff was notified via letter dated December 1, 2016, that ACM Campbell was upholding Chief Hannan's decision. That same letter notified Plaintiff that the City Manager's decision was final, and that Plaintiff was not entitled to any further appeals.

204.     ACM Campbell upheld Chief Hannan's decision despite Hannan's refusal to grant Plaintiff a hearing, in violation of City policy HR 5, which guarantees a fair and impartial hearing on matters of harassment, which includes discrimination.

205.     ACM Campbell did indicate, however, that "investigation of your concern did reveal and affirm that there is opportunity for improvement in the Fire Department's promotion and selection process. Specifically, I am strongly recommending that the Fire Department incorporate a formal feedback process at the conclusion of any promotion or selection process."

206.     ACM Campbell also stated that "the [fire] department needs to do a better job communicating that the opportunity exists for all interested applicants to seek additional or clarifying information about job opportunities."

207.     Upon information and belief, despite these findings, the CFD did not revise its processes in a timely or adequate manner to address the concerns raised by Plaintiff or the findings of ACM Campbell.

208.     Upon information and belief, despite the City's knowledge of the problems within the CFD's transfer and promotional process, these processes continue to have an adverse impact on Black/African American firefighters and officers.

209.     Upon information and belief, the CFD/City has not considered changing its conflict of interest or grievance policies to make them less biased or to create a remedy to avoid conflicts of interest that exist when an entity investigates itself.

210. While the City/CFD failed to follow its own policies and procedures when it favored white employees for management positions and discriminated against Black/African Americans, it nevertheless failed to address and correct those policy violations when it allowed the conflicts of interest to exist in the grievance and appeal processes.

## FAILURE TO FOLLOW, CONSISTENTLY ENFORCE, AND INSTITUTE ADEQUATE POLICIES AND PROCEDURES TO PREVENT DISCRIMINATION, BIAS, CONFLICTS OF INTEREST, UNLAWFUL RETALIATION, AND DUE PROCESS VIOLATIONS

211. The City of Charlotte is arguably a major metropolitan City with significant resources and HR personnel. Despite this, the City and the CFD's HR policies are lacking, confusing, point to each other (often misstating rules), and even contradict each other. The City's current policies and procedures regarding discrimination, conflicts of interest, and grievances are failing its employees.

212. As of the date of this filing, the City's HR policies are not publicly available on its website despite the fact that the undersigned's office contacted the City Attorney's office to correct a defective link to the policies on June 18, 2018. So, even if there are policies to protect the City's employees, they are not easily accessible on the City's HR website.

213. Remarkably, neither the City nor the CFD have specific anti-discrimination policies and procedures, although the Harassment policies (City HR 5 and General Order 208.07) do reference discrimination based on race, sex, national origin, religion, or color, as a form of harassment which will not be tolerated.

214. It is astounding that there is no dedicated policy prohibiting discrimination in 2018.

215. The City and the CFD's Conflict of Interest policies (General Order 208.05 and City HR 13) do not address internal conflicts of interest that arise as a result of the promotional process, transfers, special assignments, or in the grievance and appeal process.

216.    City HR 5 states:

Investigation of a complaint will normally include conferring with the parties involved and any named or apparent witnesses. A review of written documentation will be made. Employees are **guaranteed** an impartial and fair hearing. All employees will be protected from coercion, intimidation, retaliation, interference or discrimination for filing a complaint or assisting in an investigation.

(emphasis added).

217.    However, General Order 208.07, the CFD's Harassment policy, does not guarantee any hearing at all, only a prompt investigation by a supervisor and that the next supervisor in the Chain of Command "up to the Deputy Chief level" should be notified. It does not state how a claim of harassment or discrimination against the Fire Chief should be initiated or investigated. Similarly, it does not state what to do in the event that there is a conflict of interest between the complainant and the investigator.

218.    In comparison, CMPD's Harassment and Discrimination policy 300-017 states that "The City of Charlotte or CMPD Human Resources Department is responsible for investigating all internal complaints alleging harassment, discrimination, or retaliation, **unless there is a conflict of interest**." (emphasis added)

219.    Moreover, the City adopted a policy on retaliation which does not fully protect employees from retaliation and even discourages complaints of retaliation. (City HR 26, adopted on April 1, 2018).

220.    The CFD/City has knowingly failed and refused to adopt fair and nondiscriminatory policies and procedures not subject to improper manipulation, bias, nepotism, favoritism, and retaliation in compliance with legal, constitutional, and procedural and substantive due process requirements in its promotion, transfer, special assignments, appeals, grievances, policies, and procedures.

221.   Interim and current CFD and City senior management are aware of the discriminatory, retaliatory, and unfair treatment, and resulting injuries to Plaintiff, occurring in violation of his legal rights as a result of the actions and inactions described above, but have chosen not to take corrective action.

222.   Within the past four years, the City has spent $304,000 in taxpayer dollars on independent investigations by Management Partners and Turning Point Litigation, and over $432,000 to defend against an investigation into retaliation by the North Carolina Department of Labor and subsequent lawsuit, all of which found that the City retaliated against a CFD employee when she engaged in protected activity and violated the First Amendment and Retaliatory Employment Discrimination Act when they wrongfully terminated her as a result of her health and safety complaints.

223.   All of this signaled the need for significant change.

224.   The City commissioned Management Partners to do an independent assessment of the Fire Department's management, which was completed on April 27, 2015 and titled the "Fire Department Management Systems Review" (the "Management Partners Report").

225.   On April 28, 2015, the City released the Management Partners Report to the public concurrently with the Van Laningham Report. The report included the following findings:

      a.   "Many employees indicated that application of the discipline process is not consistent across work units or across different levels of staff…;"

      b.   "Many [focus group] participants indicated they are uncomfortable providing feedback that is contrary to the chief's ideas because there is fear of possible retribution;"

c. There is a "fear of retribution if people speak out...[that] was a theme throughout the focus groups and the employee survey;"

d. Multiple participants "expressed the opinion that [Chief Hannan] sometimes says what he thinks staff wants to hear and then does something else;"

e. There is evidence that "minorities and women are under-represented in the department," and that the gender composition was 8% in 2008 and 7% in 2015;

f. There is a "lack of positive communication from the chief;"

g. "Gag orders are issued to prevent communication;"

h. "Highest level [employees] in the organization exhibit poor managerial behavior and there is no accountability;"

i. "One infraction will get three different results;"

j. "Retaliation was not prevalent under [the] old chief;"

k. "Investigations are not documented or supported by policy;"

l. "We are treated like a sworn officer but aren't given the benefits of civil service;" and,

m. "Retaliation takes many forms. You might get transferred or just have a target on your back forever if you challenge the system."

226. The Management Partners Report set forth eighteen (18) recommendations, of which, upon information and belief, half have actually been implemented in three (3) years. Some of the recommendations implemented were only implemented after the new Fire Chief took office in April 2018.

227.    The Management Partners Report Recommendation was to "Enhance the department's efforts to attract and develop a workforce that is more representative of the population the department serves." This is exactly what Plaintiff strives to do every day.

**NCDOL Investigation**

228.    On or about March 24, 2015, the NCDOL issued a report on its investigation into Crystal Eschert's complaint of retaliation as a result of her complaints about health and safety issues.

229.    The NCDOL's report included the following excerpts and summaries:

    a.   "If you complain, they will terminate you;"

    b.   "The Fire Department gets rid of anybody that complains;"

    c.   "Is there a general fear in the Department that if anybody complains about safety they will be targeted by Management?" "I think so, if you do not go through the chain of command, you will be remembered;"

    d.   "If anybody complains, they will encounter retaliatory discipline or targeting and Respondent will lie to put anybody in a bad situation;"

    e.   "There is a culture in the fire department that if you got on the bad side of management, that might not be the best or in your favor;"

230.    The NCDOL's report included the following findings:

    a.   "[T]he department failed to follow their own procedures;"

    b.   "Complainant never had the chance to have [her] appeal looked at by an impartial or new person. ... [T]he same people that were involved in the meetings discussing Complainant's termination were the people that reviewed [her] appeals."

231.    Despite the City's exorbitant spending on independent investigations, reports, and the defense of its wrongful conduct, the CFD and City senior management have failed to make the appropriate changes needed to make sure that all its employees, including senior managers, consistently follow and enforce its policies and procedures, and institute adequate policies and

46

procedures in order to prevent discrimination, bias, conflicts of interest, unlawful retaliation, and due process violations.

232.     As a result, interim and current CFD and City senior management are responsible for ratifying the wrongful actions and inactions of Chief Hannan and Chief Granger and those acting in concert with them.

**Recruited Away from Charlotte Fire Department**

233.     As a result of the City's failure to institute a fair, merit-based, and nondiscriminatory promotional process, the City of Asheboro was able to recruit Plaintiff away from the CFD and has hired him to serve as its Fire Chief. His departure is a great loss to the City and the CFD.

**CONCLUSION**

234.     Plaintiff has established prima facie cases of violations of Title VII, 42 U.S.C. §1981, §1983, Article I Sections 1, 14 and 19 of the North Carolina Constitution as well as irreparable harm and/or no adequate remedy at law.

**COUNT I**
**(Title VII, 42 U.S.C. § 2000e *et seq.* – Race and Color Discrimination, Failure to Promote/Transfer, and Retaliation against the City)**

235.     The allegations of the previous paragraphs are realleged and incorporated herein by reference.

236.     The CFD regularly employed more than fifteen (15) employees at all relevant times.

237.     Plaintiff is a Black/African American male and is thus a member of a protected class based on his race and color.

238.     The CFD, through its agents, employees, and supervisors, engaged in unlawful discrimination against Plaintiff based on his race and color.

239.    As noted above, the CFD has a long history and pattern and practice of denying special assignments and promotions to Black/African American candidates. Upper management, including Chief Hannan and some Deputy Chiefs had a well-known, deeply ingrained bias against Black/African Americans.

240.    The CFD violated Title VII by treating Plaintiff differently than his similarly situated or less qualified peers outside of his protected class in the terms and conditions of his employment.

241.    Specifically, Plaintiff applied for a transfer to the special assignment of Health and Safety Officer, which is a preferred position and a promotion because of the increased pay differential, regular daily hours, access to a CFD vehicle and related benefits, and because it is a stepping stone to future promotions. Despite his education, interest, experience, qualifications, and seniority, Plaintiff was not selected. Instead, the CFD hired a white female candidate who was less tenured and less qualified than Plaintiff, and gave her additional information on the position prior to the Deputy Chiefs' interview.

242.    Upon information and belief, the candidate chosen did not meet the minimum requirements of the May 13, 2016 Assessment Process Memo.

243.    Upon information and belief, the Deputy Chief overseeing this competitive process either knew or should have known that this candidate did not have all of the required certifications at the time she applied and at the time they chose to hire her.

244.    Plaintiff was also treated differently than his similarly situated or less qualified peers in other ways to be proven at trial.

245.    As a result of this race/color-selective and targeted discrimination, Plaintiff was passed over and denied multiple promotions and special assignments because of his race and color.

48

246. Upon information and belief, as set forth above, there is a widespread belief among members of the CFD that any action deemed undesirable by certain members of the command staff will result in targeting and retaliation.

247. CFD management also targeted Plaintiff for retaliation because he was known for advocating for equal opportunity and equal terms and conditions of employment for Black/African American firefighters, equal opportunity for stretch and special assignments for Black/African American firefighters, meaningful training on diversity related to race/color, and accountability for recruiting, mentoring, retaining, and promoting Black/African American employees within the CFD.

248. Plaintiff engaged in recruiting on behalf of the CFD at the CIAA tournament and Johnson C. Smith University, both historically black institutions.

249. Plaintiff also conducted research on Minority Leadership in the Fire Service and the Next Generation, which was published at the National Fire Academy.

250. Chief Hannan has manipulated and used the promotional process to engage in bias, nepotism, and favoritism, as well as retaliation against those who speak out against unfair practices, including Plaintiff.

251. The City had knowledge of and ratified the acts of unlawful race and color discrimination and continuing retaliation against Plaintiff based on his race/color and his advocacy for equal opportunities for Black/African American employees and it failed to take corrective action to remedy the discrimination and continuing retaliation inflicted upon Plaintiff.

252. There is compelling evidence of willful and intentional discrimination, violations of procedural and substantive due process, and violations of Plaintiff's constitutional rights by the City.

253.     The City and CFD retaliated against Plaintiff after he engaged in protected activities by repeatedly failing to adopt adequate policies and procedures, failing to require compliance, denying him promotions and special assignments and by failing to afford Plaintiff fair and impartial grievance and appeal processes when Chief Hannan presided over Plaintiff's grievance despite his conflict of interest, failed to provide or allow due process, failed to properly investigate Plaintiff's grievance, failed to interview Plaintiff, and upon information and belief, failed to interview any witness related to Plaintiff's grievance before making a determination since his mind was made up before he reviewed it, he had a conflict of interest, and he does not allow or provide due process.

254.     In addition, the City retaliated by upholding Chief Hannan's decision when Plaintiff appealed Chief Hannan's decision of his grievance, and by failing to revise its promotional and grievance processes, which have had an adverse impact on Plaintiff and Black/African American firefighters within the CFD.

255.     A causal connection exists between Plaintiff's protected activities and the adverse actions taken against him.

256.     As a result of Plaintiff's protected activities, race, and color, Plaintiff was passed over and denied multiple promotions and special assignments, including the Health and Safety Officer Position.

257.     To the extent the City purports to have had legitimate, non-discriminatory reasons for taking adverse actions against Plaintiff, such reasons are pretexts for the true reasons, which are his race, color, and legally protected activities, as described herein.

258.     The City's conduct, as described above, was without justification or excuse, is reprehensible, and occurred despite Plaintiff's efforts to prevent, halt, and reverse the discrimination and retaliation.

259.     Plaintiff requests injunctive relief to stop current practices of the City, including: 1) discriminating against Black/African American employees in the promotional process and the competitive process for special assignments and transfers; 2) manipulating the promotional process to cause selections or rankings based on bias(es), nepotism, favoritism, retaliation, or other impermissible motivation; 3) manipulating the special assignment and transfer process to cause selections or rankings based on bias(es), nepotism, favoritism, retaliation, or other impermissible motivation; 4) failing to follow the written promotional process to cause selections for promotion or rankings based on bias(es), nepotism, favoritism, retaliation, or other impermissible motivation; 5) failing to follow the written competitive process to cause selections for special assignments based on bias(es), nepotism, favoritism, retaliation, or other impermissible motivation; 6) allowing the CFD to investigate itself in the grievance or appeal of decisions related to promotions, transfers, and special assignments; 7) allowing persons involved in the decisions or decision-making process for promotions, transfers, or special assignments to be involved in the investigation, fact finding hearing, or decision of any grievance or appeal of any decision on promotion, transfer, or special assignment; and 8) preventing or denying equal access to feedback on the promotional process and competitive process for special assignments and transfers.

260.     Plaintiff further requests declaratory and injunctive relief for the implementation of policies to address the ongoing violations of rights. This includes at a minimum: (1) requiring the City to adopt policies and procedures for promotions, transfers, and special assignments which comply with the requirements of procedural and substantive due process and do not discriminate

based on race, color, or any other protected class; (2) requiring the City to adopt policies and procedures for appeals and grievances which comply with the requirements of procedural and substantive due process and do not discriminate based on race, color, or any other protected class and which afford an opportunity to a fair and impartial hearing; (3) requiring the City to adopt policies and procedures for promotions, transfers, special assignments, grievances, and appeals which prevent the Fire Department from investigating itself, prevent those making or participating in the employment decisions from deciding the grievances or appeals, prevent those with a conflict of interest from manipulating policies and procedures to favor relatives, friends, or those who will not speak out or speak up against unlawful conduct in the workplace; (4) requiring the City to monitor the promotion, transfer, special assignment, grievance, and appeals processes so that they are not prejudiced by conflicts of interest and personal agendas of Fire Department management and manipulation of policies and procedures to favor friends and relatives of Fire Department management or those who will not speak out or speak up against unlawful conduct in the workplace.

261. In addition, Plaintiff requests declaratory and injunctive relief, as well as compensatory damages, to make him whole for the City's violation of his rights, including requiring the City not to fill any future Battalion Chief, Deputy Chief, and Fire Chief positions and special assignments to preserve the status quo until these matters can be thoroughly addressed in an effective manner. Plaintiff also requests back pay and fringe benefits as well as retroactive seniority as Deputy Chief.

262. As a result, Plaintiff is entitled to recover from the City damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, and compensatory damages; promotion; injunctive relief to

preserve the status quo and to deter similar misconduct in the future; back pay; front pay; fringe benefits; damages for emotional distress; pre- and post-judgment interest; reasonable attorney's fees; and the costs of this action.

## COUNT II
### (42 U.S.C. §1981 – Race and Color Discrimination, Failure to Promote/Transfer, and Retaliation against the City)

263.    The allegations of the previous paragraphs are realleged and incorporated herein by reference.

264.    Plaintiff is a Black/African American male and is thus a member of a protected class based on his race and color.

265.    The City, through its agents, employees, and supervisors, engaged in unlawful and intentional discrimination against Plaintiff based on his race and color.

266.    As noted above, the CFD has a long history and pattern and practice of denying special assignments and promotions to Black/African American candidates. Upper management, including Chief Hannan and some Deputy Chiefs have had a well-known, deeply ingrained bias against Black/African Americans.

267.    The City violated Section 1981 by treating Plaintiff differently than his similarly situated or less qualified peers outside of his protected class in the terms and conditions of his employment.

268.    Specifically, Plaintiff applied for the special assignment of Health and Safety Officer, which is a promotion because of the increased pay differential and it is a stepping stone to future promotions. Despite his education, interest, experience, qualifications, and seniority, Plaintiff and was not selected. Instead, the CFD hired a white female candidate who had less

seniority than Plaintiff and did not meet the minimum qualifications and also gave her additional information on the position prior to the interviews by the Deputy Chiefs.

269. In 2015, after the retirement of Chief Jeff Dulin, Plaintiff also applied for a Deputy Chief position, but was denied this promotion, and a white male with less tenure than Plaintiff was selected as set forth above. Plaintiff was not given the same opportunities because of his race and color, as set forth above, for promotion as the white male employee who was selected.

270. Plaintiff also applied for a Division Chief position in 2015, but was denied promotion, and four white employees who were less tenured and less qualified than Plaintiff were instead selected as set forth above.

271. Plaintiff was also treated differently than his similarly situated or less qualified peers in other ways to be proven at trial.

272. As a result of this race/color-selective and targeted discrimination, Plaintiff was deprived of the rights afforded to other similarly situated employees outside of his protected class and was passed over and denied multiple promotions and special assignments because of his race and color.

273. Upon information and belief, as set forth above, there is a widespread belief among members of the Fire Department that any action deemed undesirable by certain members of the command staff will result in targeting and retaliation in the form of less favorable terms and conditions of employment.

274. CFD management also targeted Plaintiff for retaliation because he was known for advocating for equal opportunity and equal terms and conditions of employment for Black/African American firefighters, meaningful training on diversity for race/color, and accountability for

recruiting, mentoring, retaining, and promoting Black/African American employees within the CFD.

275.    Plaintiff engaged in recruiting minorities, including on behalf of the CFD at both the CIAA tournament and Johnson C. Smith University, both historically black institutions

276.    On September 23, 2014, Plaintiff requested leave to attend the Fire Equity and Diversity Conference, but his request was denied. Plaintiff spoke directly with Chief Hannan about the denial on October 22, 2015.

277.    The CFD was aware of Plaintiff's engagement in these activities because they are listed in Plaintiff's 2015 Performance Review, dated July 4, 2015.

278.    Chief Hannan has manipulated and used the promotional process to engage in bias, nepotism, and favoritism, as well as retaliation against those who speak out against unfair or illegal employment practices, including Plaintiff.

279.    The City had knowledge of and ratified the acts of unlawful race discrimination and continuing retaliation; it failed to take corrective action to remedy the discrimination and continuing retaliation inflicted upon Plaintiff.

280.    There is compelling evidence of willful and intentional discrimination, violations of procedural and substantive due process, and violations of Plaintiff's constitutional rights by the City.

281.    The City and CFD retaliated against Plaintiff after he engaged in protected activities by repeatedly denying him promotions and special assignments and by failing to afford Plaintiff fair and impartial grievance and appeal processes, and by disparaging and isolating him. Chief Hannan failed to properly investigate Plaintiff's grievance, failed to interview him, and upon

information and belief, failed to interview any witness related to Plaintiff's grievance before making a determination since his mind was made up before he reviewed it.

282.    In addition, the City retaliated by upholding Chief Hannan's decision when Plaintiff appealed Hannan's decision of his grievance, and by failing to revise its promotional and grievance processes, which have had an adverse impact on Plaintiff and Black/African American firefighters within the CFD.

283.    A causal connection exists between Plaintiff's protected activities and the adverse actions taken against him.

284.    As a result of Plaintiff's protected activities, Plaintiff was passed over and denied multiple promotions and special assignments, including but not limited to the Health and Safety Officer Position, the 2015 Deputy Chief position, and the 2015 Division Chief position, and was undermined, disparaged, isolated, and discouraged from applying due to prior experience and fear of retaliation.

285.    To the extent the City purports to have had legitimate, non-discriminatory reasons for taking adverse actions against Plaintiff, such reasons are pretexts for the true reasons, which are his race, color, and legally protected activities as described herein.

286.    The City's conduct, as described above, was without justification or excuse, is reprehensible, and occurred despite Plaintiff's efforts to prevent, halt, and reverse the discrimination and retaliation.

287.    As a direct and proximate result of the City's unlawful conduct, Plaintiff was unlawfully deprived of income in the form of wages, compensation, and other monetary benefits due to him, in amounts to be proven at trial, as well as non-monetary benefits to be proven at trial.

288.    Plaintiff requests injunctive relief to stop current practices of the City, including: 1) discriminating against Black/African American employees in the promotional process and the competitive process for special assignments and transfers; 2) manipulating the promotional process to cause selections or rankings based on bias(es), nepotism, favoritism, retaliation, or other impermissible motivation; 3) manipulating the special assignment and transfer process to cause selections or rankings based on bias(es), nepotism, favoritism, retaliation, or other impermissible motivation; 4) failing to follow the written promotional process to cause selections for promotion or rankings based on bias(es), nepotism, favoritism, retaliation, or other impermissible motivation; 5) failing to follow the written competitive process to cause selections for special assignments based on bias(es), nepotism, favoritism, retaliation, or other impermissible motivation; 6) allowing the CFD to investigate itself in the grievance or appeal of decisions related to promotions, transfers, and special assignments; 7) allowing persons involved in the decisions or decision-making process for promotions, transfers, or special assignments to be involved in the investigation, fact finding hearing, or decision of any grievance or appeal of any decision on promotion, transfer, or special assignment; and 8) preventing or denying equal access to feedback on the promotional process and competitive process for special assignments and transfers.

289.    Plaintiff further requests declaratory and injunctive relief for the implementation of policies to address the ongoing violations of rights. This includes at a minimum: (1) requiring the City to adopt policies and procedures for promotions, transfers, and special assignments which comply with the requirements of procedural and substantive due process and do not discriminate based on race, color, or any other protected class; (2) requiring the City to adopt policies and procedures for appeals and grievances which comply with the requirements of procedural and substantive due process and do not discriminate based on race, color, or any other protected class

and which afford an opportunity to a fair and impartial hearing; (3) requiring the City to adopt policies and procedures for promotions, transfers, special assignments, grievances, and appeals which prevent the Fire Department from investigating itself, prevent those making or participating in the employment decisions from deciding the grievances or appeals, preventsthose with a conflict of interest from manipulating policies and procedures to favor relatives, friends, or those who will not speak out or speak up against unlawful conduct in the workplace; (4) requiring the City to monitor the promotion, transfer, special assignment, grievance, and appeals processes so that they are not prejudiced by conflicts of interest and personal agendas of Fire Department management and manipulation of policies and procedures to favor friends and relatives of Fire Department management or those who will not speak out or speak up against unlawful conduct in the workplace.

290.    In addition, Plaintiff requests declaratory and injunctive relief, as well as compensatory damages to make him whole for the City's violation of his rights, including requiring the City not to fill any future Battalion Chief, Division Chief, Deputy Chief, and Fire Chief positions and special assignments to preserve the status quo until these matters can be thoroughtly addressed in an effective manner; Plaintiff also requests back pay and fringe benefits as well as retroactive seniority as Deputy Chief.

291.    As a result, Plaintiff is entitled to recover from the City damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, and compensatory damages; promotion; injunctive relief to deter similar misconduct in the future; back pay; front pay; damages for emotional distress; pre- and post-judgment interest; reasonable attorney's fees; and the costs of this action, pursuant to 42 U.S.C. § 1988.

## COUNT III

**(42 U.S.C. §1983 – Race and Color Discrimination, Failure to Promote/Transfer, and Retaliation, Due Process, Equal Protection, and First Amendment Retaliation against the City)**

292.    The allegations of the previous paragraphs are realleged and incorporated herein by reference.

### Race and Color Discrimination, Failure to Promote/Transfer, and Retaliation

293.    Plaintiff is a Black/African American male and is thus a member of a protected class based on his race and color.

294.    The City, through its agents, employees, and supervisors, engaged in unlawful and intentional discrimination against Plaintiff based on his race and color.

295.    As noted above, the CFD has a long history and pattern and practice of denying special assignments and promotions to Black/African American candidates. Upper management, including Chief Hannan and some Deputy Chiefs have had a well-known, deeply ingrained bias against Black/African Americans.

296.    The City violated Section 1983 by treating Plaintiff differently than his similarly situated or less qualified peers outside of his protected class in the terms and conditions of his employment.

297.    Specifically, Plaintiff applied for the special assignment of Health and Safety Officer, which is a promotion because of the increased pay differential and it is a stepping stone to future promotions. Despite his education, interest, experience, qualifications, and seniority, Plaintiff was not selected. Instead, the CFD hired a white female candidate who had less seniority than Plaintiff and did not meet the minimum qualifications and also gave her additional information on the position prior to the interviews by the Deputy Chiefs.

298.     In 2015, after the retirement of Chief Jeff Dulin, Plaintiff also applied for a Deputy Chief position, but was denied this promotion and a white male with less tenure than Plaintiff was selected as set forth above. Plaintiff was not given the same opportunities because of his race and color, as set forth above, for promotion as the white male employee who was selected.

299.     Plaintiff also applied for a Division Chief position in 2015, but was denied promotion, and four white employees who were less tenured and less qualified than Plaintiff were instead selected as set forth above.

300.     Plaintiff was also treated differently than his similarly situated or less qualified peers in other ways to be proven at trial.

301.     As a result of this race/color-selective and targeted discrimination, Plaintiff was deprived of the rights afforded to other similarly situated employees outside of his protected class and was passed over and denied multiple promotions and special assignments because of his race and color.

302.     Upon information and belief, as set forth above, there is a widespread belief among members of the Fire Department that any action deemed undesirable by certain members of the command staff will result in targeting and retaliation in the form of less favorable terms and conditions of employment.

303.     CFD management also targeted Plaintiff for retaliation because he was known for advocating for equal opportunity and equal terms and conditions of employment for Black/African American firefighters, meaningful training on diversity for race/color, and accountability for recruiting, mentoring, retaining, and promoting Black/African American employees within the CFD.

304. Plaintiff engaged in recruiting minorities, including on behalf of the CFD at both the CIAA tournament and Johnson C. Smith University, both historically black institutions

305. On September 23, 2014, Plaintiff requested leave to attend the Fire Equity and Diversity Conference, but his request was denied. Plaintiff spoke directly with Chief Hannan about the denial on October 22, 2015.

306. The CFD was aware of Plaintiff's engagement in these activities because they are listed in Plaintiff's 2015 Performance Review, dated July 4, 2015.

307. Chief Hannan has manipulated and used the promotional process to engage in bias, nepotism, and favoritism, as well as retaliation against those who speak out against unfair or illegal employment practices, including Plaintiff.

308. The City had knowledge of and ratified the acts of unlawful race discrimination and continuing retaliation; it failed to take corrective action to remedy the discrimination and continuing retaliation inflicted upon Plaintiff.

309. There is compelling evidence of willful and intentional discrimination, violations of procedural and substantive due process, and violations of Plaintiff's constitutional rights by the City.

310. The City and CFD retaliated against Plaintiff after he engaged in protected activities by repeatedly denying him promotions and special assignments and by failing to afford Plaintiff fair and impartial grievance and appeal processes, and by disparaging and isolating him. Chief Hannan failed to properly investigate Plaintiff's grievance, failed to interview him, and upon information and belief, failed to interview any witness related to Plaintiff's grievance before making a determination since his mind was made up before he reviewed it.

311. In addition, the City retaliated by upholding Chief Hannan's decision when Plaintiff appealed Hannan's decision of his grievance, and by failing to revise its promotional and grievance processes, which have had an adverse impact on Plaintiff and Black/African American firefighters within the CFD.

312. A causal connection exists between Plaintiff's protected activities and the adverse actions taken against him.

313. As a result of Plaintiff's protected activities, Plaintiff was passed over and denied multiple promotions and special assignments, including but not limited to the Health and Safety Officer Position, the 2015 Deputy Chief position, and the 2015 Division Chief position, and was undermined, disparaged, isolated, and discouraged from applying due to prior experience and fear of retaliation.

## Due Process and Equal Protection

314. The City acted under color of state law and with reckless or deliberate indifference to Plaintiff's constitutional rights and with malice.

315. The City deprived Plaintiff of his constitutional rights to equal protection and due process under the Fourteenth Amendment, and retaliated against Plaintiff in violation of his First Amendment rights.

316. The constitutional rights to free speech, equal protection, and due process were established at the time of the City's actions.

317. The City knew, or in the exercise of its duties should have known, about Plaintiff's constitutional rights and its violation of them.

318. There is compelling evidence of willful and intentional discrimination, violations of substantive and procedural due process to allow or ratify retaliatory, arbitrary, discriminatory,

irrational, and/or improperly motivated abuses of power, in violation of Plaintiff's constitutional rights, by the City.

319. Plaintiff was not an at-will employee, and he had a protected property and liberty interest in his continued employment and a fair promotion, transfer, special assignment, grievance, and appeal process because his employment was governed by the policies and procedures of the City with the involvement of City Council as required.

320. The City failed to follow the policies and procedures that governed Plaintiff's employment depriving Plaintiff of his protected property and liberty interest in a fair promotion, transfer, special assignment, grievance, and appeal process for positions he was qualified to hold.

321. Plaintiff should have been guaranteed an impartial and fair hearing, but the City denied him a hearing and deprived Plaintiff of due process. At no time did Chief Hannan interview Plaintiff regarding his grievance or, upon information and belief, ever investigate Plaintiff's grievance.

322. As a result of this race/color-selective and targeted discrimination, Plaintiff was deprived of the rights afforded to other similarly situated employees outside of his protected class and was passed over and denied multiple promotions and special assignments because of his race and color.

323. As a result of Plaintiff's protected activities, he was passed over and denied multiple promotions, transfers, and special assignments, including but not limited to the Health and Safety Officer position, the 2015 Deputy Chief position, and the 2015 Division Chief position, and was undermined, disparaged, and discouraged from applying due to prior experience and fear of retaliation.

324.     To the extent the City purports to have had legitimate, non-discriminatory reasons for taking adverse actions against Plaintiff, such reasons are pretexts for the true reasons, which are his race, color, and legally protected activities as described herein.

## First Amendment Retaliation

325.     Plaintiff has a right, protected under the First Amendment to the United States Constitution, to speak as a private citizen on matters of public interest, including actively and consistently advocating for equal opportunity and equal terms and conditions of employment for Black/African American firefighters, meaningful training on diversity for race and color, and accountability for recruiting, mentoring, retaining, and promoting Black/African American employees within the CFD.

326.     Plaintiff advocated for equal opportunity and equal terms and conditions of employment by representing the CFD Recruitment Division, often during off-duty time, in activities attended by historically black colleges, and he requested leave to attend a conference on Fire Equity & Diversity.

327.     Plaintiff's speech was a matter of social and political public concern as race discrimination by city officials was an issue brought within the public concern by the 2016 police shooting in Charlotte.

328.     The CFD does not require department leaders to take cultural competency/implicit bias/diversity training, unlike the police department, yet the area served by the CFD was 32.8% Black/African American.

329.     The CFD's interest in maintaining discipline and ensuring harmony was not impaired by Plaintiff's speech.

330. The legitimate interests of the CFD does not include using discriminatory, retaliatory, and manipulative processes for promotion, transfer, special assignments, grievances, and appeals.

331. Plaintiff's interest in expressing these concerns did not compete with the CFD's interest in providing efficient and effective services to the public. Rather, to the extent that Plaintiff's speech created any perceived risk to the CFD's interests, such perceived risk was unreasonable and outweighed by Plaintiff's meritorious interest in advocating for equal opportunity and equal terms and conditions of employment.

332. Plaintiff hit a glass ceiling within the CFD, limiting his ability to compete for promotion, transfer, and special assignments, because the CFD was manipulating the process to punish Plaintiff in retaliation for his speech.

333. The actions of the CFD and the City, as described above, violated Plaintiff's rights. The CFD manipulated the promotion, transfer, and special assignment process to discriminate and retaliate against Plaintiff because he engaged in speech protected by the First Amendment, as punishment for that speech, and did so without any legitimate justification, and the City deferred to that decision.

334. The City's actions, taken in retaliation for Plaintiff's exercise of free speech, and the City's failure to afford due process and equal protection, deprived Plaintiff of rights, privileges, and immunities secured by the Constitution and violates 42 U.S.C. §1983.

335. As a result of the violation of Plaintiff's First Amendment rights, he has been injured. He was punished for his protected speech, and the exercise of that right has been improperly chilled.

336. To the extent the City purports to have had legitimate, non-discriminatory reasons for taking adverse actions against Plaintiff, such reasons are pretexts for the true reasons, which are his race, color, and legally protected activities as described herein.

337. The City's conduct, as described above, was without justification or excuse, is reprehensible, and occurred despite Plaintiff's efforts to prevent, halt, and reverse the discrimination and retaliation.

338. As a direct and proximate result of the City's unlawful conduct, Plaintiff was unlawfully deprived of income in the form of wages, compensation, and other monetary benefits due to him, in amounts to be proven at trial, as well as non-monetary benefits to be proven at trial.

339. Plaintiff requests injunctive relief to stop current practices of the City, including: 1) discriminating against Black/African American employees in the promotional process and the competitive process for special assignments and transfers; 2) manipulating the promotional process to cause selections or rankings based on bias(es), nepotism, favoritism, retaliation, or other impermissible motivation; 3) manipulating the special assignment and transfer process to cause selections or rankings based on bias(es), nepotism, favoritism, retaliation, or other impermissible motivation; 4) failing to follow the written promotional process to cause selections for promotion or rankings based on bias(es), nepotism, favoritism, retaliation, or other impermissible motivation; 5) failing to follow the written competitive process to cause selections for special assignments based on bias(es), nepotism, favoritism, retaliation, or other impermissible motivation; 6) allowing the CFD to investigate itself in the grievance or appeal of decisions related to promotions, transfers, and special assignments; 7) allowing persons involved in the decisions or decision-making process for promotions, transfers, or special assignments to be involved in the investigation, fact finding hearing, or decision of any grievance or appeal of any decision on promotion, transfer, or special

assignment; and 8) preventing or denying equal access to feedback on the promotional process and competitive process for special assignments and transfers.

340. Plaintiff further requests declaratory and injunctive relief for the implementation of policies to address the ongoing violations of rights. This includes at a minimum: (1) requiring the City to adopt policies and procedures for promotions, transfers, and special assignments which comply with the requirements of procedural and substantive due process and do not discriminate based on race, color, or any other protected class; (2) requiring the City to adopt policies and procedures for appeals and grievances which comply with the requirements of procedural and substantive due process and do not discriminate based on race, color, or any other protected class and which afford an opportunity to a fair and impartial hearing; (3) requiring the City to adopt policies and procedures for promotions, transfers, special assignments, grievances, and appeals which prevent the Fire Department from investigating itself, prevent those making or participating in the employment decisions from deciding the grievances or appeals, prevent those with a conflict of interest from manipulating policies and procedures to favor relatives, friends, or those who will not speak out or speak up against unlawful conduct in the workplace; (4) requiring the City to monitor the promotion, transfer, special assignment, grievance, and appeals processes so that they are not prejudiced by conflicts of interest and personal agendas of Fire Department management and manipulation of policies and procedures to favor friends and relatives of Fire Department management or those who will not speak out or speak up against unlawful conduct in the workplace.

341. In addition, Plaintiff requests declaratory and injunctive relief, as well as compensatory damages to make him whole for the City's violation of his rights, including requiring the City not to fill any future Battalion Chief, Deputy Chief, and Fire Chief positions and

special assignments to preserve the status quo until these matters can be thoroughly addressed in an effective manner. Plaintiff also requests back pay and fringe benefits as well as retroactive seniority as Deputy Chief.

342. As a result, Plaintiff is entitled to recover from the City damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, and compensatory damages; promotion; injunctive relief to deter similar misconduct in the future; back pay; front pay; damages for emotional distress; pre- and post-judgment interest; reasonable attorney's fees; and the costs of this action, pursuant to 42 U.S.C. § 1988.

## COUNT IV
### (Violations of the Constitution of the State of North Carolina, Article I, Section 1 – Equality and Rights of Persons; Section 14 – Freedom of Speech; and Section 19 – Law of the Land; Equal Protection of the Laws)

343. The allegations of the previous paragraphs are realleged and incorporated herein by reference.

344. No other state law is available to remedy Plaintiff's injury, and he may plead the following claims under the North Carolina Constitution.

345. The City acted under color of state law and with reckless or deliberate indifference to Plaintiff's constitutional rights and with malice.

346. The City deprived Plaintiff of his state constitutional rights including: the right to the enjoyment of the fruits of his labor; the right of equal protection and due process; and the right to free speech and protection from retaliation for exercising that right. Each right was established at the time of the City's actions.

347. As described in the June 8, 2015 Deputy Chief Assessment Process Memo and the

July 24, 2015 Division Chief Assessment Process Memo, "the promotional process is a competitive process *based on merit principles*." (emphasis added). Similarly, the May 13, 2016 Health and Safety Officer Assessment Processs Memo states, "The successful candidate will be selected through a competitive process *based on merit principles*." (emphasis added). The statements in the Assessment Process Memos are consistent with Charlotte's City Council Resolution on the promotional processes for civil service employees such as police officers and fire fighters.

348.   The Charlotte City Council February 5, 1973 Resolution on such promotions provides:

> Under the general supervision of the Civil Service Board, the City Personnel Director Shall: . . . (e) develop and administer a plan for promotions which gives appropriate considerations to an applicant's qualifications, record of performance and abilities in relation to the work to be performed.

Resolution, Section 3(5)(e).

349.   The Resolution provides further:

> Selection techniques used in the examination process shall be impartial and related to those subjects which fairly measure the relative capacities of the persons examined to execute satisfactorily the duties and responsibilities of the positions open for appointment.

Resolution, Section 5.1(1).

350.   The Resolution goes on to provide that:

> As determined by the [City] Personnel Director, examinations (sic) shall consists (sic) of selection techniques which will test fairly the qualifications of candidates . . .

Resolution, Section 5(3).

351.   As described above, Plaintiff, and others participating in the CFD's promotional

processes, have ongoing liberty and property interests in being judged based on performance and merit for purposes of promotion or transfer. Plaintiff, and others participating in the CFD's promotional processes, also have ongoing liberty and property interests in the promotional processes of the CFD and the underlying policies and processes in compliance with and implemented in accordance with applicable laws and City Council Resolutions.

352. The failure and refusal of the City and its officials to follow and comply with the duly enacted policies and resolutions of the City Council regarding promotional processes in the CFD, and the manipulation of the application of policies and resolutions by the CFD and the City's affirmation and participation in that manipulation constitutes arbitrary and capricious acts which violate the fundamental rights of Plaintiff as guaranteed by Article I, Sections 1, 14, and 19 of the North Carolina Constitution.

## Article I, Section 1. The equality and rights of persons.

353. Article I, Section 1 of the North Carolina State Constitution provides:

We hold it to be self-evident that all persons are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness.

354. Article I, Section 1 of the North Carolina Constitution guarantees Plaintiff the right to engage in his chosen profession and to advance in his chosen profession based on performance and merit.

355. Plaintiff is not an at-will employee, and he is entitled to a protected interest in the fruits of his labor, including access to a fair promotion, transfer, special assignment, grievance, and appeal process, for the duration of his employment because his employment was governed by the policies and procedures set by the City with involvement from City Council as required.

356. The City violated the clearly established policies and procedures that granted Plaintiff his protected interest in a fair promotion, transfer, special assignment, grievance, and appeal process. The City's violation denied Plaintiff his constitutional right to the fruits of his labor, and his right to a fair grievance and appeal process.

357. The City knew, or should have known, in the exercise of its duties, that the City violated Plaintiff's constitutionally protected interests.

358. CFD's policy and practice of preselecting preferred candidates based upon Chief Hannan's personal preferences, as implemented by Deputy Chief Granger and those acting in concert with them, was disguised by the CFD publishing objective qualifications in the Promotional Process Memo to create the appearance of a fair process.

359. The City acted in a retaliatory, arbitrary, discriminatory, and/or improperly motivated manner by failing to abide by its own promotion, transfer, special assignment, grievance, and appeal processes.

360. Plaintiff was denied access to a fair promotion, transfer, special assignment, grievance, and appeal process because he did not fit within the arbitrary, personal preferences of Chief Hannan, even though Plaintiff met the stated qualifications in the Promotional Process Memo.

361. To the extent the City purports to have legitimate, non-discriminatory reasons for taking adverse actions against Plaintiff, such reasons are pretextual and only serve to cover the City's discriminatory reasons: Plaintiff's race, color, and protected activities.

362. By denying Plaintiff's access to a fair promotion, transfer, special assignment, grievance, and appeal process due to the arbitrary and irrational preferences set by Chief Hannan,

Plaintiff was denied the enjoyment of the fruits of his own labor, in violation of the North Carolina Constitution.

## Article I, Section 14. Freedom of Speech

363. Article I, Section 14 of the North Carolina State Constitution provides:

> Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained, but every person shall be held responsible for their abuse.

364. Plaintiff advocated for equal opportunity and equal terms and conditions of employment by representing the CFD Recruitment Division, often during off-duty time, in activities attended by historically black colleges, and he requested leave to attend a conference on Fire Safety Equity & Diversity.

365. Plaintiff's efforts to advocate for equal opportunity and equal terms and conditions of employment constitutes protected speech under Section 14.

366. As a result of Plaintiff's protected activities, he was passed over and denied multiple promotions, transfers, and special assignments, including but not limited to the Health and Safety Officer position, the 2015 Deputy Chief position, and the 2015 Division Chief position, and was undermined, disparaged, and discouraged from applying due to prior experience and fear of retaliation.

## Article I, Section 19. Law of the Land; Equal Protection of the Laws

367. Article I, Section 19 of the North Carolina State Constitution provides:

No person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land. No person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin.

368. Plaintiff was not an at-will employee, and he was entitled, for the duration of his employment, to fair and equal access to the processes for promotions, transfers, special

assignments, grievances, and appeals because his employment was governed by the policies and procedures set by the City with the involvement of City Council when required.

369. The City and CFD failed to follow the policies and procedures that governed Plaintiff's employment and deprived Plaintiff of equal protection and due process in access to the fair processes established for promotions, transfers, special assignments, grievances, and appeals.

370. Additionally, the City, through its agents, employees, and supervisors, engaged in unlawful and intentional discrimination against Plaintiff, based on his race and color, by denying Plaintiff's application for promotions or special assignments, and giving the positions to less qualified and less experienced white candidates.

371. The City acted in a retaliatory, arbitrary, discriminatory, and/or improperly motivated manner by failing to abide by its own promotion, transfer, special assignment, grievance, and appeal processes.

372. By failing to follow its own written promotion, transfer, and special assignment policies and then subjecting Plaintiff to an unfair grievance procedure, the City arbitrarily, capriciously, and irrationally deprived Plaintiff of liberty, property, due process, and equal protection in violation of the North Carolina Constitution.

373. There is compelling evidence of willful and intentional discrimination, and violations of substantive and procedural due process by the City to allow or ratify retaliatory, arbitrary, discriminatory, irrational, and/or improperly motivated abuses of power, in violation of Plaintiff's state constitutional rights.

374. The City's failure to follow its own established promotion, transfer, special assignments, grievance policies, and the Charlotte City Council February 5, 1973 Resolution was a violation of Plaintiff's procedural and substantive due process rights.

375. Plaintiff is entitled to a non-arbitrary and non-capricious promotion, transfer, and grievance process.

376. The failure and refusal of the City and its officials to follow and comply with the duly enacted policies and resolutions of the City Council regarding promotional processes in the CFD, and the manipulation of the application of policies and resolutions by the CFD and the City's affirmation and participation in that manipulation constitutes arbitrary and capricious acts which violate the fundamental rights of Plaintiff as guaranteed by Article I, Sections 1, 14, and 19 of the North Carolina Constitution.

377. Plaintiff requests injunctive relief to stop current practices of the City, including: 1) discriminating against Black/African American employees in the promotional process and the competitive process for special assignments and transfers; 2) manipulating the promotional process to cause selections or rankings based on bias(es), nepotism, favoritism, retaliation, or other impermissible motivation; 3) manipulating the special assignment and transfer process to cause selections or rankings based on bias(es), nepotism, favoritism, retaliation, or other impermissible motivation; 4) failing to follow the written promotional process to cause selections for promotion or rankings based on bias(es), nepotism, favoritism, retaliation, or other impermissible motivation; 5) failing to follow the written competitive process to cause selections for special assignments based on bias(es), nepotism, favoritism, retaliation, or other impermissible motivation; 6) allowing the CFD to investigate itself in the grievance or appeal of decisions related to promotions, transfers, and special assignments; 7) allowing persons involved in the decisions or decision-making process for promotions, transfers, or special assignments to be involved in the investigation, fact finding hearing, or decision of any grievance or appeal of any decision on promotion, transfer, or special

assignment; and 8) preventing or denying equal access to feedback on the promotional process and competitive process for special assignments and transfers.

378.    Plaintiff further requests declaratory and injunctive relief for the implementation of policies to address the ongoing violations of rights. This includes at a minimum: (1) requiring the City to adopt policies and procedures for promotions, transfers, and special assignments which comply with the requirements of procedural and substantive due process and do not discriminate based on race, color, or any other protected class; (2) requiring the City to adopt policies and procedures for appeals and grievances which comply with the requirements of procedural and substantive due process and do not discriminate based on race, color, or any other protected class and which afford an opportunity to a fair and impartial hearing; (3) requiring the City to adopt policies and procedures for promotions, transfers, special assignments, grievances, and appeals which prevent the Fire Department from investigating itself, prevent those making or participating in the employment decisions from deciding the grievances or appeals, prevent those with a conflict of interest from manipulating policies and procedures to favor relatives, friends, or those who will not speak out or speak up against unlawful conduct in the workplace; (4) requiring the City to monitor the promotion, transfer, special assignment, grievance, and appeals processes so that they are not prejudiced by conflicts of interest and personal agendas of Fire Department management and manipulation of policies and procedures to favor friends and relatives of Fire Department management or those who will not speak out or speak up against unlawful conduct in the workplace.

379.    In addition, Plaintiff requests declaratory and injunctive relief, as well as compensatory damages to make him whole for the City's violation of his rights, including requiring the City not to fill any future Battalion Chief, Deputy Chief, and Fire Chief positions and

special assignments to preserve the status quo until these matters can be thoroughtly addressed in an effective manner; and Plaintiff's promotion to Deputy Chief as of the date the vacancy became available and also back pay and fringe benefits as well as retroactive seniority as Deputy Chief.

380.    As a result, Plaintiff is entitled to recover from the City damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, and compensatory damages; promotion; injunctive relief to deter similar misconduct in the future; back pay; front pay; damages for emotional distress; pre- and post-judgment interest; and the costs of this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays the Court as follows:

1.    Pursuant to Count I (Title VII, 42 U.S.C. § 2000e *et seq.* – Race and Color Discrimination, Failure to Promote/Transfer, and Retaliation against the City), that Plaintiff have and recover damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, and compensatory damages; promotion/transfer; injunctive relief to deter similar misconduct in the future; back pay; front pay; fringe benefits; damages for emotional distress; pre- and post-judgment interest; reasonable attorney's fees; and the costs of this action;

2.    Pursuant to Count II (42 U.S.C. § 1981 – Race and Color Discrimination, Failure to Promote/Transfer, and Retaliation against the City), that Plaintiff have and recover damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, and compensatory damages; promotion/transfer; injunctive relief to deter similar misconduct in the future; back pay; front pay; fringe benefits; damages for

76

emotional distress; pre- and post-judgment interest; reasonable attorney's fees; and the costs of this action, pursuant to 42 U.S.C. § 1988;

3.   Pursuant to Count III (42 U.S.C. §1983 - Due Process, Equal Protection, and First Amendment Retaliation), that Plaintiff have and recover damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, and compensatory damages; promotion/transfer; injunctive relief to deter similar misconduct in the future; back pay; front pay; fringe benefits; damages for emotional distress; pre- and post-judgment interest; reasonable attorney's fees; and the costs of this action, pursuant to 42 U.S.C. § 1988;

4.   Pursuant to Count IV (Article I, Sections 1, 14, and 19 Constitution of the State of North Carolina), that Plaintiff have and recover damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, and compensatory damages; promotion; injunctive relief to deter similar misconduct in the future; back pay; front pay; damages for emotional distress; pre- and post-judgment interest; and the costs of this action.

5.   That this matter be tried by a jury;

6.   That Plaintiff be granted an injunction prohibiting unlawful employment practices in violation of Title VII, 42 U.S.C. § 1981, 42 U.S.C. § 1983, and Article I Sections 1, 14, and 19 of the North Carolina Constitution; and

7.   That the Court grant such other and further relief as this Court may deem just, proper, and equitable.

//

Respectfully submitted, this the 9th day of October, 2018.

MALONEY LAW & ASSOCIATES, PLLC

Margaret Behringer Maloney, N.C. Bar 13253
Jennifer Diane Spyker, N.C. Bar 46048
1824 E. Seventh Street
Charlotte, NC 28201
mmaloney@maloneylegal.com
jspyker@maloneylegal.com
Telephone: 704-632-1622
Facsimile: 704-632-1623
*Attorneys for Plaintiff*

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

FILED

2018 OCT 18 P 4: 22

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18-CVS-10723

WILL SUMMERS, JR., a/k/a WILLIE
SUMMERS,

    Plaintiff,

v.

CITY OF CHARLOTTE,

    Defendants.

**AFFIDAVIT OF SERVICE**

The undersigned, being first duly sworn, deposes and says:

1. A copy of the Application and Order Extending Time to File Complaint and Civil Summons to be Served with Order Extending Time to File Complaint in this action were sent via USPS certified mail, return receipt requested, on May 29, 2018 to the City of Charlotte, attention Marcus Jones, City Manager, City of Charlotte, 600 E. Fourth Street, Charlotte-Mecklenburg Government Center, Charlotte, NC 28202. Such copies were in fact delivered to the City of Charlotte at the above-listed addresses on June 1, 2018, as evidenced by the delivery receipt attached hereto as **Exhibit A**.

2. A copy of the Complaint, Amended Complaint, Delayed Service of Complaint and Alias and Pluries Civil Summonses in this action were sent via USPS certified mail, return receipt requested, on October 10, 2018 to the City of Charlotte, attention Marcus Jones, City Manager, City of Charlotte, 600 E. Fourth Street, Charlotte-Mecklenburg Government Center, Charlotte, NC 28202. Such copies were in fact delivered to the City of Charlotte at the above-listed addresses on October 15, 2018, as evidenced by the delivery receipt attached hereto as **Exhibit B**.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **AFFIDAVIT OF SERVICE** was served by depositing same in the U.S. mail, postage prepaid and addressed as follows:

City of Charlotte
Attn: Marcus Jones, City Manager
Charlotte-Mecklenburg Government Center
600 E. Fourth Street
Charlotte, NC 28202

This the 18th day of October, 2018.

MALONEY LAW & ASSOCIATES, PLLC

Margaret Behringer Maloney, N.C. Bar No. 13253
1824 East Seventh Street
Charlotte, NC 28204
mmaloney@maloneylegal.com
Telephone: 704-632-1622
Facsimile: 704-632-1623
*Attorney for Plaintiff*

3

2.      Therefore, Defendant has been duly served in accordance with Rule 5(a) of the

North Carolina Rules of Civil Procedure.

This, the 18th day of October, 2018.

MALONEY LAW & ASSOCIATES, PLLC

Margaret Behringer Maloney, N.C. Bar No. 13253
Jennifer Spyker, N.C. Bar No. 46048
1824 E. Seventh Street
Charlotte, NC 28204
mmaloney@maloneylegal.com
jspyker@maloneylegal.com
Telephone:  704-632-1622
Facsimile:  704-632-1623
*Attorneys for Plaintiff*

Sworn to and subscribed before me,
This, the 18th of October, 2018.

Notary Public
My commission expires: May 6, 2019

# EXHIBIT A

SENDER: COMPLETE THIS SECTION

■ Ensure items 1, 2, and 3 are completed.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

City of Charlotte
Attn: Marcus Jones, City Manager
Charlotte-Mecklenburg Government Center
600 E. Fourth Street
Charlotte NC 28202-2816

9490 9118 9956 0304 0553 ＠

2. Article Number (Transfer from service label)

9414 7118 9956 0304 0553 40

PS Form 3811 Facsimile, July 2015 (SDC 3930)

COMPLETE THIS SECTION ON DELIVERY

A. Signature: ( ☐ Addressee or ☐ Agent)

X

B. Received By: (Printed Name)          C. Date of Delivery

JUN 0 1 2018

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

JUN 0 1 2018

3. Service Type

☑ Certified Mail®

Domestic Return Receipt

# EXHIBIT B

| **SENDER:** *COMPLETE THIS SECTION* | **COMPLETE THIS SECTION ON DELIVERY** |

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

A. Signature

X _____

☐ Agent
☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery

OCT 1 5 2018

1. Article Addressed to:

City of Charlotte
Attn: City Manager Marcus Jones
600 E. Fourth Street
Charlotte, NC 28202

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

OCT 1 5 2018

9590 9402 3922 8060 7468 16

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

2. Article Number *(Transfer from service label)*

7018 0360 0001 7136 4960

PS Form 3811, July 2015 PSN 7530-02-000-9053

Domestic Return Receipt