IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:18-cv-00612-RJC-DSC

|  |  |
|---|---|
| WILL SUMMERS, JR. a/k/a WILLIE SUMMERS,<br><br>          Plaintiff,<br><br>v.<br><br>CITY OF CHARLOTTE,<br><br>          Defendant. |  |
| SYLIVIA SMITH-PHIFER and LANCE PATTERSON,<br><br>          Plaintiffs,<br><br>v.<br><br>CITY OF CHARLOTTE,<br><br>          Defendant. | **AMENDED COMPLAINT OF SYLIVIA SMITH-PHIFER AND LANCE PATTERSON**<br>**(Jury Trial Demanded)** |
| AARON PHIFER,<br><br>          Plaintiff,<br><br>v.<br><br>CITY OF CHARLOTTE,<br><br>          Defendant. |  |
| MARTY PUCKETT,<br><br>          Plaintiff,<br><br>v.<br><br>CITY OF CHARLOTTE,<br><br>          Defendant. |  |

1

COME NOW Plaintiffs Lance Patterson ("Patterson") and Sylvia Smith-Phifer ("Smith-Phifer"), and amend their complaint against Defendant City of Charlotte, alleging as follows:

## INTRODUCTION AND NATURE OF ACTION

1.      Patterson (Black/African American male) and Smith-Phifer (Black/African American female) are career Captains who have served the Charlotte Fire Department ("CFD") for 22 and 28 years respectively.  For over a decade, Plaintiffs have been passed over for multiple promotions and have hit a glass ceiling because of the deeply ingrained culture of racism, retaliation, and gender bias within the CFD.

2.      Plaintiffs bring this action against Defendant for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), 42 U.S.C. § 1981, 42 U.S.C. § 1983, and Article I Sections 1, 14, and 19 of the North Carolina Constitution.

## PARTIES

3.      Plaintiff Sylvia Smith-Phifer ("Smith-Phifer") is, and at all relevant times mentioned, an adult citizen and resident of Charlotte, Mecklenburg County, North Carolina. Smith-Phifer is a female of African American descent and is a person of color, black.

4.      Plaintiff Lance Patterson ("Patterson") is, and at all relevant times mentioned, an adult citizen and resident of Mooresville, Iredell County, North Carolina.  Patterson is a male of African American descent and is a person of color, black.

5.      Upon information and belief, Defendant City of Charlotte (the "City" or "Defendant") is organized by City Charter under §160A of the North Carolina General Statutes with its principal office and place of business in Charlotte, Mecklenburg County, North Carolina, where it maintains and administers a fire department known as the Charlotte Fire Department (the "CFD" or "Fire Department") which employs Plaintiffs.

2

6.      To the extent it is applicable, Defendant has adopted a plan of insurance pursuant to N.C. Gen. Stat. § 160-A-485 and has waived its immunity from civil liability.

## JURISDICTION AND VENUE

7.      The unlawful practices alleged in this Complaint were committed in Mecklenburg County.

8.      Jurisdiction and venue are proper in this court pursuant to N.C. Gen. Stat. §§ 1-75.4 and 1-79.

## ADMINISTRATIVE PROCEDURES

9.      Smith-Phifer timely submitted her first charge of discrimination ("Charge") against Defendant with the Equal Employment Opportunity Commission ("EEOC") on or about November 21, 2016.

10.      On or about August 28, 2018, the EEOC issued a Notice of Right to Sue entitling Smith-Phifer to commence a Title VII action within ninety (90) days of receipt of that notice.

11.      Smith-Phifer timely submitted her second Charge against Defendant with the EEOC on or about November 14, 2018.  The EEOC sent the Charge to the United States Department of Justice.

12.      On or about November 26, 2018, the United States Department of Justice issued a Notice of Right to Sue entitling Smith-Phifer to commence a Title VII action within ninety (90) days of receipt of that notice.

13.      Patterson timely submitted his charge of discrimination against Defendant with the EEOC on or about November 16, 2018.  The EEOC sent the charge to the United States Department of Justice.

14.     On or about November 26, 2018, the United States Department of Justice issued a Notice of Right to Sue entitling Patterson to commence a Title VII action within ninety (90) days of receipt of that notice.

15.     Plaintiffs timely filed an Application and Order Extending Time to File Complaint on November 26, 2018.  N.C. Gen. Stat. § 1A-1, Rule 3.

16.     Plaintiffs timely file their Complaint on December 17, 2018.

17.     Plaintiffs' Complaint was removed by Defendant to the United States District Court for the Western District of North Carolina Charlotte Division on January 18, 2019.

18.     Smith-Phifer timely submitted her third Charge against Defendant with the EEOC on or about December 13, 2019.

19.     On or about January 15, 2020, the EEOC issued a Notice of Right to Sue entitling Smith-Phifer to commence a Title VII action within ninety (90) days of receipt of that notice.

20.     Smith-Phifer has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

21.     Patterson has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

## CHARLOTTE FIRE DEPARTMENT

22.     The CFD serves the City of Charlotte and provides fire protection for approximately 800,000 residents living in a 300 square-mile area and has employed over 1,000 firefighters for the past several years and presently.

23.     The CFD is a paramilitary organization whose ranks in order of ascension are Recruit, Firefighter 1, Firefighter 2, Fire Engineer, Captain, Battalion Chief, Division Chief, Deputy Chief and Fire Chief.

24. Upon information and belief, Fire Chief Jon Hannan ("Chief Hannan"), who was the Fire Chief during many of the promotional processes participated in by Plaintiffs, failed to implement and consistently follow a fair and merit-based promotional process and manipulated the promotional process to give promotions and special assignments to his handpicked successors even if it meant violating or changing written policies and procedures.

25. Chief Hannan showed preferential treatment to white males when choosing who to promote.

26. Chief Hannan told Smith-Phifer that when it comes to Battalion Chiefs, he promotes whomever he wants to promote.

27. Hannan became Fire Chief in 2007. Upon information and belief, under Chief Hannan, diversity throughout the ranks decreased:

| Rank | Black/AA under Chief Fincher in 2000 | Black/AA under Chief Hannan in 2017 |
|---|---|---|
| All Fire Suppression Personnel | 15% | 10.7% |
| Captain | 12% | 7.7% |
| Battalion Chief | 22% | 10% |
| Division Chief[1] | n/a | 1 out of 6 (16.6%) |
| Deputy Chief | 0% | 1 out of 3 (33.3%) |
| Fire Chief | 0% | 0% |

28. This decrease occurred even as Charlotte's Black/African American population increased from 32.11% in 2000 to 35.03 in 2010, and Charlotte's white population shrank from 59.02% in 2000 to 49.96% in 2010 according to U.S. Census Bureau data.

29. In 2000, there were six (6) Black/African American female firefighters; in 2017, there were only two (2).

---

[1] The rank of Division Chief was eliminated in 1992, purportedly due to budget cuts, but reintroduced in 2015 after recommendations to add management were made by the consultant group Management Partners.

30.     Upon information and belief, the number of women working in fire suppression at The CFD also decreased as follows:

| Rank | Women Under Chief Fincher in 2000 | Women Under Chief Hannan in 2017 |
|---|---|---|
| All Fire Suppression Personnel | 38 out of 790 (4.8%) | 29 out of 1059 (2.7%) |
| Captain | 8 out of 181 (4%) | 6 out of 246 (2.4%) |
| Battalion Chief | 2 out of 18 (11%) | 1 out of 29 (3%) |
| Division Chief | n/a | 1 out of 6 (16.6%) |
| Deputy Chief | 0% | 0% |
| Fire Chief | 0% | 0% |

31.     During his tenure, Chief Hannan had a well-known, deeply ingrained bias against Black/African Americans, in particular, Black/African American females and any Black/African Americans who were highly respected and had a following within the CFD.  Chief Hannan also had a bias and retaliated against anyone who challenged the procedural and substantive due process or fairness of his decisions, policies, practices, or procedures, such as Patterson and Smith-Phifer, or who alleged race discrimination or harassment.

32.     Chief Hannan retired on August 31, 2017 and the City announced the selection of Reginald Johnson ("Chief Johnson," Black/African American) for Fire Chief in March 2018. Chief Johnson was sworn in on April 30, 2018.

<strong><u>PLAINTIFFS</u></strong>

<strong><u>Smith-Phifer</u></strong>

33.     Smith-Phifer graduated with a BS in Business Administration with a concentration in Finance in 1990.  She went on to earn an Associate's Degree in Interpreter Sign Language in 1995, as well as a Master's Degree in Business Administration in 2008.  She also received her Chief Officer's Certification in 2012 and Fire Management Certification in 2016.

34.     Smith-Phifer has been a firefighter since 1992.  She was harassed at the training academy based on race and gender.  She was held to a higher standard than her male counterparts

6

because the male command staff did not want her to succeed. However, she passed the written and physical tests and has been one of only nine (9) Black/African American females to serve as a firefighter in the entire history of the CFD.

35. As all firefighters do, Smith-Phifer works approximately three 24-hour shifts a week with her company, meaning they eat meals together and sleep at the fire station waiting for calls. At various times throughout her career, her male coworkers made unwanted sexual advances and harassed her based on her race and gender. She was treated much more harshly than her white male peers and was sometimes isolated.

36. Smith-Phifer was determined to succeed and advance her career despite the challenges she faced due to her race and gender. She began participating in the promotional process for Battalion Chief in 2006.

37. Smith-Phifer was promoted to Captain after firefighter Priscilla Johnson, the first Black/African American female *eligible* for promotion to Captain filed a lawsuit alleging discriminatory failure to promote based on race and gender.

38. In 2002, Plaintiff Smith-Phifer became the first Black/African American female promoted to Captain.

39. Smith-Phifer has a history of outstanding performance reviews and a personnel file full of unsolicited commendations and thank yous from other departments and volunteer organizations. Her last five performance reviews have been Exceptional (2015), Exceptional (2016), Exceeds Expectations (2017), Exceeds Expectations (2018), and Exceeds Expectations (2019).

40. Smith-Phifer currently has the following training and certifications:

   a. Aircraft Rescue and Fire Fighting
   b. High Rise Fire Operations

7

c.  North Carolina Fire Officer 3
d.  North Carolina Fire and Rescue Instructor – Level I & II
e.  Urban Search and Rescue
f.  Incident Command System Logistics Section Chief
g.  Incident Command System Planning Section Chief
h.  Incident Command System Command and Control Multi-Alarm Incidents
i.  Incident Command System Command and Control Natural & Manmade Disasters
j.  OCSII
k.  ICS 100, 200, 300, 400, and 800
l.  CFD – Structure Collapse Technician
m.  NC Technical Rescuer Structural Collapse
n.  NC Driver – Operator Aerial
o.  NC Driver – Operator Pumps
p.  NC Driver – Operator EVD
q.  Brush Truck
r.  NC Technical Rescuer Ropes
s.  CFD – Rescue Technician
t.  NC Technical Rescuer VMR
u.  US ODP-WMD Course
v.  Smeal Engine
w.  Smeal Ladder
x.  American LaFrance Engine
y.  Quality Engine
z.  NC Hazmat Operation – Level 1
aa.  NC EMT
bb.  CFD Chief Officer Development Course
cc.  City's QUEST Class for first level supervisors
dd.  UNC Charlotte Fire Rescue Institute

41.     Smith-Phifer has also received the following awards and recognition:

a.  Distinguished Citizen Award, Grand Chapter of Kappa Alpha Psi Fraternity
b.  Honor of Distinction, Alpha Lambda Omega Chapter of Alpha Kappa Alpha Sorority
c.  Odyssey of a Woman Award, Beta Omicron Sigma Chapter of Sigma Gamma Rho Sorority
d.  Ashanti Award, NAACP Charlotte Mecklenburg Branch
e.  UTPO Legacy Award, UNC Charlotte
f.  Meritorious Service Award, CFD
g.  FSO Phenomenal Women Award, V101.9
h.  Burnette Nobles Safety Award, Charlotte Association of Insurance Professionals

42.     Smith-Phifer currently serves on the Strategic Planning Committee and the Inclusion Advisory Committee.  Smith-Phifer has served on the Health, Safety & Wellness Committee, the Chair of the Cancer Group subcommittee, the Disciplinary Policy and Procedures Committee, the Performance Review Committee, the United Way Campaign Committee, and the Minority Recruitment Committee as well.

43.     Smith-Phifer has been invited to speak at conferences for female fire and industrial leadership around the country, pushed for and participated in minority recruitment efforts for the CFD, and was a founder of a camp for young women with interest in a fire service career used as a model for similar camps in other states.  Smith-Phifer was also the CFD Coordinator of the Charlotte Mecklenburg Police Explorers' Christmas Project for eleven years, helping to distribute gifts, food, clothing, and other essential items to families who have experienced devastating fires.

44.     Smith-Phifer is one of the founders of Camp Ignite, which is CFD's high school residential camp for girls who are interested in learning what it is like to be a firefighter.

45.     Smith-Phifer has served as an assessor in other promotional processes for fire departments across the nation for the last fourteen (14) years.

46.     Since 2010, the CFD has acknowledged that Smith-Phifer is qualified to serve as a Battalion Chief, a practice known as "riding up" or "riding the car" since the Battalion Chief rides in the Battalion Chief's car, not on the fire truck.  Since 2014, Smith-Phifer has ridden as Battalion Chief for at least ten percent of her working days and performed the work of a Battalion Chief by commanding fires or other incidents that arise during her shift.

47.     Smith-Phifer's 2018 performance review states, "[w]hen given an assignment at an incident, I am confident that she will carry out the assignment and go beyond what is required to take care of the situation."

48.     Smith-Phifer has participated in the promotional process for Battalion Chief for the past fourteen (14) years, while many white males with less qualifications and experience were promoted to Battalion Chief ahead of her.

49.     On July 1, 2016, Smith-Phifer filed a discrimination complaint with the City's Director of Community Relations.  Her complaint says she has taken the Battalion Chief's promotional exam numerous times from 2006 to 2016 and was passed over for promotion while the City promoted less qualified white males.

50.     Without giving her an opportunity for a hearing to present evidence, the City HR denied her complaint and closed its investigation on or about August 24, 2016, claiming it found no evidence of race or gender discrimination.

51.     On October 27, 2016, Smith-Phifer met with an Assistant City Manager regarding her complaint.  During the meeting, Smith-Phifer could hear Chief Hannan on the other side of the door.

52.     Smith-Phifer expressed concern to the Assistant City Manager that Chief Hannan was listening in on their conversation, must have known she was there and why she was there, was trying to intimidate her, and would retaliate against her.

53.     On November 21, 2016, Smith-Phifer filed an EEOC Charge.

54.     By letter dated December 2, 2016, the Assistant City Manager claimed he found no discrimination and closed Smith-Phifer's appeal.  His letter states that he received information from Deputy Chief Gordon relevant to his decision, but that information has never been disclosed or shared with Smith-Phifer to give her an opportunity to respond.

55. On February 20, 2017, Smith-Phifer filed a grievance with the Civil Service Board and the City HR Director regarding the City's failure to secure the written test booklets for the written test for the 2017 promotional process.

56. A week later, on February 27, 2017, a white male Battalion Chief, who, upon information and belief, is close to Chief Hannan, emailed Smith-Phifer's Battalion Chief falsely claiming that, based on an event from six weeks prior, Smith-Phifer "lacks effective communication skills, the ability to handle critical decision making during stressful situations as well as the ability to convey a competent and professional demeanor."

57. However, based on the audio recording of the event the white male Battalion Chief was describing, Smith-Phifer's Battalion Chief said his complaint about her performance had no merit and did not match the audio recording.

58. Upon information and belief, Chief Hannan encouraged this white male Battalion Chief to make the complaint to retaliate against Smith-Phifer for her complaints about race and gender discrimination and the compromised promotional process. The white male Battalion Chief's comments are stereotypical comments related to Smith-Phifer's race and gender, which were made in retaliation for her protected activity as directed or encouraged by Chief Hannan.

59. Stereotypical comments about women, especially Black/African American women, are pervasive in the CFD. Before his retirement on August 31, 2017, Chief Hannan told Patterson directly that he would never promote Smith-Phifer because she did not have "command presence," a stereotypical comment used to negatively comment on her race and gender, and the same comment was made about prior Black/African American female candidate for Captain that Hannan and others did not want to promote.

60.     Upon information and belief, Chief Hannan made this statement in retaliation for her complaints, grievances, appeals, and EEOC Charge.

61.     On February 28, 2017, the Civil Service Board voted to take no action on Smith-Phifer's grievance about the compromised Battalion Chief written test and Smith-Phifer was denied the opportunity for a hearing or an opportunity to appear before the Civil Service Board to discuss her complaints and answer any questions the Civil Service Board had about her concerns.

62.     On March 22, 2017, Smith-Phifer submitted a grievance to the City HR Director regarding the retaliation she was facing as a result of her complaints, grievances and EEOC Charge.

63.     The City delayed responding until May 1, 2017, when HR denied Smith-Phifer's grievance related to the retaliation and harassment by the white male Battalion Chief and advised her that she had no right of appeal to the City Manager in violation of the City's grievance policy, HR 11, denying Smith-Phifer due process.

64.     City HR claimed the white male Battalion Chief had no knowledge of her grievance and complaints despite the fact that everyone knew she filed them because the information had been spread far and wide within and outside of CFD, even a retired captain knew about it.

65.     City HR also concluded that because there was no merit to the white male Battalion Chief's complaint, and since Smith-Phifer was not written up, there was no retaliation.

66.     On June 2, 2017, Smith-Phifer emailed the City Manager, Marcus Jones, about discrimination, retaliation, Chief Hannan's presence outside the door during her meeting about her grievance, and the Civil Service Board's denial of her request for a hearing.

67.     Her complaint to City Manager Jones also included allegations about an incident where Chief Hannan retaliated against her son, Aaron Phifer ("Mr. Phifer"), who had applied to

be a CFD firefighter. Mr. Phifer passed the written and physical tests and moved through two rounds of interviews. While Chief Hannan at first claimed to be supportive of Mr. Phifer, things changed after Smith-Phifer filed her July 1, 2016 discrimination complaint. In September 2016, Chief Hannan told Mr. Phifer he would not be proceeding in the process. Mr. Phifer was not hired in retaliation by association for his mother's protected activities and because of his race (Black/African American). CFD used retaliation and threat of retaliation against children of Black/African American firefighters as a means to prevent them from complaining.

68.     Based on Smith-Phifer's prior experience, and the widespread distrust of City and CFD HR, which consistently finds in the City's favor over its employees, she requested a meeting directly with City Manager Jones, but he never responded or met with her. Instead, he passed her back off to City HR, which had already denied her constitutional rights to procedural and substantive due process and allowed the discrimination, harassment, and retaliation to continue.

69.     During this same time period, another long-tenured Black/African American female firefighter started to speak out against the CFD. Indeed, this firefighter went to City Council meeting on June 5, 2017 and publicly spoke to complain about the disparate treatment of Black/African American women by the CFD command staff, in particular, the CFD's failure to hire and promote them.

70.     In early May 2017, Smith-Phifer spoke with local NAACP President, Corine Mack ("Mack"), about discrimination against Black/African Americans, especially Black/African females within the CFD, in recruiting, assignments, and promotions, and expressed concern about retaliation from Chief Hannan and former Deputy Chief Rich Granger ("Deputy Chief Granger") for anyone who spoke out.

13

71. Smith-Phifer had no duty to speak out in the community and to the NAACP about the longstanding pattern and practice of discrimination and retaliation within the CFD against Black/African Americans and women, especially Black/African American women, and was doing so to benefit the department and the community at large.

72. Smith-Phifer's discussion with the NAACP President about the longstanding pattern and practice of discrimination and retaliation in the CFD based on race and gender was protected speech on matters of important public concern, was protected speech under the United States Constitution and the North Carolina Constitution, as well as protected activity pursuant to Title VII, 1981, and 1983.

73. Mack confronted former Deputy Chief Granger on these issues on May 31, 2017 at a meeting which was reported by the media. Mack met with Smith-Phifer again on June 13, 2017, she met with former Mayer Jennifer Roberts on June 29, 107 and July 10, 2017, the City Manager Jones on June 5, 2018, June 28, 2017, and October 11, 2018.

74. The CFD command staff was aware of the multiple complaints by Black/African Americans, including Black/African American women, to the City Manager's Office, Mayor, the NAACP, the media, HR, and City Council and they wanted to silence them.

75. On June 7, 2017, Smith-Phifer emailed Chief Hannan for his permission to attend the Executive Fire Officer Program ("EFO") at the National Fire Academy ("NFA"). The program is designed for those who aspire to progress through the ranks within their organization and includes courses designed to enhance professional development.

76. Smith-Phifer's status as a Captain and service as an acting Battalion Chief coupled with her other leadership experiences during her tenure meant she met the service requirements

14

for the EFO program and was eligible to participate with a signed letter of recommendation from the head of the organization, the Fire Chief.

77.    Chief Hannan refused to give Smith-Phifer permission and responded, "I appreciate your interest.  The service level requirement for this program is 'battalion level chief officer' in a metro sized department.  Have you looked into any other classes at the National Fire Academy?" Upon information and belief, at the time he made this statement, Chief Hannan knew it was untrue. This was the third time that Chief Hannan denied permission for Smith-Phifer's application for the National Fire Academy's EFO Program—he also denied her permission in 2010 and 2012.

78.    Upon information and belief, in 2016, Chief Hannan gave permission to and wrote a letter of recommendation for a white male Captain to attend the National Fire Academy Executive Fire Officer Program and he was accepted on or about August 23, 2016 and attended.

79.    Smith-Phifer has continually sought a more senior position within the CFD, and has been a leader inside and outside of the CFD, however the Fire Chief chose not to grant her permission to attend because he did not want a Black/African American female to rise to the level of Battalion Chief or above.  He would not allow Smith-Phifer to progress because she was a Black/African American female, had engaged in protected activity under Title VII, had spoken out about race discrimination within the CFD, especially Black/African American women, and had involved the NAACP local Chapter President, who in turn spoke out publicly in the media as well as to the City Manager, City Council, and others.

80.    Upon information and belief, the City HR Director, Mayor Pro Tem, the current Fire Chief, and the City Manager have asked employees of the CFD not to speak out about discrimination against Black/African Americans and women in recruitment and promotions within the CFD or about retaliation by CFD against employees who complain about illegal discrimination.

81.     Upon information and belief, the Mayor Pro Tem even told Mack that there would be negative consequences to her and anyone else who spoke out against the CFD publicly or through trial testimony.

82.     On or about April 24, 2018, Smith-Phifer presented her Promotional Power Point Presentation entitled "Inclusion Within the Charlotte Fire Department" for the presentation portion of the 2018 promotional process.

83.     Smith-Phifer's presentation addressed CFD's "cultural legacies and traditions that systematically repeat and enforce patterns of exclusion" of Black/African Americans, women, and other minorities.  She explained how the current culture of exclusion affects the quality of public services provided to the community, including social consequences such as racial and gender disparities, generation restrictions, isolation, low morale, decreased performance, and increased turnover.

84.     Smith-Phifer's presentation advocated for inclusion through sensitivity training, normalizing conversations of race, the use of racial equity tools, mentorship programs, as well as community and professional partnerships and outreach.  She explained the differences between diversity and inclusion, proposed goals and objectives for adopting a culture of inclusion within the City and the CFD, and described the benefits to the Charlotte community of the CFD making strides on these issues.

85.     Smith-Phifer has witnessed and experienced blatant and continuing racism, gender discrimination, harassment, and retaliation against Black/African Americans and women, including but not limited to the following examples:

     a.  Smith-Phifer was directed to ride with Battalion Chiefs on her unpaid off-duty days in order to get more experience, while white males were not made to do this;

b. A white Battalion Chief would not let her ride with him for training although he allowed white male Captains and firefighters who did not aspire to be Battalion Chiefs to ride with him in the Battalion Chief's car;

c. Chief Hannan refused to allow Smith-Phifer to participate in the EFO program but allowed a less qualified white male;

d. Chief Hannan screamed at Smith-Phifer aggressively and pointed his fingers in her face; she never saw him do this to white males;

e. A white Battalion Chief refused to help Smith-Phifer although he had offered to help and upon information and belief did help white males;

f. A white Battalion Chief isolated and would not speak to Smith-Phifer or her husband, and routinely singled her out for criticism;

g. A white Battalion Chief criticized the pitch of Smith-Phifer's voice (female) and manner of her speech (Black/African American).

h. When Smith-Phifer was invited to speak at conferences, a white Battalion Chief told her she was "not qualified" and did "not know why anyone would ever want [her] to speak" despite the praise she received from speaking at these events;

i. A white Battalion Chief (now Division Chief) told Smith-Phifer she was "worthless," and that he would "ship her and everyone in her company to the far corners of Charlotte" if he could; this same Chief was an internal assessor in the 2018 Battalion Chief promotional process;

j. Smith-Phifer has observed white males in the CFD being disrespectful to other female firefighters, particularly Black/African American females;

k. Smith-Phifer has observed white firefighters criticize black firefighters for being "negative," "radical," and "racist" because they are advocating for equality and merit-based decisions and point out the need for more diversity to reflect the community served;

l. Smith-Phifer was subjected to yelling, cursing, and screaming from a white male Battalion Chief for her efforts to help Black/African American firefighters aspiring to be promoted;

m. Smith-Phifer was told that she was a burden to the CFD during when she was pregnant;

n. A Fire Chief told her it looked like the CFD paid her to have babies.

86. The City, Civil Service Board, members at all levels of the fire department (including retired members), HR, the City Manager, City Council, and the City Attorney's Office, all had knowledge of Smith-Phifer's various protected activities including her protected speech on matters of public concern, involvement of NAACP local President Mack, who she asked to speak on her behalf, grievances, opposition to discrimination and harassment against Black/African Americans and women, especially Black/African American women, her advocacy for inclusion

and diversity, her EEOC Charges, her support for other minority firefighters, and the improper discrimination and retaliation against her son, whose application to be a firefighter were repeatedly denied although he passed the written exam, CPAT, and interviews.

**Patterson**

87.     Before joining the CFD, he was a member of the 101st Airborne Air Assault Division of the US Army, trained to operate military weapons, machines, and vehicles.  He received the Army Achievement Medal and Army Commendation Medal, and an honorable discharge.

88.     After the Army, Patterson worked as a detention officer and later as a training officer for the Mecklenburg County Sheriff's office for three years.  Patterson then got an Associate's Degree in Fire Science & Technology from Central Piedmont Community College, *cum laude*, and a Bachelors in Fire Science engineering, *cum laude*, and was Fire Science Engineering Student of the year.

89.     Patterson has worked as a safety, security, and loss prevention specialist for the past 22 years.  He has experience in safety training, resource management, team building, leadership, and strategic planning.  There, he managed risk management and loss prevention, the budget, fire and life safety inspections, loss prevention, audit and insurance claims, and provided training such as emergency response, evacuation, and blood borne pathogens.

90.     Patterson currently has the following training and certifications:

    a.   High Rise Fire Operations
    b.   North Carolina Fire Officer 3
    c.   North Carolina Fire and Rescue Instructor – Level II
    d.   OCS I and II
    e.   ICS 200, 300, 400, and 800
    f.   IS 700 National Incident Mgmt System
    g.   NC Driver – Operator EVD
    h.   NC Driver – Operator Aerial

18

i.   NC Technical Rescuer Ropes
j.   NC Technical Rescuer VMR
k.   CFD – Rescue Technician
l.   CFD Chief Officer Development Course
m.  Smeal Engine
n.  Smeal Ladder
o.  American LaFrance Engine
p.  NC Hazmat Operation – Level 1
q.  NC Hazmat Operations – Air Monitoring
r.  NC Hazmat Operations – Decontamination
s.  NC Hazmat Operations – PPE
t.  NC EMT
u.  US ODP – WMD Course
v.  Hospitality Security Certification;
w. TIPS Certification
x.  Behavioral Interviewing Certification
y.  Brand Training
z.  First Responder and EMT-D Certification
aa. Hazardous Material/ Decon Training
bb. National Emergency Management System Training
cc. Incident Command System Training
dd. Detention Officer Certification
ee. NC Security and Protective Services Certification
ff. Combat Medic Certified
gg. Attended the National Fire Academy

91.     Patterson has been a firefighter since 1998 and was promoted to Captain in 2005.

92.     He currently serves on the CFD Pay Committee, Succession Planning Committee, and a new workgroup for promotional processes.  Previously, he served on the Civil Disturbance Committee, which examined first responder actions during riots and other disturbances.

93.     In addition to his service for the CFD, Plaintiff participated in the following community service and other activities: "100 Young Men of Charlotte," a group that mentors inner city male youths and helps provide financial and educational assistance; assisted with the High School Academy Internship Program and Explorer Program, designed to help minority and other youths explore interest in a firefighting career; Ministers of Defense, a church fellowship and leadership group at his church; several inner-city neighborhood discussion panels to discuss

solutions to problems in predominantly Black/African American neighborhoods; recruiting trips to find minorities interested in the CFD; mock assessment centers and study groups for Black/African American firefighter candidates for Captain; served as an assessor and proctored the entrance exam within CFD.

94.     In 2016, Patterson was asked to instruct the Wadesboro Fire Department on the functions and responsibilities of a Rapid Intervention Team, which is a team of two or more firefighters dedicated solely to the search and rescue of other firefighters in distress.

95.     The CFD has acknowledged that Patterson is qualified to serve as Battalion Chief and often does so on his shift. Since 2015, Patterson has ridden as Battalion Chief for at least ten percent of his working days and performed the work of a Battalion Chief by commanding fires or other incidents that arise during his shift.

96.     Patterson's 2016 performance review states, "During this time [2016], he has been the incident commander at four working fires. He also was the incident commander at a third alarm apartment fire. Due to his clear and concise orders the incidents were mitigated in a safe and timely manner."

97.     Patterson has a passion for firefighting. He has always wanted to be challenged at busy stations and on challenging fires and rescues.

98.     Patterson has witnessed and experienced blatant and continuing racism, gender discrimination, retaliation, and harassment against African Americans and female firefighters, including but not limited to the following examples:

   a.   In 2010, at a specialized rescue station, Patterson's white Battalion Chief told Patterson he was only assigned there because he was black, meaning he was assigned solely based on race/color for purposes of diversity numbers, not based on merit;
   b.   His white Battalion Chief treated Patterson's crew less favorably than crews under white captains, for example, by assigning Patterson's crew the more

menial or janitorial tasks and not giving them the same opportunities as the crews under the white captain;

c. Black/African American Chief told him not to speak to other Black/African American firefighters in front of white/Caucasian firefighters because it made the white firefighters uncomfortable;

d. Patterson's white Battalion Chief told Patterson that Black/African Americans do not know how to speak properly and "can't write;"

e. Patterson's white Battalion Chief made inappropriate comments about Treyvon Martin and former Charlotte Police Chief Rodney Monroe;

f. Patterson's white Battalion Chief did not allow Patterson's black crew members to serve as acting Captains before being placed on the eligibility list for Captain, although that was not a requirement;

g. Patterson's white Battalion Chief allowed white firefighters, but not Black/African American firefighters, in his battalion to serve as acting Captains even when they were not on the eligibility list for Captain;

h. On more than one occasion, Patterson's white Battalion Chief undermined Captain Patterson's decision and pulled a Black/African American firefighter off the truck during a call when he was serving as acting Captain for Patterson while Patterson was on vacation, although the firefighter Patterson had assigned had the knowledge, experience, and confidence to serve as acting Captain in Patterson's absence;

i. Patterson's white Battalion Chief threatened to write up Patterson for a white male Captain's mistake which the Battalion Chief knew was not Patterson's fault;

j. Patterson's white Battalion Chief attempted to block Patterson from participating in the promotional process without basis and, upon information and belief, did not do this to white candidates;

k. In 2015, a white male Division Chief, who was then a Battalion Chief, told others that he would never allow Patterson to be promoted; this same individual was used as an internal assessor in the 2018 Battalion Chief promotional process;

l. Patterson's white Battalion Chief threated to mark Patterson as AWOL for taking a break within the parameters of applicable policy;

m. In 2017, Chief Hannan told Patterson that he would never promote Smith-Phifer because she did not have "command presence," which is a stereotypical reference to her race and gender;

n. Patterson's white Battalion Chief provided false information and wrote him up for his subordinate's failure to go to mandatory training even though Patterson took all of the necessary steps to ensure that his subordinates knew about the training and had the opportunity to attend training.

99. On May 12, 2016 Captain Patterson submitted a grievance to his Division Chief based on racial discrimination by his white Battalion Chief, who made several racially discriminatory remarks about Black/African Americans in front of and to Captain Patterson,

threatened Patterson with a bad performance review, and told Patterson that he would not recommend/would block Patterson for promotion. After the grievance was filed, the harassment continued, and Patterson transferred to a different station because it became apparent that the Battalion Chief would not be disciplined. Upon information and belief, the harassing white Battalion Chief, who was friends with Chief Hannan, was never disciplined.

100. Beginning in 2018, Patterson was extremely vocal about his concerns about the 2018 promotional process. He spoke with multiple people throughout the command staff, CFD HR, and the City Manager's Office, and even spoke to retirees, including Black/African American males who previously filed a lawsuit against the City regarding discrimination against Black/African Americans in the promotional process, as explained in further detail below.

## PROMOTIONAL PROCESS BACKGROUND

101. Both Plaintiffs are Black/African American Captains who have experienced harassment, discrimination, and retaliation based on race, gender, and for EEO activity during their tenure within the CFD.

102. Both Plaintiffs have worked hard to move up through the ranks in the CFD but have reached a glass ceiling.

103. Both have made it clear to their supervisors and the command staff that they want to be promoted to Battalion Chief.

104. Both Plaintiffs have asked what they can do to improve their chances and have done everything suggested.

105. Smith-Phifer has participated in the promotional process for Battalion Chief for the past fourteen (14) years, and Patterson has participated in the promotional process for Battalion Chief for the past ten (10) years, without being promoted.

106.     The promotional process occurs annually and involves a written test and an assessment center. At the end of the process, all candidates who pass all sections of the process are placed on an eligibility list for promotion.

107.     Over the following year, when a promotion becomes available, the Fire Chief selects a candidate from the eligibility list. At the end of the year, the eligibility list expires and any candidates who were not promoted are required to compete in the process again if they wish to continue to be considered for promotion.

108.     The promotional process is an extensive time commitment for candidates, and is emotionally draining, especially for minorities, who have begun to feel that it is futile for them to participate since the process is continually changing and manipulated to exclude Black/African Americans and women so that certain preferred individuals are promoted, generally white males. Very few minorities are given promotional opportunities, and it has taken multiple lawsuits for them to advance.

109.     Year after year, Plaintiffs and other Black/African Americans and women have seen white males with less qualifications and experience get promoted ahead of them.

110.     Since 1999, only four (4) Black/African Americans and three (3) women have been promoted to Battalion Chief even though there have been approximately fifty (50) promotions to Battalion Chief within that time.

111.     Per the Charlotte City Charter, "Employment shall be based on merit without regard to race, creed, color, gender, political affiliation, age, or physical defect or impairment of the applicant…" (Charlotte, N.C., Ordinances, ch. 4, art. II, § 4.05(1))

112.     Additionally, CFD GO 206.01(II)(D) states that the promotion process "is competitive, based on merit principles."

113.     GO 206.01(II)(D)(1) explains that each year, "the Deputy Chief of Administration shall send out a detailed Promotional announcement outlining the reading list, important dates and process details."  The promotional announcement for at least the past six (6) years has stated, "The promotional process is a competitive process based on merit principles."

114.     The City is well aware of longstanding problems within the CFD which have resulted in discriminatory treatment and disparate impact on Blacks/African Americans and women in recruitment, hiring, training opportunities, development opportunities, special assignments and promotions, but has chosen not to adequately investigate and develop appropriate policies and procedures to prevent this from continuing to occur.

115.     The City has chosen not to implement the following policies, procedures, practices and safeguards within the promotional processes within the CFD:

    a.  No internal assessors for any portion of exam;

    b.  No internal facilitators for any portion of the exam;

    c.  Avoidance of conflicts of interests with persons involved in the process who are related to applicants or candidates;

    d.  Written Exam

        i.  Validation of the written exam;
        ii.  Single day testing of the written exam;
        iii.  Same day scoring of the written exam;
        iv.  Written exam results directly to the candidate from the vendor;
        v.  Written exam test booklets remain sealed and secured by non-CFD employee until the time of the exam;

    e.  Oral Exam

        i.  Validation of test;
        ii.  Validation of all questions prior to testing;
        iii.  Adequate time to prepare and respond to questions;

      iv.  Questions that do not give advantage to whites who have received special assignments at a higher rate than qualified Black/African Americans.

  f.  Assessment Center

      i.  No cut-off scores for individual portions of the test;
     ii.  No unvalidated individual components;
    iii.  Content of individual components not revealed to anyone internal to CFD or to anyone within the City who will not maintain confidentiality.

  g.  Analysis

      i.  Analysis after every promotional process to ensure that process was fair, merit based, and job related;
     ii.  Regular job analysis to ensure that job descriptions are accurate, up to date, and job related.

## 2015 PROMOTIONAL PROCESS

116.    In 2015, both Plaintiffs participated in the promotional process for Battalion Chief along with 22 others. Of the 24 candidates, four (4) were Black/African American and two (2) female, with Smith-Phifer the only Black/African American female.

117.    The 2015 Battalion Chief Promotional Announcement, dated December 15, 2014 states: "The promotional process is a competitive process based on merit principles."

118.    In 2015, there were complaints about the security of the written test and concerns that test answers were not secure from one testing day to the next.

119.    Indeed, on the second day of testing, HR realized that there were not enough tests to go around even though they knew exactly how many test takers there would be, ordered that number of tests from the vendor, and upon information and belief, received extra tests from the vendor. Upon information and belief, the tests were not secured which allowed for inappropriate access, tampering, and manipulation by some candidates, directly or indirectly.

120.    As a result, the CFD used a cut-off score of 63, the lowest score of the participants, rather than the vendor-recommended cut-off score per the 2015 Battalion Chief Promotional Announcement, which means that all candidates passed the written test, including candidates that, upon information and belief, would have failed who nevertheless were allowed to advance to the second stage of the process.

121.    Both Plaintiffs passed the assessment center and proceeded to the Deputy Chiefs' interview, which was the third portion of the 2015 Battalion Chief promotional process.

122.    Following the Deputy Chiefs' interview, neither Plaintiff was provided with written notice or feedback or told whether they were being placed on the promotion list, in direct violation of the policies and procedures governing the selection and promotion of employees in the Fire and Police Departments as set forth in Section 5(6)(d) of Rule IX of the Council's 1973 Resolution Amending the Personnel Rules and Regulations ("Rule IX)

123.    Section 5(6)(d) says, "<u>Notification</u> - Each candidate taking an examination shall be given prompt written notice of the results, thereof, and whether or not his or her name will be placed upon an eligible register."   The "eligible register" is the eligibility list.   "Examination" includes the oral interviews.

124.    The eligibility list was never published so neither Plaintiff knew whether or not they were eligible for promotion.

125.    Upon information and belief, the CFD used the Deputy Chiefs' interview as an improper, unfair, and subjective means to keep Black/African American and female candidates from placement on the eligibility list and refused to provide feedback to let candidates know whether or not they made it on the eligibility list in order to prevent grievances and appeals.

126.    Upon information and belief, the Deputy Chiefs knew who the Fire Chief wanted to promote and confirmed to his wishes.

127.    The eligibility pool resulting from the 2015 Battalion Chief Promotional Process was open from July 1, 2015 through June 30, 2016. During this time, Chief Hannan promoted three candidates. Two of the candidates had significantly less seniority and were less qualified than Smith-Phifer and one candidate had less seniority and was less qualified than Patterson.

128.    After the eligibility pool expired on June 30, 2016, Plaintiffs realized that they would not be promoted.

129.    Fire Chief Hannan discriminated against Plaintiffs when he knowingly chose lesser qualified white candidates for promotion to Battalion Chief, and when he chose lesser qualified males than Smith-Phifer.

130.    On July 1, 2016, Smith-Phifer submitted a discrimination complaint pursuant to Rule X of the City's Personnel Rules and Regulations to the City's Director of Community Relations, Willie Ratchford, for the CFD's failure to promote her to Battalion Chief and instead promoted less qualified males. She requested a hearing on her complaint based on the City's HR 5, which states, "Employees are guaranteed an impartial and fair hearing." Mr. Ratchford sent the complaint to the City's HR department.

131.    On August 24, 2016, City HR denied Smith-Phifer's complaint. She filed an appeal to the City Manager's office, which was also denied on December 2, 2016. She also filed an EEOC Charge for race and gender discrimination in November 2016.

**2017 PROMOTIONAL PROCESS**

132.    The 2017 Battalion Chief Promotional Announcement, dated December 19, 2016 states: "The promotional process is a competitive process based on merit principles."

27

133.    The 2017 promotional process included 27 candidates, of which four (4) were Black/African Americans and two (2) were female.

134.    In violation of standard testing procedures, the box containing the unsealed individual test booklets was not kept sealed between when CFD received them from the publisher and when they were handed out prior to the exam.  When the booklets were distributed at the time of the test, the box had already been opened so there was no way to confirm that the booklets had not been tampered with.  Some booklets also appeared to have been copied because the quality and color were different and were discolored.  Deputy Chief Gordon made statements just prior to the exam indicating he had reviewed the test before it was administered.  When a candidate taking the test asked about it, he was told the box the booklets were in was sealed.

135.    Both Plaintiffs were told they scored 65 and were thus eliminated from proceeding in the promotional process, having fallen below the cut-off score of 66 chosen by Chief Hannan. Chief Hannan claimed that anyone who scored below 66 were not ready because they lacked sufficient knowledge.  Chief Hannan told Patterson he had knowledge of all of the candidates' test scores and purposefully chose a cut-off score that would eliminate Smith-Phifer.

136.    Ultimately, no Black/African Americans or females passed all sections of the promotional process and no females or minorities were promoted to Battalion Chief as a result of the 2017 promotional process.

137.    Smith-Phifer filed a grievance with the Civil Service Board on February 20, 2017 regarding the handling of the written test for the 2017 Battalion Chief promotional process and requested a hearing.

138.    On March 2, 2017, Smith-Phifer filed a grievance with the City after CFD retaliated against her for filing her prior grievances and EEOC charge.  She spoke with HR regarding her

grievance on April 7, 2017. An HR consultant representative told Smith-Phifer on May 1, 2017 that HR denied her grievance and she had no right of appeal to City Manager in violation of City HR 11, further depriving Smith-Phifer of procedural and substantive due process.

139.     On May 2, 2017, the Civil Service Board notified Smith-Phifer it had decided to take no action.

## 2018 PROMOTIONAL PROCESS

140.     Before the 2018 promotional process began, there was a meeting on November 1, 2017 with then-Interim Fire Chief and Deputy Chief Pete Key ("Deputy Chief Key"), Deputy Chief Kevin Gordon ("Deputy Chief Gordon"), Battalion Chief Shane Nantz ("Battalion Chief Nantz"), Firefighter II Marty Puckett ("Puckett," former Charlotte Firefighters Association "CFFA" Vice President), and Captain Tom Brewer ("Captain Brewer," CFFA President) to discuss the 2018 promotional process for Battalion Chief. Then-Interim Fire Chief Key decided that not only should no internal assessors be used, but all assessors should be from outside of North Carolina. Brewer, Nance, and Puckett supported the elimination of internal assessors. Deputy Chief Gordon was silent on the issue. The group also agreed to have another meeting before the announcement of the 2018 promotional process for Deputy Chief was made.

141.     However, upon information and belief, while Deputy Chief Key was on vacation, Deputy Chief Gordon, who was designing the promotional process for approval by the Interim Fire Chief and the City's HR Director, sent out a promotional memo to all CFD personnel on December 18, 2017, which had not been approved by Deputy Chief Key and which was inconsistent with Deputy Chief Key's expectations based on the discussions in the November 1st meeting.

142.    A second 2018 promotional process memo was sent on December 30, 2017 with minor changes, but it too contradicted the decision Deputy Chief Key made in the November 1st meeting, namely to only use external accessors from outside the City of Charlotte and state of North Carolina.

143.    The 2018 Battalion Chief Promotional Announcement, dated December 30, 2017 states: "The promotional process is a competitive process based on merit principles."

144.    Deputy Chief Gordon (white male) oversaw the 2018 Battalion Chief promotional process: all of the promotional materials were sent by him, and he was included in meetings and made key decisions on how the promotional process would be structured, despite the fact that his brother was a candidate competing in the Battalion Chief promotional process.  This is in direct violation of the City's Nepotism policy (HR 7).  The Fire Chief and other high-level officials in the CFD and City HR were aware of this and failed to prevent this serious policy violation from tainting the 2018 promotional process.

145.    Upon information and belief, Deputy Chief Gordon specifically created a process that would be easily manipulated and more favorable to his brother (white male).  He sent the 2018 promotional announcement during Deputy Chief Key's vacation in order to prevent or discourage Deputy Chief Key (Black/African American) from objecting.

146.    Additionally, since Deputy Chief Gordon decided which subjects the testing vendor should focus their test questions on, candidates with that information would have a distinct advantage since they would not have to study all 3,128 pages of written materials for the exam.

147.    Upon information and belief, Deputy Chief Gordon was able to get HR approval for use of internal assessors on the 2018 promotional process despite the discussions and decisions made at the November 1st meeting.  The use of internal assessors invites bias and has been a

continuing complaint of African Americans who object to the CFD's promotional practices to the extent they are unfair, overly subjective, not merit based, and used to discriminate against Black/African Americans, particularly Black/African American females and Black/African Americans who stand up and speak out, especially about the treatment of Black/African Americans.

148. The final 2018 Promotional Process Memo for Battalion Chief that Deputy Chief Gordon sent to all potential candidates on December 30, 2017 outlined the entire process. This year, the process included a written test, and a day at an assessment center in which candidates were tested on an operational fire problem, responded to an oral board exam, and gave a power point presentation.

a. <u>Written Test</u>. Candidates were given 3.5 hours to take the test, which has 100 questions. Candidates were told to study 4 fire and fire officer textbooks, a guidebook on effective supervisory practices, the CFD Tactical Operating Guidelines, and the testing vendor's study guide. These reading materials total about 3,128 pages. Purchased new, these books cost about $700. This year, candidates had to meet or exceed the predetermined cut-off score of 66.

b. <u>Assessment Center</u>. Each candidate who passed the written test was invited to participate in an assessment center. Each portion of the assessment center included two external assessors, one internal assessor, and an internal facilitator.

   i. <u>Fire Problem</u>. Candidates are given a set of written instructions and five minutes to prepare a presentation on their action plan to mitigate an incident. Candidates were not told the preparation and presentation times during the orientation, as they have been told in years past.

   ii. <u>Oral Board Exam</u>. This exercise was added in 2018 after its removal in 2015. Candidates were given 5 minutes to prepare for 6 questions and were given 15 minutes to present their response. Candidates were not given the preparation and presentation times during orientation, as they have been told in years past.

   iii. <u>Power Point Presentation</u>. Candidates were given a choice of presentation topics and were told to prepare a power point presentation. Candidates were not given the topics during the orientation, but rather received the topics two weeks before the assessment center. Both Plaintiffs gave presentations

that discussed the importance of diversity and inclusion. Battalion Chiefs are not normally required to give power point presentations in the normal course of business, although the City Charter, Article III, Sec. 4.61 states that the promotional test "shall be limited to matters which fairly test the relative ability of the applicant to discharge the duties of the position applied for."

149. The 2018 promotional process for Battalion Chief had 33 candidates, of which six (6) were Black/African American; with one (1) woman, Smith-Phifer.

150. Candidates were notified of their combined written and assessment center scores via email on May 21, 2018 after Chief Johnson had the opportunity to review and approve the process.

151. It is no surprise that when the eligibility list was posted, Deputy Chief Gordon's brother was on it, and he was among the first six Captains promoted to Battalion Chief in the 2018 process. Deputy Chief Gordon's brother had been serving as acting Battalion Chief, although it was a requirement that firefighters had to participate in the Battalion Chief promotional process before they were allowed to serve as an acting Battalion Chief, an upon information and belief, this requirement was never waived for any Black/African American Captains. Moreover, Deputy Chief Gordon was known to say that no one should be promoted to Battalion Chief the first time they completed the process because they needed more experience before becoming a Battalion Chief.

152. Upon information and belief, Deputy Chief Gordon's brother never competed in the Battalion Chief process previously because, upon information and belief, he did not meet minimum qualifications to do so. Deputy Chief Gordon's brother received the highest score out of all of the candidates posted on the eligibility list on the oral board section—a 72.78. His score

was at least 14.45 points higher than any other candidate on the eligibility list. The next highest score was a 58.33.

153. Upon information and belief, assessors for the oral board thought that some of the candidates knew the questions ahead of time.

154. Upon information and belief, assessors were harder on the Black/African candidates than the white candidates.

155. Upon information and belief, Deputy Chief Gordon's brother scored well on the oral board portion of the test not only because he had been given the questions in advance, but because of rater bias—internal assessors knew that he was the Deputy Chief's brother.

156. Of the thirty-three (33) candidates who participated, eleven (11) made the eligibility list, meaning that when a position became available, the Chief would promote a candidate from the list of eligible candidates.

157. Plaintiffs were not included on the eligibility list because the assessors gave them a score below the 50-point cut-off score on the oral board portion of the test.

158. Upon information and belief, the eligibility list included ten (10) white men and one (1) black man. Of the 11 who were eligible for promotion, six white men on the eligibility list were promoted to open Battalion Chief positions on October 9, 2018. On November 6, 2018, two (2) additional white males from the eligibility list were promoted to newly opened Battalion Chief positions. Of the eight (8) who have been promoted to date, only two have more qualifications, seniority, experience, training, and knowledge than Patterson. Smith-Phifer has more qualifications, seniority, experience, training, and knowledge than all of the eight (8) white males who have been promoted.

159. In past years, candidates have been able to review the notes and score cards of the assessors so that they can get feedback on their performance. However, this year, the CFD did not allow them to do this. Candidates were given oral feedback based solely on the internal assessors' assessments.

160. The City Manager's office previously recommended that the CFD incorporate a formal feedback process at the conclusion of any promotion or selection process, but upon information and belief, they did not do anything to ensure that the CFD did so.

161. The process followed for the 2018 promotional process, in addition to promotional processes of the past, was manipulated to favor certain individuals, specifically white males, and those who have been chosen by the CFD command staff for promotion based on favoritism and nepotism rather than merit.

162. Additionally, the promotional process utilized by the CFD for 2018, and in years past, has not been validated, nor supported by a recent job analysis, and it has ultimately been used for disparate treatment of Plaintiffs and has had an adverse impact on Blacks/African Americans and women, particularly Black/African American women.

163. Plaintiffs are in agreement that they believe that the 2018 promotional process is the most unfair, biased, and non-merit-based process in which they have participated to date.

## Discussions, Complaints, and Grievances

164. On multiple occasions throughout the 2018 promotional process, Plaintiffs and others raised concerns about the unfairness of the process directly to command staff and senior City management, which was designed to introduce subjectivity and an ability to manipulate the process to exclude Black/African Americans, especially Black/African American females, as in the past.

34

165.    Many Black/African Americans, including Plaintiffs, were concerned about the validity with the 2018 Battalion Chief promotional process as soon as the first emails and memos were sent by Deputy Chief Gordon in late 2017.

166.    Patterson had discussions with Deputy Chief Key and Deputy Chief Gordon to discuss his complaints that the process was unfair and could be used to eliminate more qualified Black/African Americans.

167.    Black/African Americans were particularly concerned about the use of internal assessors, which was an issue in three 2003 lawsuits alleging discrimination against Black/African Americans in the promotional process for Deputy Chief.  The use of internal assessors was eliminated after these lawsuits.  The 2003 lawsuits had serious and valid allegations, but were dismissed on technical Statute of Limitation grounds, not on substance.  Patterson shared this background when he met with City officials to raise his concerns.

168.    On February 12, 2018, Patterson met with Deputy Chief Gordon to discuss issues with the 2018 promotional process, including the use of internal assessors and cut-off scores as a means to eliminate Blacks/African Americans.

169.    Deputy Chief Gordon told Patterson that he should just focus on passing the written test, that he would not discuss the specifics of the process, that he had recused himself from overseeing the process, and that he would look into Patterson's concerns.  Patterson never received any response or follow up to this meeting from Deputy Chief Gordon or anyone else in management.

170.    On April 17, 2018, Plaintiffs met with other Black/African American candidates for the Captain and Battalion Chief promotional processes to discuss their concerns about the processes and how to address them.  Also, in attendance were current and retired Black/African

35

American officers who shared their concerns. Approximately ten people attended the meeting. The group discussed the use of internal assessors, the lack of transparency about the process during orientation, the added components of the oral board and the power point presentation, and rumors that the written exam answers and the questions for the oral boards had been shared. Those attending this meeting believed that all of these components gave white males an unfair advantage in the 2018 promotional processes.

171.    The oral board was not validated, and the questions used gave an unfair advantage to the white candidates who received special assignments and other opportunities denied to Black/African Americans and Black/African American women, including Plaintiffs, who were more qualified than whites chosen for special assignments for which they applied.

172.    The power point presentation was not validated and is not job related.

173.    Patterson went directly to City management and spoke on behalf of the group.

174.    On April 27, 2018, Patterson went to the City Manager's office in an attempt to meet with City Manager Marcus Jones. When Patterson was told that City Manager Jones was not available, he spoke with Interim Assistant City Manager Danny Pleasant ("Assistant City Manager Pleasant").

175.    Patterson told Assistant City Manager Pleasant that he represented a group of Black/African American firefighters who all had similar concerns about the 2018 promotional processes. Patterson requested that the City Manager ask the new Fire Chief, Chief Johnson, who would be sworn into office on April 30, 2018, to do one of four things in order to try to eliminate or minimize the potential for disparate treatment and disparate impact on Black/African Americans that had taken place in the Captain and Battalion Chief processes as of that date:

1.    Eliminate all cut-off scores for both the 2018 processes; or,

2. Redo the assessment center without internal assessors; or,

3. Delay all promotions and redo the entire process under the new Chief; or,

4. Delay all promotions and allow an outside vendor to redo the entire process.

176. The speech that Patterson delivered to the City Manager's Office was in the context or circumstance of a group complaint, demonstrating the public import of the speech. The speech Patterson adopted was by a group of most of the Black/African American CFD officers it, therefore, had the potential for broad impact.

177. The public has a fundamental interest in effective law enforcement organizations that are free of discrimination. Patterson's individual interests, then, merged in a real sense with those of the community at large.

178. At this point, the Black/African American candidates, including Plaintiffs, were still hopeful that the new Chief would only allow promotional decisions to be made based on a fair, unbiased, non-discriminatory, non-retaliatory, merit-based promotional process.

179. Before coming to Charlotte, various personnel reached out to Chief Johnson to get him up to speed on current issues plaguing the CFD, including numerous problems with and challenges to the promotional process, specifically for the current 2018 promotional process, which was underway at the time he was sworn in on April 30, 2018. Chief Johnson was advised of past concerns regarding internal assessors, unsecured written tests, oral boards, cut-off scores for the oral boards, and non-job-related exams being used for discriminatory treatment of the Black/African Americans and Black/African American females, and of historic disparate treatment and adverse impact on Black/African Americans and women and manipulation to pick white males based on favoritism and nepotism.

180. Deputy City Manager Pleasant told Patterson that the City Manager was aware of the concerns with the CFD promotional processes, hiring, diversity and morale, and Pleasant said he was sure Patterson and the other Black/African American firefighters would be pleased with the new Fire Chief's actions to address the concerns, without identifying what those concerns were.

181. Later in the day on April 27, 2018, Patterson sent an email to City Manager Marcus Jones that stated, "I have an urgent CFD issue that I want to make you aware of. I briefed Mr. Pleasant earlier to day [sic] on the issue, but I would like to discuss it in detail with you. If possible can [we] meet sometime this Monday? Time is of the essence."

182. The City Manager failed and refused to respond despite Patterson's expression of urgency. Upon information and belief, City Management did reach out to CFD or cause Chief Johnson to address the concerns raised or consider the suggestions made by the group of Black/African American firefighters represented by Patterson.

183. Upon information and belief, Chief Johnson had the opportunity to review the promotional process and throw out or redo any of the portions of the test that were unfair, overly subjective, non-job related, unvalidated, and easily manipulated, in order to ensure a fair, merit-based, validated, and job related, non-discriminatory process, but he chose not to do so. Instead, he ratified the process, although he knew it could be manipulated to cause adverse treatment of Black/African Americans and women, especially those who had complained of race or gender discrimination, corruption of the process, or retaliatory treatment in promotions based on protected activity. In ratifying the process, Chief Johnson engaged in an affirmative action which denied Plaintiffs their right to a fair, unbiased, non-discriminatory, non-retaliatory, validated, job-related, and merit-based promotional process.

184. On April 28, 2018, Patterson spoke by phone to Deputy Chief Key regarding the concerns of Black/African American candidates in both the Captain and Battalion Chief processes. Deputy Chief Key advised Patterson to put his concerns in writing and request a meeting through Patterson's supervisor, then-Battalion Chief Willie Summers. Deputy Chief Key said he would review the memo at that time. Patterson did as he was instructed. However, upon information and belief, Deputy Chief Key would not meet with Battalion Chief Summers and Patterson was never granted a meeting with Deputy Chief Key.

185. After speaking with Deputy Chief Key on April 28th and again on April 30, 2018, Patterson requested a meeting with Deputy Chief Gordon regarding the 2018 promotional process. Deputy Chief Gordon said that Chief Johnson had already been briefed on Patterson's concerns and suggestions regarding the 2018 promotional process.

186. During the meeting, which included the HR Manager at Chief Johnson's request, Patterson emphasized to Deputy Chief Gordon and the HR Manager that approximately ten Black/African American firefighters had problems with the use of internal assessors and at least one person in that group had a problem with each of the three specific internal assessors used for the assessment center in the 2018 process.

187. Deputy Chief Gordon and the HR Manager told Patterson that those people should have come forward earlier; Patterson told them that they were afraid of retaliation if they complained and wanted to give the new Fire Chief an opportunity to address the issues first.

188. Patterson told Deputy Chief Gordon and the HR Manager that he and other Black/African Americans were concerned about the lack of information provided about the oral board and fire ops problem at orientation, and the overall lack of transparency. Deputy Chief Gordon said that orientation is a courtesy, not a requirement. Deputy Chief Gordon also told

Patterson that they brought back the oral board after they eliminated the Deputy Chief interview. Upon information and belief, the CFD command staff wanted internal assessors involved so that they could maintain control over who was promoted.

189.　　After his meeting with Deputy Chief Gordon and the HR Manager, Patterson had a private meeting with Deputy Chief Gordon.  Patterson and Deputy Chief Gordon discussed prior concerns and added that Black/African Americans were concerned they would not be scored fairly by internal assessors, especially in the oral boards where lack of opportunities for special assignments was an issue.  He told Deputy Chief Gordon that he oversaw a process which promoted his brother, while at the same time, passed over more qualified Black/African Americans.  Deputy Chief Gordon was defensive of his brother and said that he had recused himself from the process, although it was obvious he had not.  Deputy Chief Gordon told Patterson that he would recommend the removal of cut-off scores for the assessment center, evaluate the entire promotional process, and that because Chief Johnson would make the promotions—any blame for an unfair process would be on Chief Johnson, not Deputy Chief Gordon.

190.　　Between May 28, 2018 and June 4, 2018, both Plaintiffs filed grievances with the City about the lack of diversity among the chiefs, the failure to give special assignments to Black/African Americans at the same rate as whites, the failure to promote Black/African Americans at the same rate as whites (i.e., it takes much longer for Black/African Americans to pass the promotional process and actually be selected for promotion), the creation of positions in order to promote more whites, nepotism, favoritism, and conflicts of interest which favored whites, disparate treatment, and adverse impact on Black/African Americans, the lack of honesty and trustworthiness of those in charge of the promotional process, the use of internal assessors, the lack of security, the manipulation of cut off scores to exclude Black/African Americans, the

manipulation of the promotional process to favor white males (e.g., formatting or choosing an assessment center question or assignment in a way that favors candidates with certain special assignments, including training officers), the subjectivity of exams, and inconsistent feedback or lack of feedback.

191.    Patterson emailed his grievance directly to City HR Director Sheila Simpson on June 1, 2018 and requested a meeting with Chief Johnson to discuss the concerns detailed in his grievance.

192.    In June 2018, Captain Patterson spoke with Chief Johnson who told Patterson that he, Chief Johnson, did not see anything wrong with the 2018 Battalion Chief promotional process or with the use of internal assessors.  Patterson shared the history of the 2003 lawsuits and removal of internal assessors, which was a demonstrated barrier to the equal advancement of Black/African Americans.  Chief Johnson told Patterson that he was a numbers guy, and that Patterson would have to prove to him that there was a problem.  Patterson explained that the numbers and data support his assertions.  Patterson told Chief Johnson that the African American candidates for Battalion Chief studied and passed the written test but were unfairly eliminated by the assessment center.  Chief Johnson was repeatedly warned that the oral boards were used to prevent candidates from passing the assessment center.

193.    On June 25, 2018, Patterson met with Chief Johnson, and City HR Director Simpson to discuss his grievance.

194.    During the meeting, Chief Johnson and City HR Director Simpson argued that they had followed the process as outlined in the December 2017 promotional announcement and insinuated that any problems were the fault of Deputy Chief Key.  Chief Johnson said, "wait until next year," meaning this year is already done, but he would do better next year.  However, that is

not the case.  Upon information and belief, the 2019 process will have many of the same problems as recent processes.

195.    On June 25, 2018, Captain Smith-Phifer and her employee advocate with the Charlotte Firefighters Association, Marty Puckett, met with Chief Johnson and City HR Director Simpson to discuss her grievance filed earlier that month.  They discussed the problems with the 2018 Battalion Chief promotional process, including the use of internal assessors, promotions not made based on merit, and other issues resulting in disparate treatment and adverse impact on Black/African Americans.

196.    On August 2, 2018, Smith-Phifer emailed Chief Johnson for a status update and copied the City HR Director, asking when she could receive a response to her grievance since the City's Grievance Policy, HR 11, states that the department director has twenty (20) business days to respond.  Chief Johnson responded that the grievance would be completed in the next several days.

197.    On September 12, 2018, Patterson emailed Chief Johnson for a status update on his grievance filed on June 1, 2018.  On September 19, 2018, Chief Johnson replied that he and City HR Director Simpson were finalizing a response.

198.    Patterson did not receive any response to or decision on his grievance from the City or CFD until September 9, **2019**, and Smith-Phifer never received any response to her grievance, in violation of the City's grievance policy and the timeline.  In failing to respond to Plaintiffs' grievances per City HR 11, Chief Johnson engaged in an affirmative action which has denied Plaintiffs their right to due process.

199.    After the 2018 promotions were announced on October 9, 2018, Plaintiffs submitted written requests to the Civil Service Board for the opportunity to speak at their next regular meeting.

200.    Plaintiffs were allowed to attend the November 6, 2018 meeting of the Civil Service Board and each given 5 minutes to speak about their grievances related to the 2018 promotional process.

201.    The Civil Service Board did not have any questions for Plaintiffs and there was no further interaction after they spoke.  Plaintiffs were denied access to due process when the City only granted them 5 minutes each to speak and denied them an appeal hearing in front of the Civil Service Board.

## 2019 PROMOTIONAL PROCESS

### Smith-Phifer

202.    Smith-Phifer participated in the Battalion Chief's Promotional Process again in 2019.

203.    When the scores for the process were posted on June 24, 2019, Smith-Phifer had the third highest combined test score on the list, but she was placed fourth because the individual who was placed in the third slot received two additional points for having a bachelor's degree in Fire Science.  This placed him above Smith-Phifer.

204.    The CFD has a policy/practice of awarding two extra points on the Battalion Chief's exam for a Fire Science Bachelor's degree as an additional unnecessary artificial barrier that has an adverse impact on females and Black/African Americans; as generally the minorities who come to the department have already obtained their bachelor's degree in another field of study.  To go

back and obtain a Bachelor's Degree in Fire Science would cause an undue burden to minority candidates participating in the Battalion Chief's promotional process.

205. The CFD does not award points for other advanced degrees; Smith-Phifer has a Bachelor's and a Master's Degree in Business Administration.

206. The rank of Battalion Chief is the second level of management within the CFD. The Battalion Chief's job function is more business and strategic rather than operational or tactical. Thus, Smith-Phifer's degree is more relevant to the rank of Battalion Chief than the Fire Science degree.

207. There is no business necessity for Battalion Chiefs or other candidates promoting to Battalion Chief to have a four-year Fire Science degree. Therefore, the two relevant factor points are an artificial barrier to promotion.

208. If Smith-Phifer had a Fire Science degree rather than a Bachelor's and a Master's Degree in Business Administration, she would have been promoted on January 11, 2020. The person promoted over her who had a Fire Science Degree was a less experienced white male.

209. In addition, after receiving her individual test scores in May 2019, the CFD leadership harassed her and issued an unwarranted complaint against her; looking for and threatening adverse action against her in order to remove her from the promotional list or prevent her eligibility to the position of Battalion Chief, which caused Smith-Phifer emotional distress.

210. Smith-Phifer complained to the City's HR director on July 20, 2019. On July 25, 2019, Smith-Phifer received a reply email from the HR Director sharing her concerns about the two educational points factored into the total score for the promotional process. Indeed, the HR Director called the points added for education an "artificial barrier" to promotion for minorities

and women.  Smith-Phifer did not receive any follow up correspondence or resolution to her complaint.

**Patterson**

211.    Patterson also participated in the Battalion Chief's Promotional Process in 2019.

212.    On July 11, 2019, Patterson submitted a grievance to his supervisor regarding the 2019 Battalion Chief Promotional Process.

213.    Patterson's grievance complained that Blacks/African Americans and women were being passed over for promotions by lesser-qualified white males.  Patterson stated, "CFD does not promote based on merit and body of work. This is in direct contradiction of GO 206.01 which states 'The process is competitive, based on merit principles.' The administrations [sic] unwillingness to develop and administer a process that promotes African Americans and women proportionately to the city's demographics is evident."

214.    On August 8, 2019, Patterson met with City HR.  In the meeting, Patterson repeated his concerns concerning CFD promotional processes and the adverse impact they have on Black/African Americans and women.  City HR wanted to discuss matters separately, instead of from a broader scope which reveals the CFD's pattern and practice of discrimination and retaliation.  Patterson expressed to City HR that this was a tactic used by the City to defend their arguments against minority employees who complain of discrimination and retaliation.

215.    Patterson also told City HR that he believed he was being wrongly and hurriedly forced out of Station 34 as it transitioned to a HazMat Station in retaliation for his previous complaints of race discrimination and retaliation and grievances.  City HR agreed with Patterson that the CFD had poorly handled the transition and had many questions for Patterson.

216.    City HR asked Patterson if Chief Johnson knew about the Station 34 transition. Patterson replied, "I want you to understand what you just asked me. If the Fire Chief did not know about one of his fire stations being changed to a HazMat Station and the process to do so, that is incompetent. If he did, and allowed it to move forward in the manner it did, then he is complicit, either way it was scary and concerning." City HR agreed with Patterson's assessment.

217.    Before the meeting ended, Patterson told City HR that he knew the City would come back and say that his grievance would be unsubstantiated because they had to protect themselves. Patterson also told City HR that Patterson and Smith-Phifer never received a response from the City to their 2018 grievance, although another Captain who filed a grievance about the 2018 Battalion Chief's Promotional Process received a response to his grievance.

218.    On September 9, 2019, Patterson met with the City HR Director ("HR Director"). Patterson shared with the HR Director the same concerns he previously shared with City HR. In this meeting, the HR Director finally gave Patterson a copy of the City's response to his 2018 grievance. She said she thought she had sent it to him even though Smith-Phifer and Patterson both reached out to the HR Director on multiple occasions to her and Chief Johnson for answers about their 2018 grievances, but never received any response.

219.    Patterson also openly shared his concerns with the 2019 Battalion Chief's Promotional Process as a member of the Promotional Process Workgroup. In one of the final workgroup meetings attended by Chief Johnson, Chief Johnson stated, "I understand Captain Patterson has some concerns. We can listen to him or take what he says with a grain of salt."

## DENIAL OF SPECIAL ASSIGNMENTS, TRAINING, AND OPPORTUNITIES

220.    In addition to participating in the promotional process for Battalion Chief on a yearly basis, Plaintiffs have continually sought additional training, opportunities to learn and

network, committee work, special assignments, and other development opportunities as a means to grow and further their career with the CFD. However, Plaintiffs have been denied the opportunities, committee work, training, and special assignments that have been given to their white male counterparts.

221.    In January 2018, the City supplied the EEOC with a list of special assignments for the past two years, which showed that out of 270 special assignments, only 17 special assignments were given to Black/African American employees.

222.    Special assignments are tantamount to promotions in that they receive a 5% pay increase, generally work 8-hour day shifts, receive a car, and are provided other benefits.

223.    Special assignments are treated as transfers rather than promotions by the CFD, upon information and belief, to avoid giving employees denied a special assignment any appeal right to the Civil Service Board.

224.    Each special assignment should rely on an objective merit-based competitive process to select the most qualified applicant. Additionally, per GO 206.02, "When there is more than one request for an open position, the senior-in-grade member, who is qualified, will receive priority consideration."

225.    Qualified Black/African American senior in rank members are not being given priority consideration even when they are more qualified.

**Smith-Phifer**

*Recruiter Special Assignment*

226.    In August 2017, Smith-Phifer competed for the role of Recruitment Officer. Smith-Phifer has volunteered countless times over the years for recruiting events, in particular, recruiting events for minorities. During the selection process for Recruitment Officer, Smith-

Phifer prepared a presentation on how she would recruit minorities, in particular women, for CFD. Smith-Phifer's presentation compared the typical business day (8-5) to a 24-hour fire department day, and explained how she could use her own personal story to explain a day in the life of a firefighter and mother to attract other females to apply to be firefighters.

227.     Upon information and belief, Smith-Phifer was not chosen for Recruitment Officer because the command staff did not want her to recruit other minorities and women and had already promised the role to a lesser qualified black male.

*Incident Management Special Assignment*

228.     On January 13, 2017, Deputy Chief Granger sent an email to all CFD personnel seeking those interested in participating on the CFD's Incident Management Team.

229.     Smith-Phifer sent an email expressing her interest on January 16, 2017 and again on February 3, 2017.  At the time, Smith-Phifer was one of about five members of the CFD who had the Logistics Section Chief Certification as well as the Planning Section Chief Certification, which made her especially qualified.

230.     By letter on February 20, 2017 and email on February 21, 2017, interested persons were notified that out of 100 members of the CFD who expressed interest, they only had 64 positions available.  Those chosen to serve on the Incident Management Team were asked to attend special training.

231.     On March 7, 2017, Smith-Phifer received an email with the list of those who would receive the special training and had been selected to serve on the CFD's new Incident Management Team.  Of the 63 individuals listed, 59 were white and 57 were white males.  Smith-Phifer received no feedback as to why.

**Patterson**

*Fire Department Planner Special Assignment*

232.    Even though Patterson was especially qualified to be Fire Department Planner, and was scheduled for an interview, the position was reclassified at the last minute as only available to Battalion Chiefs, not Captains, although there was no change in the job description that would require more experience, certifications, or skills specific to the rank of Battalion Chief.  As a result, Patterson no longer met the minimum qualifications.  Upon information and belief, the change was made so a white male friend of Deputy Chief Gordon could be selected over Patterson.  The position was given to the white male friend.

*Health and Safety and Training Captain Special Assignments*

233.    CFD notified Patterson that he would not receive the special assignment to Health and Safety on July 3, 2018.  Patterson later found out that CFD gave the assignment to a less qualified white male relief captain with less seniority and experience than Patterson.

234.    CFD notified Patterson that he would not receive the special assignment to Training Captain on August 15, 2018.  The Training Captain special assignment was given to a less qualified Hispanic male relief captain with less seniority and experience.

*Trailblazers*

235.    Upon information and belief, Patterson was denied permission by Chief Hannan to join the City of Charlotte Trailblazer Program.  Upon information and belief, this was to deny him developmental opportunities to increase his chances of being promoted since he was Black/African American.

*Committee Work*

236. Although volunteer committee work does not have the same effect on promotional opportunities as special assignments, it is still helpful in networking and showing the command staff that you are engaged, aspirational, take initiative, and care about the future of the CFD. Committees seeking members do not post openings, but acquire members through word of mouth.

237. On multiple occasions, Patterson has volunteered for committee work, but has been denied. Indeed, Patterson requested to serve on the Accreditation Committee twice and was denied, although less qualified white males with less seniority and experience were chosen. Patterson also volunteered to serve on the Truck Committee but was denied, and white candidates were chosen.

## DUE PROCESS AND CITY CHECKS AND BALANCES

### Problems with HR: City and CFD

238. The CFD has not had an impartial HR Manager within the CFD since January 29, 2012.

239. In or about January 2012, CFD's current HR Manager was hired by and reported directly to the Administrative Deputy Chief and the Fire Chief.

240. City HR did not adequately oversee the HR function of the CFD, but instead, allowed the CFD's HR Manager to defer decisions to the Administrative Deputy Chief and the Fire Chief.

241. When Plaintiffs filed grievances related to Deputy Chief Gordon and his involvement with the 2018 promotional process, upon information and belief, the HR Manager did not adequately respond since she directly reported to Deputy Chief Gordon.

242.    In addition, the City and CFD's HR has failed to update and maintain the following policies and procedures despite notice that they are insufficient, circular, and sometimes in conflict, including, but not limited to:

a. HR 5 Harassment, last revised on March 29, 2010;
b. HR 7 Nepotism Policy, last revised on July 1, 1997;
c. HR 11 Employee Grievance Policy, last revised on August 15, 2016;
d. HR 13 Conflict of Interest Policy for City, Secondary and Other Employment, last revised on July 11, 2005;
e. CFD General Order 208.05, Conflict of Interest Policy, does not address what to do in the event a conflict of interest arises in a promotional process, disciplinary proceeding, grievance, appeal, termination hearing, etc.; and
f. CFD General Order 208.04, Grievance Policy, merely states that the CFD grievance process is the same as the City's grievance policy except for employees who are covered by the Civil Service Board;
g. CFD General Order 208.07, harassment policy, which includes discrimination.

243.    Most importantly, the CFD's Grievance Policy does not apply to Civil Service employees' promotions, disciplinary issues, suspensions, and terminations.  Instead, civil service employees are directed to the "Civil Service Charter" for those issues.  In contrast, HR 11 says that matters of suspension, demotion, and dismissal for Civil Service employees go to the Civil Service Board.  Thus, HR 11 and GO 208.04 conflict on the matter of promotions for civil service employees.

244.    The City and CFD do not have a dedicated anti-discrimination policy. Rather, they list discrimination as a form of harassment under their harassment policies, HR 5 and GO 208.07; however, not all discrimination manifests as harassment.

245.    The City's HR has not developed or implemented state of the art or best practices in the City's policies and procedures for conflicts of interest, hiring, harassment, discrimination, retaliation, discipline, promotions, terminations, or grievances.

246.     The City has been on notice of these issues for more than enough time to have addressed them by now.

## CIVIL SERVICE BOARD

247.     The Civil Service Board, established in 1929, operates under the City Charter, Chapter 4, Article III, Section 4.61.

248.     On February 5, 1973, City Council approved the Civil Service Board's new policies and procedures, known as Rule IX. These policies and procedures helped to define the rights of civil service employees, establish the processes to be used by the Civil Service Board, and to create more equitable procedures during the hiring and promotion of employees, but Rule IX has not been followed.

249.     The fairness of the promotional process, especially when there is adverse impact based on race, color, or gender, and proper implementation of the promotional process, are all inherently within the Civil Service Board's responsibilities and duties and should be reviewed and monitored by the Civil Service Board, which should be allowed to request independent legal and other expert advice at the City's expense, as requested.

250.     City HR, the CFD and the City Attorney's Office improperly interfere with the Civil Service Board's ability to do its job as defined in the statutes.

251.     The Civil Service Board is on notice that they have a duty and responsibility for the promotional process, per Rule IX, the General Orders, and HR policies, and is on notice of the chronic problems plaguing the CFD promotional process, particularly during the 2018 Battalion Chief promotional process, but has failed to take action in response to Plaintiffs' complaints about the 2018 promotional process based on direction from the City Attorney's Office.

252.	Historically, upon information and belief, members of the Civil Service Board have been approved by the Fire Chief and Police Chief before they are selected.

253.	Civil Service Board members lack training on the basics of the promotional process, fire department command structure, and other important matters essential to their basic understanding of the fire department that would allow them to make informed decisions on matters of hiring and promotion.

254.	As a result of the lack of training and knowledge, the Civil Service Board defers to the City Attorney's Office, City HR, and the Fire Chief.  They are a rubber stamp for the Fire Chief and serve to offer a false legitimacy for his decisions rather than providing the intended checks and balances necessary to ensure the promotional process is fair, merit-based, and non-discriminatory.

255.	Upon information and belief, at least one member of City Council recruits Board members by choosing those who agree to support the Fire Chief's decisions.

Problems with City Management and Oversight

256.	City Management is aware of the history of complaints regarding the CFD promotional processes and longstanding pattern and practice of race and gender harassment, discrimination, and retaliation within the CFD, as well as the specific multiple complaints, grievances, and concerns raised and filed by Plaintiffs.

257.	The City is failing to follow the time limits of its own grievance policy.  According to HR 11, the Department Director-Level review (in this case, Chief Johnson) is supposed to be completed within 20 days after they receive the grievance.  That has not happened.  Upon information and belief, HR and management intentionally delayed their response in order to push

the 2018 promotional process through before having to respond to Plaintiffs' grievances, or they plan not to respond at all.

258.    The failure of CFD and the City to have effective and working policies and procedures, or follow the existing policies and procedures that the City and CFD have in place, is a result of a breakdown in City Management and lack of accountability and action, showing a deliberate indifference to the discrimination, retaliation, and denial of due process and the rights of both Plaintiffs.

259.    Municipalities are typically operated under a Council-Manager or Mayor-Council form of government.  Charlotte is organized as a Council-Manager form of local government.  Like many other forms of government, the Council-Manager form of government is dependent on checks and balances for the government to work properly and avoid corruption, discrimination, retaliation, and other illegal conduct.

260.    In Charlotte, the Mayor is elected separately from and remains independent from the City Council.  Meanwhile, the City Council's direct supervision of personnel is limited to the City Manager, the City Attorney, and the City Clerk, all of whom are appointed by the City Counsel.

261.    The current Mayor worked in the City Manager's Office for many years before becoming Mayor and is uniquely positioned to help guide and educate the City Manager and City Council on issues related to CFD, including the historic problems of discrimination and retaliation within the CFD and operations of HR and the City Attorney's Office with regard to City divisions. After she retired from the City, the Mayor worked for Lee Institute analyzing problems within the CFD as documented in 2008.  Many of these problems still exist to this day and give rise to concerns expressed herein.

262. The City Council creates the general policies that the City Manager must follow, providing oversight on the City Manager's action, and allowing voters to have a say in the governing of their City.

263. A city manager is comparable to a Chief Operating Officer and responsible for the day-to-day administrative operations of the city. In Charlotte, the City Manager's direct reports are the City Attorney, City Clerk, and all the Department Directors, including the Fire Chief.

264. An effective City Manager can provide direction to the departments; ensure they communicate with each other; empower HR and the City Attorney's Office to enforce the correct personnel policies; guide all departments in following best practices; minimize the effect of internal biases by providing training and implementing policies and procedures; and check the autocratic tendencies of Department Directors.

265. Charlotte's City Manager, City Attorney, and City Council have not fulfilled their purpose or function as a check and balance on Department Directors, and do not adequately protect firefighters who are or have suffered from discrimination, harassment, and retaliation through appropriate policies and procedures.

266. Historically, the City Managers have deferred to the Department Directors, particularly Directors, like Chief Hannan, with ties to individual council members.

267. The City Managers have failed to serve as an effective check and balance on the autocratic tendencies of the Fire Chief, by consistently siding with the Fire Chief in its review of grievance decisions on appeal and not overseeing CFD and decisions made by or ratified or condoned by the past or current Fire Chief.

268. There are current Chiefs in positions now and a former Fire Chief and a Deputy Chief over Administration who currently do not or did not have the minimum qualifications for

their positions, either at the time they were promoted, or when they received prior promotions. The City has been made aware of these issues but has failed and refused to take action.

269. The City allows those with prejudicial motives to disparage, undermine, shame, and isolate Plaintiffs.

270. The City Manager will not meet with Plaintiffs. The Fire Chief has not spoken to Plaintiffs at or since the November 6, 2018 Civil Service Board hearing where they spoke.

Problems with the City Attorney's Office

271. The City Attorney supported the prior Fire Chief even when the City's own independent investigation reveals that he fostered a culture of fear and retaliation, and his office stated that the Fire Chief did not need to be correct in his decision for the City Attorney's Office to defend him.

272. During the relevant time period, the City Attorney's Office does not provide adequate or accurate legal advice to its Department Directors and HR, which interferes with the rights of City employees, including Plaintiffs.

273. For example, although the City Attorney's Office knows or is intentionally indifferent to the fact that Rule IX is still in effect, upon information and belief, the City Attorney's Office has told City employees that it is no longer in effect, creating a custom of ignoring Rule IX.

274. Upon information and belief, when the City Manager's Office and City Attorney's Office enforced and followed Rule IX, the number of Black/African Americans promoted went up, and when the City Manager's Office and Attorney's Office did not enforce and follow Rule IX, the number of Black/African Americans promoted went down.

275. Upon information and belief, Chief Johnson wants to eliminate Rule IX and the oversight of hiring, firing, and promotions by the Civil Service Board, although it has been

56

explained to him that the number of Black/African Americans hired and promoted increased when Rule IX was followed and enforced.

276.    Plaintiffs are not asking to be promoted ahead of *more* qualified candidates, they are simply requesting policies, procedures, and processes that are validated, fair, job related, and merit based, that follow known best practices so the promotional process cannot be manipulated for disparate treatment of Plaintiffs and others based on race, color, and gender, as applicable, for less qualified candidates, primarily white males, who receive the benefit of favoritism and nepotism.

277.    These issues are particularly important to the public since Plaintiffs are first responders and provide critical services to protect the lives and property of citizens in this community.  The community is entitled to a fire department that welcomes and promotes all races and colors of citizens based on qualifications, experience, contributions, and performance.  The community is entitled to a fire department of first responders reflective of the community it serves.

<u>**COUNT I**</u>
**(Title VII, 42 U.S.C. § 2000e *et seq.* – Race, Color, and Gender Discrimination, Failure to Promote/Transfer, Retaliation, and Disparate Impact against the City)**

<u>**Pattern and Practice/Systemic Disparate Treatment**</u>

278.    The allegations of the previous paragraphs are realleged and incorporated herein by reference.

279.    The City/CFD regularly employed more than fifteen (15) employees at all relevant times.

280.    As noted above, the City/CFD has a long history and pattern and practice of denying special assignments, promotions, training, and development opportunities to Black/African Americans and women candidates and retaliating against those who engage in protected activity,

as described in the Complaint. Upper management, including Chief Hannan and some Deputy Chiefs had a well-known, deeply ingrained bias against Black/African Americans, Black/African American women, and those who engage in protected activity.

281.    Senior white males have manipulated and used the promotional process to engage in discriminatory treatment and to retaliate against those who speak out against decisions that are discriminatory or retaliatory against Black/African Americans and females, including Plaintiffs, and have instead used bias, nepotism, and favoritism to provide more favorable opportunities and promotions to white males, as ratified and condoned by the offices of the City Manager, City HR, City Legal, City Council, and Civil Service Board, all of which had notice but did not take appropriate or adequate action in response.

282.    The City/CFD has maintained an employment system that intentionally discriminates and imposes discriminatory treatment and retaliation upon Black/African Americans and women, and those who engage in protected activity with respect to the terms and conditions of their employment including recruitment, hiring, special assignments, promotions, training, and development opportunities.

283.    The City and those to whom it delegated its authority over the CFD, failed to carry out their official duties and responsibilities with regard to Plaintiffs as follows:

    a.  Failing to correctly explain applicable law;
    b.  Failing to train on legal obligations;
    c.  Retaliating against Plaintiffs for reports and complaints of discrimination and harassment and problems with special assignments and the promotional processes, especially for Battalion Chief, which allows for disparate treatment and adverse impact against Black/African Americans, especially Black/African American women;
    d.  Ratifying, condoning, and acquiescing in the intentionally discriminatory and retaliatory actions of City employees against Plaintiffs and other Black/African Americans, especially Black/African American females; and,

e.  In other ways to be proven at trial.

284.    Discrimination and retaliation in the promotional process and special assignments against Black/African Americans, women, and those who engage in protected activity is the CFD's customary practice and standard operating procedure.

## Disparate Treatment/Adverse Impact

285.    The City has the responsibility to ensure that the policies, procedures, and regulations are followed by the CFD in its special assignment and promotional processes for Battalion Chief, as well as Captain, Division Chief, and Deputy Chief, and are in compliance with applicable rules, regulations, statutes, constitutions, and guidelines, including:

a.  City Manager and Office;
b.  City Attorney and Office;
c.  City HR Director and Office;
d.  Fire Chief;
e.  Civil Service Board; and,
f.  City Council

286.    The City/CFD's subjective and arbitrary manipulation of the processes and procedures for recruitment, hiring, special assignments, promotions, training, and development opportunities have been a vehicle for discriminatory treatment and have had an adverse/disparate impact on Black/African Americans and women as well as those who engage in protected activity.

287.    The City/CFD's discriminatory practices are not and cannot be justified by business necessity, and the City/CFD has known since or prior to the 1970's that less discriminatory alternatives exist that could equally serve any alleged necessity.

288.    The City/CFD has failed to follow a merit-based and non-discriminatory employment system as set forth in the City Charter, promotional process memos, and General Orders.

289. The discrimination, disparate treatment, and disparate impact have also worsened against Plaintiffs and other Black/African Americans and women after they engaged in protected activity under Title VII.

## Discrimination and Retaliation Against Plaintiffs

290. The City/CFD, through its agents, employees, and supervisors, engaged in unlawful discrimination against Patterson based on his race and color, and against Smith-Phifer based on her race, color, and gender, and against both on the basis of protected activity.

291. The City/CFD violated Title VII by treating Plaintiffs differently than their similarly situated peers outside of their protected classes in the terms and conditions of their employment as described in this Complaint and in other ways to be proven at trial.

292. Plaintiffs engaged in various protected activities as set forth above, including but not limited to: 1) speaking out and advocating for diversity and inclusion as well as equal opportunity and equal terms and conditions of employment for Black/African American firefighters; 2) objecting to the corrupt acts of CFD leadership and their confidantes including manipulation of the promotional processes and exam cut off scores, nepotism, lack of security/release of written exams and other exam questions, selecting topics for the written exam that are not kept confidential, selecting exam problems and questions that favor certain candidates, subjective grading, internal assessors, conflicts of interest, and other mechanisms for disparate impact against Plaintiffs and other Black/African Americans to favor white males; 3) making and filing various internal and external verbal and written complaints up the CFD Chain of Command to the Fire Chief, with City Management, City HR, the Civil Service Board, and EEOC alleging the above as well as the pattern and practice of continuing disparate treatment and disparate impact against them as Black/African Americans, and especially against Black/African American

females, and race/color/gender discrimination; 4) requesting hearings and a chance to present evidence on these issues; 5) speaking out on these issues to retirees of the CFD; 6) speaking out on behalf of other Black/African American firefighters; and 7) involving the NAACP President who reported these issues to the City Manager, City Council members, the media, and the public.

293. The City/CFD retaliated against Plaintiffs shortly after they engaged in protected activities by: 1) repeatedly denying them promotions, training, special assignments, and developmental opportunities; 2) subjecting them to blatant and continuing racism and retaliation; 3) encouraging others to make up false accusations and undermine them; 4) failing to protect them from ongoing discrimination, disparate impact, harassment, and retaliation; 5) denying due process and fair and impartial grievance and appeal processes in violation of their rights and existing policies; 6) failing to properly and timely investigate grievances, and upon information and belief, failing to interview appropriate witness related to their grievances; 7) failing to give Plaintiffs an opportunity to respond to information provided by others; 8) failing to timely investigate, decide, and respond to their grievances; 9) failing to revise their promotional and grievance processes despite being on notice of the manipulation for disparate treatment and the adverse impact on Plaintiffs and other Black/African Americans and female firefighters within the CFD; and, 10) in other ways to be proven at trial.

294. Despite their education, interest, experience, qualifications, and seniority, Plaintiffs were not selected for various special assignments, promotions, training, and development opportunities because of race, color, gender as well as their protected activities, as applicable. The CFD has a pattern and practice of providing special assignments and promotions to less qualified white candidates, especially white males, and providing training and development opportunities to white males rather than Black/African Americans and females to better position the white males

for promotion. Instead, the City/CFD promoted, transferred, trained, and gave favorable treatment and development opportunities to less qualified and less tenured peers outside of their protected classes who did not engage in protected activity.

295. A causal connection exists between Plaintiffs' protected activities and the adverse actions taken against them.

296. As a result of this race/color/gender based selective and targeted discrimination and retaliation, Plaintiffs were passed over and denied multiple special assignments, promotions, training and development opportunities because of Patterson's race and color and Smith-Phifer's race, color, and gender and because of Plaintiffs' protected activities.

297. To the extent the City purports to have had legitimate, non-discriminatory reasons for taking adverse actions against Plaintiffs, such reasons are pretext for the true reasons, which are Plaintiffs' race, color, and legally protective activities, as described in more detail above.

298. The City's conduct, as described above, was without justification or excuse, is reprehensible, and occurred despite the efforts of Plaintiffs, jointly and severally, to prevent, halt, and reverse the discrimination and retaliation.

299. As a direct and proximate result of said violations, Plaintiffs have suffered and incurred substantial damages, and are entitled to punitive damages and equitable relief, as more fully described below.

## COUNT II
### (42 U.S.C. §1981 – Race and Color Discrimination, Failure to Promote/Transfer, and Retaliation against the City)

300. The allegations of the previous paragraphs are realleged and incorporated herein by reference.

301.    The City/CFD is responsible for the acts of race discrimination by both supervisory and nonsupervisory employees against Plaintiffs because the City has been on notice of the problems with race discrimination against Black/African Americans in promotions and other developmental opportunities for training, special assignments, and projects within the CFD but has chosen not to properly investigate or take appropriate action related to training, adoption, and enforcement of appropriate policies and procedures, grievances, and appeals within the City, CFD, and Civil Service Board, and has instead allowed a custom and pattern and practice of disparate treatment of Black/African Americans.

302.    Plaintiffs reserve the right to sue officials and public employees in their official and individual capacities for intentional discrimination against them in violation of Section 1981 after obtaining discovery from the City/CFD after determining which officials in HR, the City Attorneys' Office, the City Manager's Office, the CFD, City Council and the Civil Service Board are most culpable while serving in those roles.

303.    The City/CFD, acting under color of law denied Plaintiffs their rights to: full and equal benefit of the laws; freedom from racial discrimination in the employment relationship; and enjoyment of all benefits, privileges, terms, and conditions of the employment relationship despite their race and color.

304.    The City/CFD's acts were the result of discriminatory intent and were done in known violation of Plaintiffs' legal rights, without good faith, and have directly and proximately caused Plaintiffs' injuries.

305.    The employment rights and privileges denied to Plaintiffs have been afforded to similarly situated persons of a different race and color.

306. As a result, Plaintiffs were deprived of the rights afforded to other similarly situated employees outside of their protected classes and were passed over and denied multiple promotions, special assignments, and other opportunities based on their race and color.

307. Senior management of the CFD have manipulated and used the promotional process to engage in discrimination and retaliation against Plaintiffs and other Black/African Americans, based on race and color, and to engage in bias, nepotism, and favoritism in favor of whites candidates, especially white males.

308. A causal connection exists between Plaintiff's protected activities and the adverse actions taken against them.

309. To the extent the City purports to have had legitimate, non-discriminatory reasons for taking adverse actions against Plaintiffs, such reasons are pretext for the true reasons, which are their race, color, and protected activities.

310. The City's conduct, as described above, was without justification or excuse, is reprehensible, and occurred despite Plaintiffs' efforts to prevent, halt, and reverse the discrimination and retaliation.

311. As a direct and proximate result of said violations, Plaintiffs have suffered and incurred substantial damages, and are entitled to punitive damages and equitable relief, as more fully described below.

### COUNT III
**(42 U.S.C. §1983 – Race, Color, and Gender Discrimination, Failure to Promote/Transfer, and Retaliation, Due Process, Equal Protection, and First Amendment Retaliation against the City)**

312. The allegations of the previous paragraphs are realleged and incorporated herein by reference.

313. The constitutional rights to free speech, equal protection, and due process were established at the time of the City's actions.

314. There is compelling evidence of willful and intentional discrimination, violations of substantive and procedural due process to allow or ratify retaliatory, arbitrary, discriminatory, irrational, and/or improperly motivated abuses of power, in violation of Plaintiffs' constitutional rights by the City.

315. The City knew, or in the exercise of its duties should have known, about Plaintiffs' constitutional rights and its violation of them.

316. Plaintiffs are not at-will employees.

317. The City/CFD acting under color of law engaged in a continuing pattern and practice of intentional race, color, gender discrimination, and retaliation as set forth above. In doing so, the City/CFD has caused Plaintiffs to suffer deprivation of their fundamental rights to due process and equal protection of the laws in violation of the Fourteenth Amendment and Section 1983.

318. The City/CFD acting under color of law, institute, authorize, tolerate, ratify, permit, and acquiesce in policies, practices, and customs which have denied Plaintiffs legal rights and have directly and proximately caused Plaintiffs injuries.

319. The City/CFD is acting under color of law and with reckless or deliberate indifference to Plaintiffs' constitutional rights and with malice as set forth above and below.

320. The City also retaliated against Plaintiffs in violation of their First Amendment rights.

321. Plaintiffs have a right, protected under the First Amendment to the United States Constitution, to speak as private citizens on matters of public interest, including actively and

consistently advocating for equal opportunity and equal terms and conditions of employment for minority firefighters including Black/African American firefighters and female firefighters, meaningful training on diversity and inclusion for race, color, and gender, and accountability for recruiting, mentoring, retaining, and promoting Black/African American and female firefighters and employees within the CFD.

322.    Smith-Phifer's discussion with and request for advocacy by the local NAACP President about the longstanding pattern and practice of discrimination and retaliation in the CFD based on race and gender was protected speech on matters of important public concern, was protected speech under the United States Constitution and the North Carolina Constitution, as well as protected activity pursuant to Title VII, 1981, and 1983. The local NAACP President spoke to the City Manager, City Council, media, and the public on behalf of Smith-Phifer and other Black/African Americans.

323.    The speech that Patterson delivered to the City Manager's Office was in the context or circumstance of a group complaint, demonstrating the public import of the speech. The speech Patterson adopted was by a group of most of the Black/African American CFD officers it, therefore, had the potential for broad impact. The public has a fundamental interest in effective law enforcement organizations that are free of discrimination. Patterson's individual interests, then, merged in a real sense with those of the community at large.

324.    Plaintiffs advocated for equal opportunity and equal terms and conditions of employment by representing the CFD, often during off-duty time, in various activities as described above.

66

325.     Plaintiffs' speech and activities were a matter of social, political, and public concern as race discrimination by city officials has been an important concern for the City of Charlotte for many years.

326.     The CFD's interest in maintaining discipline and ensuring harmony was not impaired by the speech or activities of Plaintiffs.

327.     The legitimate interests of the CFD do not include using discriminatory, retaliatory, or manipulative processes or decisions for promotion, transfer, special assignments, grievances, or appeals.

328.     The interests of Plaintiffs in expressing their concerns did not compete with the CFD's interest in providing efficient and effective services to the public.  Rather, to the extent that speech by Plaintiffs created any perceived risk to the CFD's interests, such perceived risk was unreasonable and outweighed by Plaintiffs' meritorious interest in informing the public, involving the NAACP, and the Charlotte Firefighters Association, ending the pattern and practice of race and gender discrimination within the CFD for the benefit of the public and advocating for equal opportunity and equal terms and conditions of employment.

329.     Plaintiffs hit a glass ceiling within the CFD, limiting their ability to compete for promotion, transfer, and special assignments, because the CFD was manipulating the process to punish them in retaliation for their speech and advocacy activities.

330.     The actions of the CFD and the City, as described above, violated the rights of Plaintiffs.  The CFD manipulated the promotion, transfer, and special assignment processes to discriminate and retaliate against Plaintiffs because they engaged in speech and other activities protected by the First Amendment, as punishment for their speech and activities, and did so without any legitimate justification, and the City deferred to that decision.

331.    The City's actions, taken in retaliation for Plaintiffs' speech and actions protect by the First Amendment, and the City's failure to afford due process and equal protection, deprived Plaintiffs of rights, privileges, and immunities secured by the Constitution and violates 42 U.S.C. §1983.

332.    As a result of the violation of Plaintiffs' First Amendment rights, they have been injured.  They were punished for their protected speech and actions, and the exercise of their rights has been improperly chilled.

333.    To the extent the City purports to have had legitimate, non-discriminatory reasons for taking adverse actions against Plaintiffs, such reasons are pretext for the true reasons, which are their race, color, gender, and legally protected activities as described herein.

334.    The City's conduct, as described above, was without justification or excuse, is reprehensible, and occurred despite Plaintiffs' efforts to prevent, halt, and reverse the discrimination and retaliation.

335.    As a direct and proximate result of said violations, Plaintiffs have suffered and incurred substantial damages, and are entitled to punitive damages and equitable relief, as more fully described below.

## COUNT IV
**(The City's Violations of the Constitution of the State of North Carolina, Article I, Section 1 – Equality and Rights of Persons; Section 14 – Freedom of Speech; and Section 19 – Law of the Land; Equal Protection of the Laws)**

336.    The allegations of the previous paragraphs are realleged and incorporated herein by reference.

337.    No other state law is available to remedy Plaintiffs' injuries, and they may plead the following claims under the North Carolina Constitution.

68

338.    Plaintiffs are not at-will employees, and are entitled to a protected interest in their state constitutional rights including: the right to the enjoyment of the fruits of their labor; the right of equal protection and due process; and the right to free speech and protection from retaliation for exercising that right.

339.    Plaintiffs' rights include access to a fair promotion, transfer, special assignment, grievance, and appeal process, for the duration of their employment because their employment is governed by the policies and procedures set by the City with involvement from City Council as required.

340.    Each right was established at the time of the City's actions.

341.    The City acted under color of state law and with reckless or deliberate indifference to Plaintiffs' constitutional rights and with malice.

342.    Per the City Charter, "[e]mployment shall be *based on merit* without regard to race, creed, color, gender, political affiliation, age, or physical defect or impairment of the applicant…" and "[a]ppointments and promotions shall be made *solely on the basis of merit and fitness.*" (Charlotte, N.C., Ordinances, ch. 4, art. II, 4.05(1) and (4))(emphasis added).

343.    Also, as described in the Promotional Announcements and General Orders, "the promotional process is a competitive process *based on merit principles.*" (emphasis added).  This is consistent with Charlotte's 1973 City Council Resolution ("Rule IX") on the promotional processes for civil service employees such as police officers and firefighters.

344.    The Charlotte City Council's February 5, 1973 Resolution on such promotions provides:

> Under the general supervision of the Civil Service Board, the City Personnel Director Shall: . . . (e) develop and administer a plan for

69

promotions which gives appropriate considerations to an applicant's qualifications, record of performance and abilities in relation to the work to be performed.

Resolution, Section 3(5)(e).

345. The Resolution provides further:

Selection techniques used in the examination process shall be impartial and related to those subjects which fairly measure the relative capacities of the persons examined to execute satisfactorily the duties and responsibilities of the positions open for appointment.

Resolution, Section 5.1(1).

346. The Resolution goes on to provide that:

As determined by the [City] Personnel Director, examinations (sic) shall consists (sic) of selection techniques which will test fairly the qualifications of candidates . . .

Resolution, Section 5(3).

347. As described above, Plaintiffs, and others participating in the CFD's promotional processes have ongoing liberty and property interests in being judged based on performance and merit for purposes of promotion or transfer. Plaintiffs, and others participating in the CFD's promotional processes, also have ongoing liberty and property interests in the promotional processes of the CFD and the underlying policies and procedures in compliance with and implemented in accordance with applicable laws and City Council Resolutions.

### **Article I, Section 1. The equality and rights of persons.**

348. Article I, Section 1 of the North Carolina State Constitution provides:

We hold it to be self-evident that all persons are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness.

349.    Article I, Section 1 of the North Carolina Constitution guarantees Plaintiffs the right to engage in their chosen profession and to advance in their chosen profession based on performance and merit.

350.    The City violated the clearly established policies and procedures that granted Plaintiffs' protected interest in a fair, impartial, merit-based promotion, transfer, special assignment process; and fair grievance and appeal process. The City's violation denied Plaintiffs their constitutional right to the fruits of their labor, and right to a fair grievance and appeal process.

351.    The City knew, or should have known, in the exercise of its duties, that the City violated Plaintiffs' constitutionally protected interests.

352.    The City repeatedly violated Plaintiffs' and others constitutional rights by allowing promotional practices which are biased, unfair, overly subjective, not merit based, and used to discriminate against Black/African Americans, particularly Black/African American females and Black/African Americans who stand up and speak out, especially about treatment of Black/African Americans and women.

### Article I, Section 14. Freedom of Speech

353.    Article I, Section 14 of the North Carolina State Constitution provides:

> Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained, but every person shall be held responsible for their abuse.

354.    Plaintiffs advocated for equal opportunity and equal terms and conditions of employment as set forth above.

355.    Smith-Phifer's discussion with the NAACP President about the longstanding pattern and practice of discrimination and retaliation in the CFD based on race and gender was protected speech on matters of important public concern, was protected speech under the United

States Constitution and the North Carolina Constitution, as well as protected activity pursuant to Title VII, 1981, and 1983.

356.    The speech that Patterson delivered to the City Manager's Office was in the context or circumstance of a group complaint, demonstrating the public import of the speech. The speech Patterson adopted was by a group of most of the Black/African American CFD officers it, therefore, had the potential for broad impact.

357.    The public has a fundamental interest in effective law enforcement organizations that are free of discrimination. Patterson's individual interests, then, merged in a real sense with those of the community at large.

358.    Plaintiffs have a right, protected under the North Carolina Constitution, to speak as private citizens on matters of immense public concern, including actively and consistently advocating for equal opportunity and equal terms and conditions of employment for minority firefighters including Black/African American firefighters and female firefighters, meaningful training on diversity and inclusion for race, color, and gender, and accountability for recruiting, mentoring, retaining, and promoting Black/African American and female firefighters and employees within the CFD, and freedom from retaliation for protect activities.

359.    Plaintiffs' efforts to advocate for equal opportunity and equal terms and conditions of employment were not part of their official duties and constitute protected speech under Section 14.

360.    The City's actions, taken in retaliation for Plaintiffs' exercise of free speech and activities deprived Plaintiffs of rights, privileges, and immunities secured by the North Carolina Constitution.

361.     As a result of the violation of Plaintiffs' free speech rights, they have been injured. They were punished for their protected speech and activities, and the exercise of that right has been improperly chilled.

### Article I, Section 19. Law of the Land; Equal Protection of the Laws

362.     Article I, Section 19 of the North Carolina State Constitution provides:

No person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land. No person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin.

363.     The City and CFD failed to follow the policies and procedures that govern Plaintiffs' employment and deprived Plaintiffs of equal protection and due process in access to the fair processes established for promotions, transfers, special assignments, grievances, and appeals.

364.     Additionally, the City, through its agents, employees, and supervisors, engaged in unlawful and intentional discrimination against Patterson based on his race and color and Smith-Phifer based on her race, color, and gender, by repeatedly denying them a validated, fair, non-discriminatory, job-related, impartial, merit-based process for promotions and special assignments, and giving the positions to less qualified and less experienced candidates outside of Plaintiffs' protected classes.

365.     The City acted in a retaliatory, arbitrary, discriminatory, and/or improperly motivated manner by failing to abide by its own promotion, transfer, special assignment, grievance, and appeal processes.

366.     By denying Plaintiffs' access to a validated, non-discriminatory, job-related, fair, impartial, merit-based promotion, transfer, special assignment process, and a fair grievance and appeal processes due to the arbitrary and irrational preferences set by Chief Hannan, managers of

73

like mind, and his successors, Plaintiffs were denied the enjoyment of the fruits of their own labor, in violation of the North Carolina Constitution.

367. To the extent the City purports to have legitimate, non-discriminatory reasons for taking adverse actions against Plaintiffs, such reasons are pretextual and only serve to cover the City's discriminatory reasons: Plaintiffs' race, color, gender, and protected speech and activities.

368. By failing to adopt and follow appropriate policies and procedures as described above and follow its own written promotion, transfer, and special assignment policies and then subjecting Plaintiffs to an unfair grievance procedure, the City arbitrarily, capriciously, and irrationally deprived Plaintiffs of liberty, property, due process, and equal protection in violation of the North Carolina Constitution.

369. There is compelling evidence of willful and intentional discrimination, and violations of substantive and procedural due process by the City to allow or ratify retaliatory, arbitrary, discriminatory, irrational, and/or improperly motivated abuses of power, in violation of Plaintiffs' state constitutional rights.

370. The City's failure to adopt and follow appropriate policies and procedures as described above and to follow its own established promotion, transfer, special assignments, grievance policies, the City Charter, and the Charlotte City Council's February 5, 1973 Resolution violates Plaintiffs' procedural and substantive due process rights.

371. Plaintiffs are entitled to a non-arbitrary and non-capricious promotion, transfer, and grievance process.

372. The failure and refusal of the City and its officials to adopt and follow appropriate policies and procedures as described above and follow and comply with the duly enacted policies, ordinances, and resolutions of the City Council and applicable law constitutes arbitrary and

capricious acts which violate the fundamental rights of Plaintiff as guaranteed by Article I, Sections 1, 14, and 19 of the North Carolina Constitution.

## DAMAGES

373.    The allegations of the previous paragraphs are realleged and incorporated herein by reference.

374.    As a direct and proximate result of the City's conduct, Plaintiffs have suffered substantial personal injuries and other damages in the deprivation of their legal rights and promotions, including: lost income and benefits, emotional distress and mental anguish, loss of enjoyment and quality of life, damage to employment reputation, and damage to their firefighting careers. Accordingly, each Plaintiff is entitled to compensatory damages in an amount in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, and compensatory damages; promotion; injunctive relief to preserve the status quo and to deter similar misconduct in the future; back pay; front pay; fringe benefits; damages for emotional distress; pre- and post-judgment interest; reasonable attorney's fees; and the costs of this action, pursuant to Title VII and/or pursuant to 42 U.S.C. § 1988.

375.    The City's actions, as described above, were willful and wanton, and evinced an intentional or reckless indifference to and disregard for the legal rights of Plaintiffs.  Accordingly, each Plaintiff is entitled to punitive damages against any individual defendants in their individual capacities, who may be added to this lawsuit, in an amount to be determined by the jury.

## INJUNCTIVE RELIEF

376.    The allegations of the previous paragraphs are realleged and incorporated herein by reference.

377.    Plaintiffs request injunctive relief to require the City to only allow validated, job-related, fair, merit-based, non-discriminatory promotional processes for 2018.

378.     Plaintiffs request injunctive relief to require the City to base the 2018 Battalion Chief promotional process on the job description in place at the time of the application.

379.     Plaintiffs have no adequate remedy at law because there are a limited number, if any openings, for Battalion Chief each year, and four years of service after promotion to Battalion Chief is required for further promotion to Division Chief, according to the job description for Division Chief.

380.     As a direct and proximate result of the conduct of Defendant described above, Plaintiffs have been denied their constitutional and statutory rights as stated in this Complaint and have suffered and continue to suffer mental and emotional distress, humiliation, embarrassment, discomfort, anxiety and pain.

381.     The City's policies, practices, conduct, and acts alleged herein have resulted and will continue to result in irreparable injury to Plaintiffs, including but not limited to further violations of their statutory and constitutional rights.  Plaintiffs seek injunctive relief restraining Defendant from continuing to engage in and enforce the unconstitutional and illegal policies, practices, conduct, and acts described herein.

382.     Plaintiffs request injunctive relief to stop current practices of the City, including: 1) discriminating against Black/African American employees and women in the promotional process and the competitive process for special assignments and transfers; 2) manipulating the promotional process to cause selections or rankings based on bias(es), nepotism, favoritism, retaliation, or other impermissible motivation; 3) manipulating the special assignment and transfer process to cause selections or rankings based on bias(es), nepotism, favoritism, retaliation, or other impermissible motivation; 4) failing to follow the written promotional process to cause selections for promotion or rankings based on bias(es), nepotism, favoritism, retaliation, or other

impermissible motivation; 5) failing to follow the written competitive process to cause selections for special assignments based on bias(es), nepotism, favoritism, retaliation, or other impermissible motivation; 6) allowing the CFD to investigate itself in the grievance or appeal of decisions related to promotions, transfers, and special assignments; 7) allowing persons involved in the decisions or decision-making process for promotions, transfers, or special assignments to be involved in the investigation, fact finding hearing, or decision of any grievance or appeal of any decision on promotion, transfer, or special assignment; and 8) preventing or denying equal access to feedback on the promotional process and competitive process for special assignments and transfers.

383.    Plaintiffs further request declaratory and injunctive relief for the implementation of policies to address the ongoing violations of rights.  This includes at a minimum: (1) requiring the City to adopt policies and procedures for promotions, transfers, and special assignments which comply with the requirements of procedural and substantive due process and do not discriminate based on race, color, or any other protected class; (2) requiring the City to adopt policies and procedures for appeals and grievances which comply with the requirements of procedural and substantive due process and do not discriminate based on race, color, or any other protected class and which afford an opportunity to a fair and impartial hearing; (3) requiring the City to adopt policies and procedures for promotions, transfers, special assignments, grievances, and appeals which prevent the Fire Department from investigating itself, prevent those making or participating in the employment decisions from deciding the grievances or appeals, prevents those with a conflict of interest from presiding over processes, making decisions, or manipulating policies and procedures to favor relatives, friends, or those who will not speak out or speak up against unlawful conduct in the workplace; (4) requiring the City to monitor the promotion, transfer, special assignment, grievance, and appeals processes so that they are not prejudiced by conflicts of interest

and personal agendas of Fire Department management and manipulation of policies and procedures to favor friends and relatives of Fire Department management or those who will not speak out or speak up against unlawful conduct in the workplace.

384.    In addition, Plaintiffs request declaratory and injunctive relief, as well as compensatory damages to make them whole for the City's violation of their rights, including requiring the City not to fill any future Battalion Chief positions and special assignments to preserve the status quo until these matters can be thoroughly addressed in an effective manner; Plaintiffs also request back pay and fringe benefits as well as retroactive seniority as Battalion Chiefs.

385.    As a result of the City's conduct and failure to promote Plaintiffs for so many years, Plaintiffs have also been deprived of income at ranks above Battalion Chief and are entitled to back pay and fringe benefits as well as retroactive seniority as Division Chiefs.

386.    There is no fully adequate remedy at law in that Plaintiffs cannot be totally compensated in damages for their injuries.  Thus, in the absence of injunctive relief, Plaintiffs will sustain irreparable harm.  Accordingly, Plaintiffs should be given the injunctive relief set forth above and the City should be enjoined from further violations of Plaintiffs' and other Black/African Americans and women's rights as set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray the Court as follows:

1.    Pursuant to Count I (Title VII, 42 U.S.C. § 2000e *et seq.* – Race, Color, and Gender Discrimination, Failure to Promote/Transfer, Retaliation, and Disparate Impact against the City), that Plaintiffs have and recover damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, and compensatory

damages; promotion/transfer; injunctive relief to deter similar misconduct in the future; back pay; front pay; fringe benefits; damages for emotional distress; pre- and post-judgment interest; reasonable attorney's fees; and the costs of this action;

2.      Pursuant to Count II (42 U.S.C. §1981 – Race and Color Discrimination, Failure to Promote/Transfer, and Retaliation against the City ), that Plaintiffs have and recover damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, and compensatory damages; promotion/transfer; injunctive relief to deter similar misconduct in the future; back pay; front pay; fringe benefits; damages for emotional distress; pre- and post-judgment interest; reasonable attorney's fees; and the costs of this action, pursuant to 42 U.S.C. § 1988;

3.      Pursuant to Count III (42 U.S.C. §1983 – Race, Color, and Gender Discrimination, Failure to Promote/Transfer, and Retaliation, Due Process, Equal Protection, and First Amendment Retaliation against the City), that Plaintiffs have and recover damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, and compensatory damages; promotion/transfer; injunctive relief to deter similar misconduct in the future; back pay; front pay; fringe benefits; damages for emotional distress; pre- and post-judgment interest; reasonable attorney's fees; and the costs of this action, pursuant to 42 U.S.C. § 1988;

4.      Pursuant to Count IV (The City's Violations of Article I, Sections 1, 14, and 19 of the North Carolina State Constitution), that Plaintiffs have and recover damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, and compensatory damages; promotion; injunctive relief to deter

similar misconduct in the future; back pay; front pay; damages for emotional distress; pre- and post-judgment interest; and the costs of this action;

5.      That this matter be tried by a jury;

6.      That Plaintiffs be granted an injunction prohibiting unlawful employment practices in violation of Title VII, 42 U.S.C. § 1981, 42 U.S.C. § 1983, and Article I Sections 1, 14, and 19 of the North Carolina Constitution;

7.      That the Court declare the actions against Plaintiffs by the City were in violation of Plaintiffs' federal and/or state rights;

8.      That the Court order that Plaintiffs be promoted to Battalion Chief as of the date they should have been promoted;

9.      That the Court issue a declaratory judgment that the City's conduct as complained of herein violated Plaintiffs' rights under applicable law;

10.     That the Court issue an injunction prohibiting the City from discriminating on the basis of race, color, and gender in their recruitment and promotional processes and order the City to establish effective preventative measures;

11.     That the Court grant such other and further relief as this Court may deem just, proper, and equitable.

//

Respectfully submitted, this the 4th day of May, 2020.

**MALONEY LAW & ASSOCIATES, PLLC**

/s/ Margaret B. Maloney
Margaret Behringer Maloney, N.C. Bar 13253
Jennifer Diane Spyker, N.C. Bar 46048
1824 E. Seventh Street
Charlotte, NC 28201
mmaloney@maloneylegal.com
jspyker@maloneylegal.com
Telephone: 704-632-1622
Facsimile: 704-632-1623
*Attorneys for Plaintiff*