# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:18-cv-00612-RJC-SCR

| | |
|---|---|
| SYLIVIA SMITH-PHIFER and LANCE PATTERSON, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| CITY OF CHARLOTTE, | ) ) |
| Defendants. | ) ) ) |

**THIS MATTER** comes before the Court on Plaintiff Smith-Phifer's Motion for Enforcement of Settlement Agreement (Doc. No. 333) and Plaintiff Patterson's Motion for Enforcement of Settlement Agreement (Doc. No. 329). For the reasons stated herein, the Court will grant both Motions.

## I. BACKGROUND

This matter consists of four separate actions filed by five plaintiffs asserting, among other things, race and gender discrimination in the Charlotte Fire Department. The Court consolidated the actions for purposes of discovery. Joint-Plaintiffs Smith-Phifer and Patterson's jury trial was scheduled to begin on November 7, 2022. On the Friday before trial, both Plaintiffs filed a motion to continue the trial due to Plaintiff Patterson's medical issue. The Court granted the motion to continue as to Patterson and denied the motion to continue as to Plaintiff Smith-Phifer.

Plaintiff Smith-Phifer's jury trial began on November 7, 2022. During Plaintiff Smith-Phifer's case-in-chief, after a week of trial before a jury, the Parties informed the Court that they had reached a settlement. After acknowledging the significant time and energy the jury spent on the trial, and based entirely on the Parties' representation to the Court that they had a settlement

agreement, the Court dismissed the jury and discontinued the trial. The Court ordered Smith-Phifer to file a stipulation of dismissal "when she receives the payment pursuant to the parties' settlement agreement or within 30 days, whichever is sooner."

After continuing Plaintiff Patterson's trial due to his medical issues, Patterson's jury trial was scheduled to begin on November 28, 2022. On the Friday before trial, the Parties reported to the Court that they reached "settlement terms and are preparing a final settlement agreement to be fully executed." (Doc. No. 326). Again, based entirely on the Parties' representation that they had reached a settlement, the Court cancelled Patterson's jury trial.

Within weeks, the Parties began disputing the terms of both settlement agreements. Both Plaintiffs filed motions to enforce the settlement agreements. (Doc. Nos. 329, 333). The City opposes both motions. (Doc. Nos. 335, 338).

## II. DISCUSSION

"[D]istrict courts have inherent authority, deriving from their equity power, to enforce settlement agreements." *Hensley v. Alcon Laboratories, Inc.*, 277 F.3d 535, 540 (4th Cir. 2002). To enforce a settlement agreement, "a district court (1) must find that the parties reached a complete agreement and (2) must be able to determine its terms and conditions." *Id.* at 540-41. In doing so, courts apply standard contract principles. *Swift v. Frontier Airlines, Inc.*, 636 Fed. App'x 153, 154 (4th Cir. 2016). Under North Carolina law, the "essential elements of a valid, enforceable contract are offer, acceptance, and consideration." *Lewis v. Lester*, 760 S.E.2d 91, 92-93 (N.C. Ct. App. 2014). "In deciding whether a settlement agreement has been reached, [courts] looks to the objectively manifested intentions of the parties." *Sheppard v. Coleman*, No. 4:19-CV-86-D, 2021 WL 6332356, at *3 (E.D.N.C. Nov. 10, 2021). "[I]f there is a substantial factual dispute over either the agreement's existence or its terms, then the district court must hold an evidentiary

hearing." *Id.* at 156. "If, however, a settlement agreement exists and its terms and conditions can be determined, as long as the excuse for nonperformance is comparatively unsubstantial, the court may enforce the agreement summarily." *Id.*

"If a district court concludes that no settlement agreement was reached or that agreement was not reached on all the material terms, then it must deny enforcement." *Hensley*, 277 F.3d at 541. "Having second thoughts about the results of a valid settlement agreement does not justify setting aside an otherwise valid agreement, and the fact that the agreement is not in writing does not render it unenforceable." *Id.* at 540 (internal quotation marks, citations, and alternations omitted). "A settlement agreement may be enforceable notwithstanding the fact that it is not yet consummated." *Sheppard*, 2021 WL 6332356, at *2. It is within the district court's discretion to enforce a settlement agreement. *Swift*, 636 Fed. App'x at 155 ("We review a district court's findings of fact for clear error and its decision to enforce a settlement agreement for abuse of discretion.").

### A. Complete Agreement

First, the City and each Plaintiff reached complete agreements. As to Plaintiff Smith-Phifer, the Parties prepared and executed two related agreements containing all the terms of their settlement. (Doc. No. 334-1). The Parties performed, in part, under the terms of those settlement agreements. (Doc. Nos. 324, 334). The Parties also represented to the Court in open court and in written filings that they had reached a complete agreement. Under these facts, there is no question that Smith-Phifer and the City reached a complete, binding settlement agreement including offer, acceptance, consideration, and even part performance.

Similarly, as to Plaintiff Patterson, the email correspondence makes clear that the Parties reached a complete agreement. (Doc. No. 330-10). In these emails, a mediator assisting the Parties

stated, "I believe we have an agreement to settle Patterson v[.] City of Charlotte" and set forth the terms of that settlement, including consideration on the part of both Parties including lump sum payments and sick leave from the City and resolution of the lawsuit from Patterson. (*Id.*). The mediator asked both Parties to confirm they agreed by email. (*Id.*). The City's counsel first confirmed the City's acceptance by email but provided additional terms, specifically that Patterson must retire and that the terms of the settlement would otherwise be the same or very similar to those already contained in Plaintiff Smith-Phifer's executed settlement agreement. (*Id.*). Next, Patterson's counsel accepted the counteroffered terms. (*Id.*). Thereafter, the Parties represented to the Court, in a joint status report signed by each Parties' counsel, that they "agreed to settlement terms and are preparing a final settlement agreement to be fully executed." (Doc. No. 326). The email correspondence and status report demonstrate a complete, binding agreement with offer, acceptance, consideration, and all material terms. *Sheppard v. Coleman*, 2021 WL 6332356, at *3 (finding the parties reached a complete settlement agreement where they represented to the court that they reached a complete settlement agreement).

### B. Terms and Conditions

Next, the Court is able to determine the terms and conditions of the complete agreements.

#### 1. Pension Eligible Compensation

The Parties largely dispute whether the lump sum payment that the City agreed to pay each Plaintiff after normal deductions and reportable on W-2 forms is pension eligible compensation. Specifically, the City and Smith-Phifer agreed initially that the City would pay one check in the amount of $50,000, "which is not payment for wages, and as a result, will not be subject to normal withholdings and deductions, and will be reported on an IRS Form 1099 to Smith-Phifer and [her counsel]." (Doc. No. 334-1 at 2). Smith-Phifer was permitted to return to one final day of work,

following which she executed a Supplemental Settlement and Release Agreement under which the City agreed to pay: (1) one check to Smith-Phifer's counsel in the amount of $176,829.94, "which is not payment for wages, and as a result, will not be subject to normal withholdings and deduction, and will be reported on an IRS Form 1099 to Smith-Phifer and [her counsel];" and (2) one check payable to Smith-Phifer in the amount of $73,170.06, "minus all applicable deductions for which the City of Charlotte will issue Smith-Phifer a tax form W-2." (*Id.*). Plaintiff Patterson and the City similarly agreed by email that the City would pay $101,000 to his counsel and $79,000 to Patterson "through payroll," and, as noted, under the same or very similar terms as Smith-Phifer's settlement agreement. (Doc. No. 330-10).

The City argues that although it agreed to pay Plaintiffs each a lump sum with normal deductions and reportable on W-2 forms, such settlement funds are not pension eligible compensation because they are not for services performed as an employee of the Charlotte Fire Department as required by the Charlotte Firemen's Retirement System Act (the "Act"). On the other hand, Plaintiffs argue these funds are wages that qualify as pension eligible compensation. The Court agrees with Plaintiffs that the terms of the settlement agreement contemplated both a non-wages and wages portion of the settlement funds and the agreed wages are pension eligible compensation under the Act.

The Smith-Phifer settlement agreement provided for payment of certain lump sum payments described as not for wages, and in the same section provided a lump sum payment[1]

---

[1] The City urges the Court to construe separately the two agreements between the City and Smith-Phifer. Specifically, the City and Smith-Phifer agreed initially that the City would pay one check in the amount of $50,000, after which Smith-Phifer was permitted to return to one final day of work, following which she executed a Supplemental Settlement and Release Agreement contemplated in the first agreement, under which the City agreed to pay two lump sum payments, including one lump sum payment for wages as discussed herein. The Court disagrees with the City's characterization and finds that the initial agreement and supplemental agreement are part of

"minus all applicable deductions for which the City of Charlotte will issue Smith-Phifer a tax form W-2." (Doc. No. 334-1 at 2, 9). Importantly, unlike the first two agreed payments, this third lump sum payment did not include any qualifying language that it was not for wages. Read together, the plain meaning of these provisions is that the City and Smith-Phifer agreed to both a non-wages and wages portion of the settlement funds. Specifically, the City and Smith-Phifer agreed that the third lump sum payment in the amount of $73,170.06 was wages and the remaining lump sum payments were non-wages. To interpret the agreement any other way would render meaningless the qualifier that certain lump sum payments were "not payment for wages" and were not subject to normal deductions. For the same reasons, the City and Patterson agreed to a wages and non-wages portion of settlement funds because the City agreed to pay him two lump sum payments, including one lump sum payment "through payroll" under the same or very similar terms as Smith-Phifer's settlement agreement.

> According to *Black's Law Dictionary*, "wage" is defined as:
>
> Payment for labor or services, usu. based on time worked or quantity produced; specif., compensation of an employee based on time worked or output of production. • Wages include every form of remuneration payable for a given period to an individual for personal services, including salaries, commissions, vacation pay, bonuses, and the reasonable value of board, lodging, payments in kind, tips, and any similar advantage received from the employer. An employer usu. must withhold income taxes from wages.

*Wage*, Black's Law Dictionary (11th ed. 2019). While the parties dispute which version of the Act applies in this case, under either version, the Act defines compensation as:

---

a single settlement of Smith-Phifer's lawsuit and must be construed together. *See Queen City Pastry, LLC v. Bakery Technology Enterprises, LLC*, No. 5:14–CV–143, 2015 WL 3932722, at *3 (W.D.N.C. June, 26, 2015) ("Federal and North Carolina case law states that in the absence of anything to indicate a contrary intention, instruments indicated at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together as one contract or instrument, even though they do not in terms refer to each other." (internal quotations omitted)).

> renumeration reportable on a Form W-2 earned by a Member for services performed as an employee of the Charlotte Fire Department . . . . Compensation shall include payments for unused sick and vacation days, longevity payments, bonus payments and merit increases.

(Doc. No. 334-3 at 2; Doc. No. 335-5 at 2). In considering these definitions together, wages fall under the definition of compensation under the Act. Wages are "remuneration . . . for services performed" as an employee of the Charlotte Fire Department. (Id.). And the parties agreed that such wages were to be reported on a Form W-2. Thus, the City agreed to pay Smith-Phifer and Patterson a portion of the settlement funds as wages constituting pension eligible compensation under the Act.

This interpretation is bolstered by the Supreme Court's similar interpretation in *United States v. Quality Stores, Inc.*, 572 U.S. 141 (2014). In *Quality Stores*, the Supreme Court was tasked with interpreting the Federal Insurance Contributions Act ("FICA"). In so doing, the court concluded that severance payments are "wages" under FICA. The court explained that FICA defines wages broadly in include "'all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash.' The term 'employment' encompasses 'any service, of whatever nature, performed . . . by an employee for the person employing him.'" *Id.* at 146 (quoting 26 U.S.C. § 3121). Under this definition, "as a matter of plain meaning, severance payments made to terminated employees are 'remuneration for employment.'" *Id.* It reasoned that

> [s]everance payments are, of course, "remuneration," and common sense dictates that employees receive the payments "for employment." Severance payments are made to employees only. It would be contrary to common usage to describe as a severance payment remuneration provided to someone who has not worked for the employer. Severance payments are made in consideration for employment—for a "service . . . performed" by "an employee for the person employing him," per FICA's definition of the term "employment."

*Id.* Just as severance payments are wages under FICA, the wages the City agreed to pay the Plaintiffs are "compensation" under the Act.

To the extent the City argues the wages it agreed to pay each Plaintiff are not compensation under the Act because they are not remuneration for services performed as an employee of the Charlotte Fire Department, *Quality Stores* guides the Court otherwise. The settlement agreements were reached with employees of the Fire Department arising out of their employment with, and the services Plaintiffs provided to, the Fire Department. In fact, when performing under Smith-Phifer's agreement, the City characterized the settlement funds as "Severance Pay." (Doc. No. 334-2).

Accordingly, the complete agreements include terms requiring the City to pay Smith-Phifer pension eligible wages in the amount of $73,170.06 and Patterson pension-eligible wages in the amount of $79,000.

2. Sick Leave

The Parties also appear to dispute the amount of sick leave the City agreed to pay Patterson. Specifically, in addition to the lump sum payments, the City agreed, "Patterson is provided 2200 hours sick leave to bridge him to 25 years for retirement." (Doc. No. 330-1). Patterson argues the City agreed to pay him 2,200 hours of sick leave. On the other hand, the City argues it agreed to pay Patterson the amount of sick leave only needed to bridge him to 25 years for retirement, which number would change based on Patterson's actual date of retirement. (Doc. Nos. 330-3 & 330-5).

Here, the language of the agreement is plain – the City agreed to provide 2,200 hours of sick leave to Patterson. While the City attempts to argue that its intent was only to provide the specific number of hours to get Patterson to 25 years of service, the agreement did not state this.

The agreement stated that the City agreed to provide Patterson with 2,200 hours of sick leave. The agreement did not qualify that this amount was subject to change based on the amount of sick leave actually needed to bridge Patterson to 25 years nor did the agreement otherwise state that the City would only provide Patterson the specific amount of sick leave hours needed to bridge him to 25 years of service. If the Parties agreed only that Patterson would receive the number of hours needed to bridge him to 25 years of service, then there was no need to put any specific number in the agreement. But instead the City agreed to provide 2,200 hours, the purpose of which was to bridge him to 25 years of service. Accordingly, the complete agreement requires the City to provide Patterson with 2,200 hours of sick leave.

The Parties do not raise any dispute with the remaining terms of the settlement agreements. In sum, the Parties reached complete agreements and the Court is able to determine and enforce the terms of both of those agreements. For these reasons, the Court will grant Plaintiffs' motions to enforce their settlement agreements as discussed herein.

### III. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. Plaintiff Smith-Phifer's Motion for Enforcement of Settlement Agreement (Doc. No. 333) is **GRANTED** as set forth herein; and

2. Plaintiff Patterson's Motion for Enforcement of Settlement Agreement (Doc. No. 329) is **GRANTED** as set forth herein;

3. The City of Charlotte shall comply with the terms of the settlement agreements as set forth herein within sixty (60) days of this Order.

The Clerk of Court is directed to close this case.

**SO ORDERED**.

Signed: August 30, 2023

Robert J. Conrad, Jr.
United States District Judge