UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:18-cv-00612-TMR-SCR

LANCE PATTERSON,

     Plaintiff,

v.

CITY OF CHARLOTTE,

     Defendant.

**OPINION & ORDER**

Dated: July 23, 2025

Edward T. Hinson, Jr. and Haley M. Lohr, James, McElroy & Diehl, P.A., of
Charlotte, N.C., for plaintiff Lance Patterson.

Tory Ian Summey and Jeremy D. Locklear, Parker Poe Adams & Bernstein LLP, of
Charlotte, N.C., for defendant City of Charlotte.

TIMOTHY M. REIF, Judge, United States Court of International Trade, Sitting by
Designation:

     Before the court is the motion for enforcement of settlement agreement of

plaintiff Lance Patterson ("plaintiff").  Pl.'s Mot. for Enforcement of Settlement

Agreement, ECF No. 329.  Plaintiff's motion returns to the court after the U.S.

Court of Appeals for the Fourth Circuit ("Fourth Circuit") (1) vacated this court's

prior order granting plaintiff's motion and (2) remanded for this court to hold an

evidentiary hearing before ruling on plaintiff's motion.  *Smith-Phifer v. City of*

*Charlotte*, 118 F.4th 598, 620-21 (4th Cir. 2024).  On June 10, 2025, the court heard

parties' presentations and witness testimony as directed by the Fourth Circuit. Evidentiary Hearing Tr. ("Hearing Tr."), ECF No. 359.  Defendant City of Charlotte ("defendant" or the "City") opposes plaintiff's motion and contends that no settlement was reached between the parties.  Def.'s Resp. Opp'n Pl.'s Mot. for Enforcement at 11-12, ECF No. 335.

For the reasons that follow, the court denies plaintiff's motion.

## BACKGROUND

### I.   Initial proceedings and trial

This action began with a complaint filed by plaintiff and his co-plaintiff, Sylvia Smith-Phifer, both career captains with over 20 years of service in the Charlotte Fire Department ("CFD").  Am. Compl. ¶ 1, ECF No. 25.[1]  Plaintiff, a Black man, and Smith-Phifer, a Black woman, alleged that defendant engaged in racially discriminatory employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. §§ 1981, 1983, and Article I, Sections 1, 14 and 19 of the North Carolina Constitution. Am. Compl. ¶¶ 1-4.  Plaintiff and Smith-Phifer alleged specifically that CFD, inter alia, "maintained an employment system that intentionally discriminates and imposes discriminatory treatment and retaliation upon Black/African Americans and women," and that plaintiff and Smith-Phifer "were not selected for various special assignments, promotions, training, and development opportunities because

---

[1] On December 17, 2018, plaintiff and Smith-Phifer filed their complaint initially in state court, and on January 18, 2019, defendant removed the action to this Court. Am. Compl. ¶¶ 16-17.

of race, color, gender, as well as their protected activities." Am. Compl. ¶¶ 278-386.
On October 9, 2019, the court granted defendant's motion to consolidate for
purposes of discovery plaintiff's and Smith-Phifer's action with three separate
actions against the City filed by different plaintiffs arising out of their employment
with the CFD. Order Granting Consolidation, ECF No. 18.

A combined jury trial for both plaintiff and Smith-Phifer was scheduled to
begin on November 7, 2022. *See* Pls.' Mot. for Continuance, ECF No. 287. However,
on November 6, 2022, the court granted plaintiff's motion to continue due to a
medical issue. *See id.* On November 7, 2022, Smith-Phifer's jury trial commenced,
and the court scheduled plaintiff's jury trial to begin on November 28, 2022.

## II.   Settlement talks and impasse

On November 15, 2022, after a week of trial before a jury in the Smith-Phifer
matter, Smith-Phifer and defendant notified the court that the matter had been
resolved. Hearing Tr. at 33:24-34:8. Also on that day, Smith-Phifer signed the
"General Release and Settlement Agreement," the first of two written settlement
agreements between Smith-Phifer and defendant. Pls.' Mem. Supp. Smith-Phifer's
Mot. for Enforcement of Settlement Agreement ("Pls. Mem. Supp. Smith-Phifer's
Mot. Enforcement"), Ex. A at 7, ECF No. 334-1. Subsequently, on November 19,
2022, Smith-Phifer signed the "Supplemental Release and Settlement Agreement."
*Id.,* Ex. A at 14. Then, on November 21, 2022, defendant signed both agreements.

*Id.,* Ex. A at 7, 14. The court thereafter dismissed the jury and discontinued the trial.[2] Hearing Tr. at 149:3-7.

The prospect of settlement in the Smith-Phifer matter prompted parties in the Patterson matter to explore settlement. *Id.* at 100:1-17, 128:1-21. To that end, parties employed a mediator to assist in reaching an agreement. *Id.* Those conversations, with Melissa Hall, Margaret Maloney[3] and the mediator on the one end, and Kathleen Lucchesi[4] and the mediator on the other, culminated in an email the evening of November 23, 2022, at 9:38 pm, from the mediator to the parties. *Id.* at 56:9-16. That email stated:

> I believe we have an agreement to settle Patterson v[.] City of Charlotte as follows: $180,000, of which $79,000 is paid to Patterson through payroll and $101,000 is paid to Maloney Law. Patterson is provided 2200 hours sick leave to bridge him to 25 years for retirement. Please reply-all to confirm this agreement.

Pl.'s Mem. Supp. Pl.'s Mot. Enforcement, Ex. A, ECF No. 330-1.

That night, Lucchesi responded. *Id.,* Ex. J., ECF No. 330-10. Lucchesi first thanked the mediator and plaintiff's counsel "for [their] hard work on this." *Id.* Lucchesi then added a request that parties add to the agreement an additional

---

[2] Witnesses testified at the evidentiary hearing that the Smith-Phifer agreements were "drafted, exchanged, and signed," with "the jury still assembled" because "the judge expressed that he didn't want to release the jury until he felt certain there was an agreement." Hearing Tr. at 97:15-25, 149:3-7.

[3] Maloney represented plaintiff in the litigation and in the settlement talks, and Hall worked as a paralegal with Maloney's law firm, Maloney Law, and participated in settlement talks on plaintiff's behalf. Hearing Tr. at 33:7, 101:10-18.

[4] Lucchesi was outside counsel for the City and represented the City in litigation and settlement talks. Hearing Tr. at 121:22-123:14, 127:24-128:21.

term: that plaintiff "agree to submit notice of his retirement immediately upon his execution of the settlement agreement." *Id.* Lucchesi stated that she would put the terms "in the same (or very similar given the differing terms) agreement [the parties] used for [Smith-Phifer]" and return the agreement to plaintiff "in the next day or so . . . if [she] can get approval from the City over the holiday." *Id.* Hall then followed up, stating that she would "look for [Lucchesi's] email" and that parties should "file a notice to the court." *Id.* Then, minutes later, Hall sent a second email, stating that plaintiff "want[ed] the 522 hours sick leave paid out to him" and requesting that "[t]he remaining balance will go to bridge him to 25 years [for retirement]." Def. Resp. Opp'n Pl. Mot. Enforcement, Ex. A at 1, ECF No. 335-1. Lucchesi responded that she would forward plaintiff's request to the City's attorney and human resources director for confirmation. *Id.*

On November 25, 2022, the day after Thanksgiving and the Friday before plaintiff's jury trial was scheduled to begin, plaintiff and defendant notified the court that they had "agreed to settlement terms and are preparing a final settlement agreement to be fully executed." Amended Status Report, ECF No. 326. The court then canceled plaintiff's scheduled jury trial.

Also on that day, Mitchell Davis, an attorney from Maloney Law, emailed Lucchesi asking that Lucchesi inform plaintiff "when [Lucchesi] will be able to send [plaintiff] a draft of the settlement agreement." Pl. Mem. Supp. Pl. Mot. Enforcement, Ex. C, ECF No. 330-3.

Lucchesi responded to plaintiff's team the following Monday, stating that defendant was "reviewing the draft settlement" and that she would "send it over" as soon as defendant approved the agreement.  *Id.*

On November 29, plaintiff visited the office of the Charlotte Firefighters' Retirement System, which manages Charlotte firefighters' retirement benefits.  Def. Resp. Opp'n Pl. Mot. Enforcement, Ex. B ¶ 4, ECF No. 335-2.  There, plaintiff asked the administrator of the Retirement System for an estimate of his retirement benefits considering that "he would be receiving an additional $79,000 in pension-eligible compensation."  *Id.* ¶ 5.  However, the administrator did not confirm with the City or the City Attorney's Office plaintiff's representation that the $79,000 payment would be pension-eligible.  *Id.* ¶ 6.  Instead, the administrator calculated plaintiff's estimated monthly benefit based on plaintiff's representation that the additional $79,000 was pension-eligible compensation.  *Id.* ¶¶ 7-8.  The administrator explained to plaintiff that her calculation was "purely an estimate" and that plaintiff's "final benefit would be determined using actual data received from the City."  *Id.* ¶ 5.

On Wednesday, November 30, Lucchesi emailed counsel for plaintiff and attached a draft settlement agreement.  Def. Resp. Opp'n Pl. Mot. Enforcement, Ex. D at 12, ECF No. 335-4; Pl. Mem. Supp. Pl. Mot. Enforcement, Ex. B, ECF No. 330-2.  At this point, parties reached an impasse.  Def. Resp. Opp'n Pl. Mot. Enforcement, Ex. D at 1-11.  In the email, Lucchesi noted that the draft settlement provided that defendant would "frontload" plaintiff with 1,375 hours of sick leave —

not the 2,200 hours referenced in the mediator's email — because plaintiff "has continued to work during this time and his estimated retirement is nearly 2 months later." *Id.* at 12. Lucchesi explained that plaintiff did not "require as many frontloaded sick leave hours to reach 25 years of service" as he needed when the initial settlement agreement was drafted. *Id.* However, Lucchesi also acknowledged that plaintiff's $79,000 payment would be pension-eligible: "[B]ecause the City will pay [plaintiff] $79,000 in wages as part of this settlement, his retirement benefit will increase beyond what the frontloaded sick leave provides – going from about $7100 per month to nearly $9300 per month."[5] *Id.*

The following day, Hall responded: "The City can't lower its offer after the fact. Patterson agreed to 2,200 hours and the City needs to provide that to him per the previous Agreement. 2,200 hours is included in [the mediator's] email. Please revise the Agreement based on the terms previously agreed to." *Id.* at 11.

From there, correspondence between the parties deteriorated further. On Friday, December 2, a Senior Assistant City Attorney sent an email to counsel for plaintiff maintaining that (1) defendant "is prepared to provide [plaintiff] the number of hours needed to bridge him to 25 years of service, as was always the expressed intent"; and (2) contrary to Ms. Lucchesi's email of November 30, the

---

[5] Ms. Lucchesi later stated that she expressed in her email that the $79,000 payment would be pension-eligible because the Retirement System administrator "provided [her] with those calculations based on [plaintiff's request" and that Ms. Lucchesi "learned after [her] email [that the calculations] were based on [plaintiff's]" representations to the administrator that the $79,000 payment would be pension-eligible. Def. Resp. Opp'n Pl. Mot. Enforcement, Ex. D at 2-3.

$79,000 payment to plaintiff "is not pensionable" so that "with the 1375 sick hours, [plaintiff's] retirement benefit [would] be $7100 per month." *Id.* at 9-10.  Parties engaged in further back-and-forth via email, to no avail.  *Id.* at 1-9.

On December 7, 2022, plaintiff filed his motion for enforcement of settlement agreement, in which plaintiff asserted that parties "reached an agreement to settle the case" based on specific terms but that "Defendant, having second thoughts about the level of Plaintiff's recovery, sought to reduce the amount of the benefit to Plaintiff of the settlement."  Pl. Mem. Supp. Pl. Mot. Enforcement, ECF No. 330. Plaintiff requested that the court enforce the terms of the settlement agreement as outlined by plaintiff.  *Id.* at 2.

Then, on December 20, 2022, Smith-Phifer filed her motion for enforcement of settlement agreement, alleging that defendant attempted to withdraw from the settlement agreement after "having second thoughts about the level of [Smith-Phifer's] recovery."  Pls. Mem. Supp. Smith-Phifer's Mot. Enforcement at 3, ECF No. 334.

On August 30, 2023, this Court issued an order granting the motions of both plaintiff and Smith-Phifer, concluding that (1) "the City and each Plaintiff reached complete agreements," and (2) the Court was "able to determine the terms and conditions of the complete agreements."  *Smith-Phifer v. City of Charlotte*, No. 3:18-cv-00612-RJC-SCR, 2023 WL 5620752, at *2 (W.D.N.C. Aug. 30, 2023).  The Court directed defendant to "comply with the terms of the settlement agreements" within 60 days of the order.  *Id.* at *5.

III.   **Fourth Circuit decision**

Defendant appealed this Court's order, and on September 25, 2024, the

Fourth Circuit vacated in part and affirmed in part.  *Smith-Phifer*, 118 F.4th at

603.  With respect to Smith-Phifer, the Fourth Circuit affirmed, holding that "the

parties did reach a valid written settlement agreement," and that defendant

"breached the agreement" by failing to provide "a retirement deduction" required by

the agreement's terms.  *Id.* at 603, 620.

But as to plaintiff, the Fourth Circuit held that there was an issue of whether

a final agreement was reached, stating:

> [T]he City and Patterson dispute whether a final agreement was
> reached.  And that factual question turns on other facts that are far from
> clear based on the evidence the parties presented.  It was thus "error for
> the district court to attempt to resolve th[e] question based solely on
> affidavits and briefs."  Instead, the district court needed to hold a
> hearing.

*Id.* at 612-13 (internal citations omitted).

The Fourth Circuit elaborated on the nature of the "ample material factual

issues unresolvable on the evidence presented in the parties' briefing":

> For example, did the terms communicated by the mediator constitute a
> binding contract?  Or instead did one or both parties understand that
> there would be no enforceable agreement until one was reduced to a final
> writing and executed?  The evidence is unclear.  On one hand, the
> mediator's email doesn't say anything about a written agreement.  On
> the other hand, the parties' later communications to each other and to
> the district court show they were at least intending to reduce the
> agreement to writing, and the draft agreement the parties exchanged
> contained a term stating that the City wouldn't be obligated to perform
> unless the written agreement was executed.  These pieces of evidence
> leave an unresolved factual question:  whether, during their
> negotiations with the mediator, either party demonstrated an intention
> to be bound only by a written agreement.  And if either party *did*, that
> fact has the legal consequence that there was no contract.

*Id.* at 612.

The Fourth Circuit then noted that "even if the parties reached agreement about *some* terms, there remains a factual dispute about whether the parties ever agreed on the sick-leave-hours term." *Id.* And, "[w]ithout mutual assent about this term, the parties had no contract." *Id.* (citing *Restatement (Second) of Contracts* § 17 (A.L.I. 1981)).

The Fourth Circuit specified that "[b]ecause the parties disagreed about whether an agreement existed or what its terms were, and because the relevant evidence was 'ambiguous,' 'the district court was required to hold a plenary evidentiary hearing' '[t]o resolve these factual questions.'" *Id.* at 611 (alteration in original) (quoting *Hensley v. Alcon Laboratories, Inc.*, 277 F.3d 535, 541-42 (4th Cir. 2002)). Accordingly, the Fourth Circuit vacated and remanded for further proceedings this Court's order granting plaintiff's motion for enforcement.[6] *Id.* at 621.

---

[6] The Fourth Circuit contrasted the signed and fully executed agreements in the Smith-Phifer matter with the unsigned draft settlement agreement in the Patterson matter. With respect to Smith-Phifer, not only did both parties sign the "General Release and Settlement Agreement" and the "Supplemental Release and Settlement Agreement," but parties also "began performance." *Smith-Phifer v. City of Charlotte*, 118 F.4th 598, 604 (4th Cir. 2024). Specifically, the Fourth Circuit noted that defendant "issued Smith-Phifer a check for $26,768.68." *Id.* at 605. By contrast, for the instant plaintiff, "parties . . . reached an impasse when they tried to put the tentative agreement into writing, so nothing was ever signed." *Id.* at 611.

## IV.   Evidentiary hearing

On June 10, 2025, the court held an evidentiary hearing on plaintiff's motion. Hearing Tr. at 1.  At the hearing, six witnesses testified regarding the circumstances surrounding the email exchange of November 23, the filing of the status report of November 25, the cancellation of plaintiff's jury trial and the subsequent deadlock between the parties.  *Id.* at 6:15-198:13.  Four witnesses testified on behalf of plaintiff: (1) plaintiff Lance Patterson; (2) Melissa Hall, a paralegal with Maloney Law at the time of the events underlying the instant motion and who participated in negotiations on plaintiff's behalf; (3) Mitchell Davis, a former lawyer with Maloney Law who did not participate directly in settlement negotiations; and (4) Margaret Maloney of Maloney Law, who represented plaintiff during the litigation and participated in settlement negotiations on plaintiff's behalf.  Hearing Tr. at 6:15-120:6, 192:7-198:13.  Each of plaintiff's witnesses testified that they considered the email exchange of November 23, 2022, to be a final settlement between plaintiff and defendant.  *Id.* at 13:22-15:4, 22:15-21, 36:3-23, 63:18-64:10, 71:3-8, 88:3-89:20, 102:14-106:17.  Two witnesses testified on behalf of defendant: (1) Lucchesi, counsel for defendant; and (2) Sandra Thiry, administrator for the Charlotte Firefighters' Retirement System.  *Id.* at 121:22-190:22.  Lucchesi testified that parties contemplated that any final settlement would be subject to both approval by the City and a fully executed written agreement.  *Id.* at 129:10-19, 133:5-135:23.  Thiry's testimony concerned the

circumstances of plaintiff's visit to her office and plaintiff's request for an estimate of his post-retirement benefits.  *Id.* at 171:23-185:6.

On June 25, 2025, parties filed post-hearing briefing.  Pl.'s Post-Hearing Br. ("Pl. Br."), ECF No. 361; Def.'s Post-Hearing Br. ("Def. Br."), ECF No. 362.

## STANDARD OF REVIEW

District courts have inherent authority to enforce settlement agreements. *Hensley*, 277 F.3d at 540 (citing *Millner v. Norfolk & W. Ry. Co.*, 643 F.2d 1005, 1009 (4th Cir. 1981)).  However, the court may not enforce an agreement unless the court concludes (1) that parties reached a complete agreement and (2) that the court is able to determine the agreement's terms and conditions.  *Id.* at 540-41 (citing *Moore v. Beaufort County,* 936 F.2d 159, 162 (4th Cir. 1991); *Ozyagcilar v. Davis*, 701 F.2d 306, 308 (4th Cir. 1983)).

"[I]f there is a factual dispute over the existence of an agreement, over the authority of attorneys to enter into the agreement, or over the agreement's terms," the court "must conduct a plenary evidentiary hearing in order to resolve that dispute, and make findings on the issues in dispute."  *Smith-Phifer*, 118 F.4th at 610 (quoting *Hensley*, 277 F.3d at 541).

"If a district court concludes that no settlement agreement was reached or that agreement was not reached on all the material terms, then it must deny enforcement."  *Hensley*, 277 F.3d at 541.  In such a case, the matter is restored to the trial calendar and "parties [are] placed in precisely the same position vis-a-vis one another monetarily as they occupied before the alleged 'settlement.'"  *Wood v. Va. Hauling Co.*, 528 F.2d 423, 425 (4th Cir. 1975).

## DISCUSSION

### I. Whether parties reached a valid, enforceable agreement

#### A. Legal framework

"Federal common law governs enforcement of a settlement agreement brought before the Court as part of ongoing litigation involving a federal statutory scheme." *Ford v. Food Lion, LLC*, No. 3:11-cv-625-RJC-DCK, 2013 WL 1320416, at *1 (W.D.N.C. Mar. 29, 2013) (citing *Gamewell Mfg., Inc. v. HVAC Supply, Inc.*, 715 F.2d 112, 115 (4th Cir. 1983)).

"Motions to enforce settlement agreements draw upon standard contract principles." *Bradley v. Am. Household Inc.*, 378 F.3d 373, 380 (4th Cir. 2004). The formation of a contract requires offer, acceptance and consideration. *Kenesis Adver., Inc. v. Hill*, 652 S.E.2d 284, 292 (N.C. Ct. App. 2007). Moreover, "[i]t is essential to the formation of any contract that there be 'mutual assent of both parties to the terms of the agreement so as to establish a meeting of the minds.'" *Creech v. Melnik*, 495 S.E.2d 907, 911-12 (N.C. 1988) (quoting *Snyder v. Freeman*, 266 S.E.2d 593, 602 (N.C. 1980)). "[T]he Court will look to the objectively manifested intentions of the parties to determine whether such an agreement was reached." *Food Lion*, 2013 WL 1320416, at *1 (citing *Moore v. Beaufort Cnty., N.C.*, 936 F.2d 159, 162 (4th Cir. 1991)).

#### B. Analysis

The court addresses whether parties reached an enforceable settlement agreement.

Plaintiff argues that the parties:

reached a settlement agreement whereby the City agreed to provide Patterson with 2,200 hours of sick leave and a payment of $180,000 — of which 101,000.00 is paid to Maloney Law and $79,000.00 is paid to Patterson through payroll — in exchange for Patterson's retirement from the Charlotte Fire Department and dismissal of his lawsuit.

Pl. Br. at 1.

According to plaintiff, "mutual assent was established here when the Mediator emailed the terms of the settlement agreement to the Parties, the City confirmed acceptance of the terms and then added additional terms of retirement (making a counteroffer), and Patterson accepted those counteroffered terms." *Id.* at 6.

Defendant responds that no final agreement was reached. Def. Br. at 1. Defendant asserts that "settlement between the parties was conditioned on a final written agreement," a condition that defendant "unequivocally communicated" during settlement negotiations. *Id.* Defendant adds that "even if the parties did not intend to execute a final written agreement, there was no meeting of the minds on material terms." *Id.* According to defendant, parties did not reach an agreement with respect to "the amount of sick leave that Plaintiff would receive . . . or whether any amount of the settlement would be 'pension eligible' compensation." *Id.*

The court concludes for the following reasons and based on the evidence adduced at the evidentiary hearing that parties failed to reach a final, enforceable settlement agreement.

To start, the evidence submitted at the hearing established that settlement would be subject to the execution of a written agreement. In the Fourth Circuit's

remand order, the court's instructions were clear. The Fourth Circuit specified that a hearing was required to determine whether "one or both parties underst[ood] that there would be no enforceable agreement until one was reduced to a final writing and executed," because "if either party *did*, that fact has the legal consequence that there was no contract." *Smith-Phifer*, 118 F.4th at 612; *Restatement (Second) of Contracts* § 27 cmt. b (A.L.I. 1981) ("[I]f either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.").

Here, the email correspondence of November 23, 2022, reflected a preliminary agreement in principle, and a fully executed written agreement was a condition precedent to settlement. Pl. Mem. Supp. Pl. Mot. Enforcement, Ex. J. In the email correspondence, Lucchesi linked a material term expressly and incontrovertibly to the eventual execution of a written settlement agreement. Lucchesi stated: "The City would ask that Chief Patterson agree to submit notice of his retirement *immediately upon execution of the settlement agreement . . . .*" *Id.* Email correspondence that "expressly tied" a "material event[]" to the execution of a written agreement indicates that parties contemplated that they would be bound only after such an agreement. *See Intersections, Inc. v. Loomis*, No. 1:09cv597 (LMB/TCB), 2010 WL 4623877, at *3 (E.D. Va. Nov. 3, 2010) (holding that a tentative agreement was not binding on the parties where the parties contemplated

that a "signed, written settlement agreement" would be a "trigger" for important events).

In addition, parties' conduct and communications in the days surrounding the email exchange of November 23 suggest also that no agreement could be reached in the absence of a formal, written agreement. Plaintiff's counsel in this matter served as counsel also to the other plaintiffs with similar claims arising out of their service with the CFD, and each of those plaintiffs reached fully executed written settlement agreements with the City. Hearing Tr. at 54:7-55:7 (testimony of Melissa Hall). Indeed, counsel for Smith-Phifer reached a fully executed written agreement with the City just days prior to the email exchange of November 23. Pls. Mem. Supp. Smith-Phifer's Mot. Enforcement, Ex. A. And that written agreement emphasized repeatedly the importance of reducing any agreement to writing as the final manifestation of parties' intent to be bound. *Id.*, Ex. A at 3, 6. For example, the fully executed agreement stated that it "set[] forth the entire agreement between the Parties" and that there would be no consideration "except for [Smith-Phifer's] execution of this Agreement." *Id.*

Similarly, consistent with the executed agreement in the Smith-Phifer matter, the instant draft settlement circulated by Lucchesi to counsel in the days after the mediator's email included the term that parties would be bound by only that agreement, a further indication that defendant considered a written and fully

executed agreement a condition precedent to final settlement.[7]  Pl. Mem. Supp. Pl.

Mot. Enforcement, Ex. B at 4, 7; *see Innotec LLC v. Visiontech Sales, Inc.*, No.

3:17CV00007, 2018 WL 2293969, at \*5-6 (W.D. Va. May 18, 2018) (holding that

draft settlement agreement circulated days after alleged oral agreement was

"objective evidence" that executed written agreement was "condition precedent to

the existence or formation of a binding settlement agreement"); *see also Saza, Inc. v.*

*Zota*, No. 3:11-CV-363, 2012 WL 527370, at \*6 (E.D. Va. Feb. 16, 2012) ("If . . .

parties intend to be bound by the written agreement, then the execution of the

written agreement is a prerequisite to formation of a contract.").  Accordingly,

counsel for each of the parties was on notice of the importance of a written

settlement agreement as a condition precedent to settlement.

Moreover, the evidence adduced at the hearing established also that Lucchesi

expressed unambiguously to plaintiff's counsel that agreement was conditioned on

approval from Lucchesi's client, the City.  In her response to the mediator, Lucchesi

referenced for a second time a written agreement and stated:

> I will put these terms in the same (or very similar given the differing
> terms) agreement we used for Chief Phifer and send it over to you in the
> next day or so – no later than Friday *if I can get approval from the City*
> *over the holiday.*

Pl. Mem. Supp. Pl. Mot. Enforcement, Ex. J (emphasis supplied).  Hall

responded only minutes later and confirmed that she would "look for [Lucchesi's]

---

[7] Of course, a later circulated draft agreement cannot unwind a previously reached
and fully enforceable oral or written agreement.  The court mentions the draft
settlement agreement in this matter for its consistency with parties' email
communications and broader course of dealing.

email" and suggested that the parties "file a notice to the court on Friday." *Id.* But 20 minutes later, Hall sent another email that detailed plaintiff's position that "522 hours sick leave" of the 2,200 hours referenced in the mediator's email would be "paid out to him," with the remainder used to "bridge him to 25 years." Def. Resp. Opp'n Pl. Mot. Enforcement, Ex. A at 1. Lucchesi responded and once again mentioned approval from her client, this time referencing the City's in-house counsel and director of human resources. *Id.* Lucchesi stated that she would "send this to Mindy Sanchez and Sheila Simpson *for confirmation*." *Id.* (emphasis supplied). Lucchesi's repeated reference to approval from the City as a condition precedent to final agreement is objective evidence that the parties did not reach an enforceable agreement on November 23, 2022.[8]

Witness testimony confirmed that parties did not reach an enforceable agreement on November 23, 2022. At the evidentiary hearing, Lucchesi testified that she "reiterated" to the mediator that the terms of any settlement agreement would be "subject to the city council approval." Hearing Tr. at 129:14-15. Lucchesi

---

[8] At the hearing, plaintiff's counsel emphasized that the final stages of the Smith-Phifer agreement were negotiated and executed in court, with no ostensible communication to or approval from the City prior to parties signing the agreement. Hearing Tr. at 147:8-150:25. According to plaintiff, this is an indication that Lucchesi had authority to bind the City to settlement also with Patterson. Pl. Br. at 11-13. The court does not consider this comparison persuasive. Namely, the final, executed written instrument with Smith-Phifer contains no term that settlement was contingent on further approval from the City. Pls. Mem. Supp. Smith-Phifer's Mot. Enforcement, Ex. A. By contrast, the emails on which plaintiff relies to establish an enforceable agreement between Patterson and the City establish that Lucchesi communicated expressly to plaintiff's counsel that the terms discussed in the emails would require approval by the City. Pl. Mem. Supp. Pl. Mot. Enforcement, Ex. J.

described that after she and plaintiff "agree[d] in principle," the "next step would have been to get approval from city council," after which the terms of the agreement would be reduced to a fully executed written agreement. *Id.* at 133:5-18, 134:19-23, 135:4-23.

Finally, witness testimony revealed also that the emails on which plaintiff relies did not include all material terms. As Lucchesi testified at the hearing, defendant considered crucial to any final settlement that defendant be released from future liability against plaintiff. Hearing Tr. at 133:19-134:5, 143:1-3. The executed settlement agreement in the Smith-Phifer matter and the draft settlement agreement circulated between Patterson and the City substantiate Lucchesi's testimony, as the documents contain extensive release provisions. Pls. Mem. Supp. Smith-Phifer's Mot. Enforcement, Ex. A at 3-4, 10-11; Pl. Mem. Supp. Pl. Mot. Enforcement, Ex. B at 4-5; *Innotec*, 2018 WL 2293969, at *7 (stating that alleged oral agreement lacked essential terms, including "extensive release provisions," that the draft written settlement agreement indicated were material to any final settlement). Accordingly, the court considers the emails of November 23 merely a preliminary agreement as to some, but not all, material terms.

Plaintiff maintains that the amended status report that parties filed with the court on Friday, November 25, establishes parties' mutual assent to be bound by the terms communicated by the mediator in the email of November 23. Pl. Br. at 8. That amended status report read as follows:

> The parties report that they have agreed to settlement terms and are preparing a final settlement agreement to be fully executed.

Amended Status Report.

Plaintiff's position is not persuasive.  The one sentence filing of November 25 cannot make an agreement out of the email correspondence of November 23, where a party communicated expressly that settlement was contingent on the occurrence of two conditions precedent — conditions that were not satisfied.

In sum, the court concludes that parties failed to reach a final, enforceable settlement agreement.

CONCLUSION

For the reasons set out above, the court denies plaintiff's motion.  The court directs the clerk of court to amend the caption in this matter to *Patterson v. City of Charlotte*.  It is hereby

**ORDERED** that this action is to be returned to the Court's trial calendar; and it is further

**ORDERED** that trial in this matter is set to begin on December 9, 2025.

**SO ORDERED.**

Dated: July 23, 2025                      /s/ Timothy M. Reif
New York, New York                     United States Court of International Trade
                                       *Sitting by Designation*
                                       United States District Court for the
                                       Western District of North Carolina